UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED MINE WORKERS OF AMERICA,    )
  INTERNATIONAL UNION              )
  8315 Lee Highway                 )
  Fairfax, VA 22031,               )
                                   )
          Plaintiff,               )
                                   )
          v.                       )  Civil No. 06-1053 JDB
                                   )
DAVID DYE,                         )
  Acting Assistant Secretary,      )
  Mine Safety and Health Admin.    )
  U.S. Department of Labor         )
                                   )
  Washington, D.C.                 )
                                   )
          Defendant.               )
_____      )

## DEFENDANT'S MOTION TO DISMISS

Defendant David Dye, Acting Assistant Secretary, Mine Safety and Health Administration, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), moves to dismiss the Complaint for lack of jurisdiction and failure to state a claim. In support of this motion, the Court is respectfully referred to the accompanying memorandum of points and authorities. A proposed Order

consistent with this motion is attached.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____
MARINA UTGOFF BRASWELL, DC BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED MINE WORKERS OF AMERICA,    )
  INTERNATIONAL UNION              )
  8315 Lee Highway                 )
  Fairfax, VA 22031,               )
                                   )
          Plaintiff,               )
                                   )
          v.                       )    Civil No. 06-1053 JDB
                                   )
DAVID DYE,                         )
  Acting Assistant Secretary,      )
  Mine Safety and Health Admin.    )
  U.S. Department of Labor         )
                                   )
  Washington, D.C.                 )
                                   )
          Defendant.               )
───────────────────────────────── )
```

MEMORANDUM IN SUPPORT OF DEFENDANT'S OPPOSITION
TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY
INJUNCTION AND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

In an attempt to make an end-run around rulemaking proceedings and seek unavailable mandamus relief, plaintiff United Mine Workers of America ("UMWA") has filed this action against the Mine Safety and Health Administration ("MSHA"), seeking an injunction to require MSHA to: (1) perform immediate and periodic random checks of self-contained self-rescuers ("SCSRs") in use in underground coal mines and to replace any faulty SCSRs; (2) conduct immediate and recurring hands-on, in-mine, emergency-like training with simulated SCSRs so that miners will experience labored breathing; and (3) require operators to maintain and submit to MSHA an inventory of SCSRs so that MSHA

can respond to future problems with SCSRs.  Although the UMWA is requesting a temporary and permanent injunction, the proceeding is in the nature of a request for a writ of mandamus.  Because MSHA has no underlying mandatory duty to act as the UMWA is demanding, the Court should deny the UMWA's request.

Nonetheless, MSHA certainly is mindful of the terrible recent mine tragedies that have prompted the UMWA's suit, although the UMWA's factual allegations regarding the SCSRs used in those events have not been borne out by MSHA's investigation to date.  MSHA, however, has already reacted swiftly to these tragedies by, in its discretion, taking steps to address all of the UMWA's concerns in this proceeding with respect to SCSR functionality and training.  As explained below, MSHA enacted an emergency temporary mandatory safety standard ("ETS"), effective March 9, 2006, addressing SCSR storage, use, and training, along with other procedures designed to protect miners when faced with an emergency requiring evacuation from an underground coal mine. The ETS, although currently effective, is still in the midst of rulemaking procedures.  Although the UMWA could have challenged that ETS directly in the Court of Appeals, no such challenge was made.  Moreover, once the rulemaking associated with the ETS has been completed, judicial review is directly in the Court of Appeals, not in this Court.  Thus, whether this case is viewed as a thinly disguised mandamus action, or as a challenge to the ETS,

or as a challenge to the ongoing rulemaking procedures, this Court lacks jurisdiction to hear UMWA's claims -- claims that seek to bypass the administrative proceedings currently underway to ensure miner safety and obtain a writ of mandamus in an area in which MSHA has considerable discretion.  Consequently, the UMWA is unlikely to succeed on the merits of  claims and the case should be dismissed.

The UMWA also has failed to show that its members will suffer any concrete harm if the injunctive relief requested is denied.  At present there simply is insufficient evidence to show that the recent mine disasters would have ended differently had the checks of SCSRs and the training the UMWA seeks been instituted earlier.  While MSHA takes very seriously any potential loss of life, and has consistently acted to protect miners, the harm the UMWA points to is in fact at present only speculative.

Finally, the issuance of an injunction also would cause harm to other parties and the public interest.  The public interest lies in allowing the current rulemaking process to be completed with the benefit of any comments other parties may seek to make. To interrupt this process in the middle and require MSHA to act based on a partial administrative record would be contrary to Congressional intent and could result in less effective procedures that might otherwise be instituted upon completion of

the administrative process.

Consequently, this Court should deny the UMWA's motion for preliminary injunction and dismiss the case.

<u>STATEMENT OF THE CASE</u>

I.  <u>Existing Statutory and Regulatory Background</u>

A.  <u>The 1977 Mine Act</u>

The Federal Mine Safety and Health Act of 1977 ("the Mine Act" or "the Act") was enacted to ensure safety and health in the Nation's mines.  30 U.S.C. §§ 801, <u>et</u> <u>seq</u>.  In order to prevent deaths, serious physical harm, and occupational diseases, <u>see</u> 30 U.S.C. § 801(c), Congress authorized the Secretary of Labor, acting through MSHA, to promulgate mandatory safety and health standards for the Nation's mines and to conduct regular inspections of those mines.  30 U.S.C. §§ 811 and 813.

Section 103(a) of the Act requires the Secretary to perform regular inspections of mines (at least four times a year, in the case of underground mines) to ensure compliance with the requirements of the Mine Act.  30 U.S.C. § 813(a).  Section 103(a) further authorizes the Secretary to "develop guidelines for additional inspections based on criteria including, but not limited to, the hazards found in mines ...."  30 U.S.C. § 813(a).

In addition to the authority granted in Section 101(a), Section 101(b) of the Act authorizes the Secretary to promulgate an ETS, which takes effect immediately upon publication in the

-4-

Federal Register.  Such a standard is appropriate where the Secretary determines (1) that miners face grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and (2) that the emergency standard is necessary to protect miners from the danger.  30 U.S.C. § 811(b); In re International Union, United Mine Workers of America, 231 F.3d 51, 54 (D.C. Cir. 2000).  An ETS is an extraordinary measure that enables MSHA "to react quickly to grave dangers that threaten miners before those dangers manifest themselves in serious or fatal injuries or illnesses."  S. Rep. 181, 95th Cong., 1st Sess. at 23 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3423.  "[O]nce the Secretary has identified a grave danger that threatens miners the Committee expects the Secretary to issue an emergency temporary standard as quickly as possible, not necessarily waiting until [she] can investigate how well that grave danger is being managed or controlled in particular mines."  S. Rep. No. 95-181 at 24, reprinted in 1977 U.S.C.C.A.N. at 3424.

    Once published in the Federal Register, an ETS is a fully enforceable standard.  30 U.S.C. § 811(b)(3).  In addition, the ETS serves as a proposed rule for the rulemaking proceeding authorized by Section 101(a) of the Act.  Id.  Under the Mine Act, the Secretary is required to promulgate a permanent health or safety standard no later than nine months after publication of

the ETS.  Id.

    B.  MSHA Standards for SCSRs

      1.  Pre-2006 Standards

On November 21, 1978, MSHA promulgated mandatory safety standards for SCSRs in underground coal mines.  43 Fed. Reg. 54241 (Nov. 21, 1978).[1]  These standards revised MSHA's standards for self-rescue devices in underground coal mines.  Id.  The revisions required, after a two-year phase-in period, replacement of filter-type self rescuers, which do not generate oxygen, with SCSRs, which generate oxygen.  Id.  Specifically, Section 75.1714(a) requires mine operators to provide an SCSR to each person in an underground coal mine.[2]  Section 75.1714(b) requires operators to instruct and train any person, before going

---

    [1] SCSRs are devices that aid in escape from mine fires, explosions, and other incidents where an irrespirable mine atmosphere is present.  Declaration of Ray McKinney, Administrator for Coal Safety and Health at 2 (Attachment A).  An SCSR is a closed-circuit breathing device that contains either an independent supply of oxygen or chemicals, such a potassium superoxide, which react to form oxygen.  Id.  Because SCSRs function in a closed circuit, they enable persons to breathe clean air in the presence of hazardous or life-threatening contaminants in the mine atmosphere.  Id.

    [2] 30 C.F.R. § 75.1714(a) provides:

      Each operator shall make available to each miner who goes underground, and to visitors authorized to enter the mine by the operator, an approved self-rescue device or devices which is adequate to protect such person for 1 hour or longer.

underground, in the use and location of the SCSRs.[3] Section
75.1714-3 requires mine operators to inspect, test, and maintain
SCSRs and to certify the results.[4]

---

[3] 30 C.F.R. § 75.1714(b) provides:

> Before any miner employed by the
> operator or visitor authorized by the
> operator goes underground the operator shall
> instruct and train such person in the use and
> location of the self-rescue device or devices
> made available at the mine. Instruction and
> training of miners and visitors shall be in
> accordance with provisions set forth in 30
> CFR Part 48.

[4] 30 C.F.R. § 75.1714-3 provides:

> (a) Each operator shall provide for
> proper inspection, testing, maintenance, and
> repair of self-rescue devices by a person
> trained to perform such functions.

> (b) After each time a self-rescue device
> is worn or carried by a person, the device
> shall be inspected for damage and for the
> integrity of its seal by a person trained to
> perform this function. Self-rescue devices
> with broken seals or which are damaged so
> that the device will not function properly
> shall be removed from service.

> (c) All FSRs approved by MSHA and NIOSH
> under 42 CFR part 84, except devices using
> vacuum containers as the only method of
> sealing, shall be tested at intervals not
> exceeding 90 days by weighing each device on
> a scale or balance accurate to within +1
> gram. A device that weighs more than 10 grams
> over its original weight shall be removed
> from service.

> (d) All SCSRs approved by MSHA and NIOSH
> under 42 CFR part 84 shall be tested in
> accordance with instructions approved by MSHA
> and NIOSH. Any device which does not meet the

On July 7, 1999, MSHA published an Advance Notice of
Proposed Rulemaking ("ANPRM"), requesting comments from the
mining community on issues developed at a conference held by MSHA
and the National Institute for Occupational Safety and Health
("NIOSH"), as well as other issues raised by MSHA, pertaining to
SCSR functionality and training.  64 Fed. Reg. at 36632 (July 7,
1999).[5]

On December 31, 2001, MSHA withdrew the ANPRM from its
regulatory agenda, along with 10 other regulatory agenda entries,
in light of resource constraints and changing safety and health
regulatory priorities.  66 Fed. Reg. 61866 (Dec. 3, 2001).  MSHA

specified test requirements shall be removed
from service.

(e) At the completion of each test
required by paragraphs (c) and (d) of this
section the person making the tests shall
certify by signature and date that the tests
were done. This person shall make a record of
all corrective action taken. Certifications
and records shall be kept at the mine and
made available on request to an authorized
representative of the Secretary.

(f) Self-rescue devices removed from
service shall be repaired for return to
service only by a person trained to perform
such work and only in accordance with the
manufacturer's instructions.

[5] The MSHA/NIOSH conference was held on June 15 and 16,
1999, in Beckley, West Virginia.  64 Fed. Reg. at 36632.  The
conference provided an opportunity for an exchange of information
between MSHA, NIOSH, SCSR manufacturers, mining industry
representatives, and labor representatives on a range of topics
involving SCSRs.

and NIOSH have a continuing testing program in place in which they remove a number of SCSR units each year to evaluate the service-life of SCSR models -- identified as a key concern in the ANPRM. See Letter from David G. Dye, Acting Assistant Secretary for Mine Safety and Health to UMWA (Attachment B); McKinney Declaration, at 2 (Attachment A).[6]

### 2.  The March 2006 ETS

On March 9, 2006, MSHA promulgated an ETS in response to the grave danger to which miners are exposed during underground coal mine accidents and subsequent evacuations.  71 Fed. Reg. 12252 (Mar. 9, 2006).  The ETS was promulgated in response to two mining accidents that occurred January 2006 and resulted in 14 fatalities.  Id.

On January 2, 2006, an explosion at the Sago Mine in Tallmansville, West Virginia, resulted in 12 fatalities. Additionally, on January 12, 2006, a fire at the conveyor belt drive at the Aracoma Alma Mine No. 1 in Melville, West Virginia, resulted in 2 fatalities -- a total of 14 coal miner deaths during the month of January 2006.  71 Fed. Reg. at 12253.[7]

The accidents at the Sago Mine and the Aracoma Alma No. 1

---

[6] Section 75.1714-1 provides that SCSRs that are required to be provided to persons working in an underground coal mine under Section 75.1714 must be "approved by MSHA and NIOSH under 42 C.F.R. part 84."  30 C.F.R. § 75.1714-1.

[7] In addition, on May 20, 2006, five miners died following an explosion at the Darby Mine No. 1 in Harlan County, Kentucky. McKinney Declaration at 2.

Mine indicated a need for MSHA to take additional steps to protect miners from the grave danger they face when evacuating a mine during an emergency. Id. The ETS requires that operators of all underground and surface mines immediately notify MSHA of accidents. The ETS also requires additional SCSRs for all underground coal mines, and it addresses SCSR storage and use, evacuation training, and the installation and maintenance of lifelines. 71 Fed. Reg. at 12252.

In particular, the ETS modifies the existing SCSR standards by requiring at least one additional SCSR to be stored in the mine for each individual underground. See 30 C.F.R. § 75.1714-4(a) (Attachment C). In mines where two SCSRs will not provide enough oxygen for all miners to evacuate safely, the ETS requires a mine operator to provide additional SCSRs in the primary and the alternate escapeway. See 30 C.F.R. § 75.1715-4(c) (Attachment C). The ETS requests comments on the appropriateness of requiring mine operators to report the total number of SCSRs in use at each underground coal mine, semi-annually, to the MSHA District Manager. 71 Fed. Reg. at 12265. In the preamble to the ETS, MSHA stated:

> Along with the total number of SCSRs, MSHA could require the following information be reported for each SCSR at each mine: 1) manufacturer, 2) model, 3) date of manufacture, and 4) the serial number. This information would be valuable because manufacturers often lose track of where their SCSRs are in the mining industry. When a

> mine shuts down, the SCSRs are often sold to
> another mine. In the past, problems have
> been discovered with all brands of SCSRs.
> Sometimes these problems are related to
> specific production runs that generate unique
> serial numbers for the SCSRs. Sometimes, the
> problems affect all the manufactured SCSRs
> from one manufacturer. Having knowledge of
> where the SCSRs are located will benefit
> persons because MSHA can then expeditiously
> locate the affected SCSRs so that remedial
> action can be taken.

71 Fed. Reg. at 12265. In addition, the ETS requests comments on whether mine operators should be required to report to MSHA all incidents where any SCSR is used during an accident or emergency and all instances where an SCSR has not functioned properly. 71 Fed. Reg. at 12265. Moreover, the ETS requests comments on whether a mine operator should be required to retain, for a period of 90 days, any SCSR that did not function properly, for investigation by MSHA. Id.

The ETS also requires a mine operator to provide directional lifelines in both the primary and alternate escapeways. See 30 C.F.R. §§ 75.380(d)(7) and 75.381(5) (Attachment C). Lifelines must be made of durable material, be marked with a reflective material every 25 feet, be located for effective escape, and have directional indicators placed at intervals not exceeding 100 feet. Id.

Moreover, the ETS increases the required SCSR training frequency from once each year to once at least every 90 days. It also requires hands-on training in the donning, use, and transfer

-11-

of self-rescue devices as part of regular emergency drills.  See
30 C.F.R. §§ 48.5, 48.6, 48.8, and 48.11 (Attachment C).  The
training additionally includes an MSHA-approved program of
instruction in the proper evacuation procedures, including
locating lifelines and stored SCSRs.  See 30 C.F.R. §
75.1502(a)(vii), (viii) (Attachment C).

Under the new training requirements, miners must participate
in mine emergency evacuation drills.  See 30 C.F.R. § 75.1502(c)
(Attachment C).  These drills cannot be mere simulations; rather,
miners must physically travel from the working section, or the
miner's work station, to the surface or to the exits at the
bottom of the shaft or slope.  71 Fed. Reg. at 12256.  In
addition, miner evacuation drills must include the donning and
transferring of SCSRs "to provide a more realistic training
environment."  71 Fed. Reg. at 12262.  With respect to the
realistic nature of the required miner evacuation drills, MSHA
stated in the preamble to the ETS:

> [Such] [d]rills may further provide a
> more realistic emergency evacuation
> practice. For example, conducting the drill in smoke or
> using a realistic mouthpiece that provides
> the user with the sensation of actually
> breathing through an SCSR, commonly referred
> to as "expectations" training, is more
> realistic than simulation training.  MSHA is
> asking for comments and suggestions on
> alternative realistic emergency evacuation
> practices to ensure that miners are prepared
> to act in an emergency.

71 Fed. Reg. at 12262.

Finally, the ETS requires mine operators to certify, by name, all miners who participated in the drill in order to establish a record of training for each miner. See 30 C.F.R. § 75.1502(c)(3).

II. MSHA's Action Plan

In addition to promulgating the ETS on March 9, 2006, MSHA began implementing an action plan on April 27, 2006. McKinney Declaration at 3; Attachment D. As part of the action plan, MSHA has been actively arranging as many mine visits as possible. McKinney Declaration at 3. MSHA inspectors are monitoring SCSR training and functionality by observing mine operators' hands-on training for donning the SCSRs during the quarterly Mine Emergency Evacuation drills held at the mine. Id. In doing so, inspectors are evaluating the donning process and procedures, and whether operators are conducting the training adequately. Id. MSHA inspectors have also been observing and monitoring the operator's functionality tests and reporting their observations in a central data base. Id.

On May 16, 2006, MSHA notified the UMWA that it has developed and is implementing an action plan to address SCSR training and the functionality of SCSRs. See Attachment B. MSHA's letter explained:

> [T]he action plan includes a joint MSHA and State of West Virginia effort to ensure that miners are properly trained and drilled in the proper procedures for donning and

> exchanging SCSRs.  Inspectors will place
> special focus on this effort during the
> regular inspection process as the new…ETS
> SCSR training requirements are implemented.
> MSHA will initiate this special emphasis
> program on a national basis.  Second, MSHA
> and the state of West Virginia will actively
> monitor coal mine operator's testing of SCSR
> functionality as operators perform in-mine
> testing to determine locations of caches.
> MSHA will also conduct this monitoring
> nationally.

See Attachment B.

Although the accident investigations for the Sago Mine and

the Aracoma Alma Mine and the Darby Mine have not been completed,

MSHA's preliminary data shows that the SCSRs that were recovered

at all three mines worked as designed because they all produced

oxygen.  McKinney Declaration at 3; Declaration of Jeffrey

Kravitz [Kravits Declaration], Chief Mine Emergency Operations

and Special Projects for MSHA Technical Support, at 2 (Attachment

E).  Testing of the SCSRs was a combined effort between MSHA and

the National Institute of Occupational Safety and Health [NIOSH],

and are subject to verification by an independent laboratory.

Kravitz Declaration at 1-2.  The test results on the SCSRs

recovered at these three mines are attached as Attachment F.[8]

Regarding the Sago mine explosion, 24 SCSRs found in

underground portions of the mine have been tested.  McKinney

---

[8] The spreadsheets show that oxygen was activated and
consumed.  The spreadsheets contain data from both MSHA and
NIOSH, and NIOSH is working on a report for MSHA that will
present just the data compiled by NIOSH.  NIOSH is not certain
how it will present the evidence regarding oxygen consumption.

Declaration at 3.  Preliminary tests indicate that the SCSRs had been activated and did function properly, because they had been activated and produced oxygen.  McKinney Declaration at 3; Kravitz Declaration at 2.

During its investigation, MSHA has also interviewed many of the miners who survived the Sago accident.  McKinney Declaration 3-4.  A miner on the 1st Left crew, which evacuated the mine successfully after the explosion, explained that he had problems with the mouthpiece on the SCSR because he had false teeth, and that he had had some difficulty with removing the tab on the seal band at the top of the SCSR.  McKinney Declaration at 4.  He indicated, however, that the SCSR did activate and that he was able to breathe.  Id.  No other miners reported significant problems with their SCRS.  Id.  Another miner indicated that he had trouble breathing at first when the bag did not inflate. However, when he blew into the bag, it did activate and function. Such action is in accordance with the standard training steps when the pull cord does not initially activate the system.  Id.

Regarding the crew at the Sago mine which did not evacuate, the letter of Randal McCloy, the sole survivor, prepared after the accident described problems with SCSRs.  McKinney Declaration at 4; UMWA Exh. 2.  However, Mr. McCloy has not been able to meet with investigators to provide any details.  McKinney Declaration at 4.  Moreover, the account in his letter conflicts with the

physical evidence found in the mine.  Id.  The evidence
establishes that the exact location where the SCSRs were
activated was actually some 1,330 feet from where Mr. McCloy
claimed they were activated.  Id.

MSHA's preliminary conclusion is that SCSRs were deployed by
the crew, and in some cases the victims' canisters had remaining
oxygen-producing capability.  McKinney Declaration at 4.
Although the SCSRs had been deployed, the oxygen supplies would
not have been fully exhausted if the miners donned the devices
too late after the accident or if they removed the devices to
talk or in response to breathing resistance or heat.  Id.  If
they did so, they may have suffered fatal carbon monoxide
poisoning prior to fully exhausting the SCSRs.  McKinney
Declaration at 4-5.

At the Aracoma Alma No. 1 mine, preliminary evidence based
on sworn testimony of survivors indicates that all of the crew-
members working near a belt fire donned SCSRs.  McKinney
Declaration at 5.  All but two of the miners were able to
evacuate the mine.  Id.  Miners reported that the SCSRs were
successfully deployed by the entire crew, with the exception of
one miner who stated to the other crew members that he had
difficulty donning the SCSR.  Id.

Laboratory tests indicated that all of the SCSRs were
properly activated and that all of the tested units showed some

degree of use.  McKinney Declaration at 5.  The same miner who
initially had difficulty donning the device died, but he had
successfully activated the device and was able to travel some
distance toward the mine's exit.  Id.  The deceased miner's SCSR
was found floating in standing water, so the remaining oxygen-
producing capacity at the time of death could not be determined.
Id.  The second miner who died in the evacuation had separated
from the remainder of the crew, but his SCSR was deployed and he
was wearing it when he died, with 85 percent of the oxygen-
generating chemical consumed.  Id.

At the Darby Mine, the testimony of the surviving miner
indicates that after an initial explosion, the crew of four
working near the explosion donned their SCSRs.  McKinney
Declaration at 5-6.  The survivor testified that no one had
difficulty donning the SCSR or causing it to function.  Id. at 6.
Nevertheless, three of the four were unable to evacuate, while
the survivor followed a high voltage cable to safety.  Id. at 6.
MSHA has not completed testing the SCSRs.  Id.  However,
preliminary tests, subject to confirmation, show that all the
SCSRs were activated, all the components were present, and all
the SCSRs produced oxygen.  Id.  The preliminary tests also
showed that the SCSRs were subject to various levels of use.  Id.

III.  Recent Statutory Development: The MINER Act

On June 15, 2006, the Mine Act was amended by the Mine

-17-

Improvement and New Emergency Response Act of 2006 ("MINER Act").
Pub. L. 109-236, 120 Stat. 493 (2006), which took effect the same
day.  Section 2 of the MINER Act amends Section 316 of the Mine
Act, 30 U.S.C. § 876(b), by requiring each underground coal mine
operator to develop and adopt an accident preparedness and
response plan.  Each accident response plan must be submitted to
MSHA for review and approval.  In determining whether to approve
a particular plan, MSHA must take into consideration comments
submitted by miners or their representatives.

In addition, these plans must be reviewed by MSHA at least
every six months and must include emergency supplies of
breathable air.  Specifically, Section 316(b)(2)(E)(iii) requires
(1) caches of SCSRs to provide, in the aggregate, no less than
two hours of breathable air per miner; (2) a maintenance schedule
for checking the reliability of SCSRS, retiring older SCSRs
first, and introducing new SCSR technology, such as SCSRs with
interchangeable oxygen cylinders, which do not require doffing to
replenish airflow; and (3) "training for each miner in proper
procedures for donning self-rescuers, switching from one unit to
another, and ensuring proper fit." 30 U.S.C. § 876(b)(2)(E)(iii).

<u>ARGUMENT</u>

I.    Plaintiffs Bear A Heavy Burden To Justify The
      <u>Grant Of Preliminary Injunctive Relief.</u>

It is well settled that injunctive relief is an
extraordinary remedy, and the party seeking it has a substantial

burden of proof.  <u>Mazurek</u> v. <u>Armstrong</u>, 520 U.S. 968, 972 (1997).
<u>See</u>, <u>e.g.</u>, <u>Cobell</u> v. <u>Norton</u>, 391 F.3d 251, 258 (D.C. Cir. 2004);
<u>Virginia Petroleum Jobbers Ass'n</u> v. <u>Federal Power Comm'n</u>, 259
F.2d 921, 925 (D.C. Cir. 1958).  To be entitled to the
extraordinary remedy of injunctive relief, a plaintiff must meet
this strict burden by showing that: (1) there is a substantial
likelihood of prevailing on the merits of its claim, (2) a
preliminary injunction is necessary to prevent it from suffering
irreparable injury, (3) the threatened injury to the plaintiff
outweighs the possible harm to others, and (4) the public
interest favors issuance of the injunction.  <u>Cobell</u> v. <u>Norton</u>,
391 F.3d at 258; <u>Washington Metropolitan Area Transit Comm'n</u> v.
<u>Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977).  "The
basis for injunctive relief in the federal courts has always been
irreparable harm and inadequacy of legal remedies." <u>Wisconsin</u>
<u>Gas Co.</u> v. <u>Fed. Regulatory Comm'n</u>, 758 F.2d 669, 674 (D.C. Cir.
1985).  To constitute irreparable harm, "the injury must be both
certain and great; it must be actual and not theoretical." <u>Id</u>.

Under the foregoing, the UMWA plainly is not entitled to
emergency injunctive relief.  Not only has the UMWA failed to
demonstrate a substantial likelihood of success on the merits,
but it also has failed to show the existence of any concrete,
nonspeculative harm or that it has no adequate remedy at law.
Consequently, as demonstrated below, the motion for emergency

injunctive relief should be denied.

  II. Plaintiffs are not Likely to Succeed on the
    Merits of this Case as the Case Should be
    <u>Dismissed for Lack of Jurisdiction.</u>

    A. <u>Plaintiff is not Entitled to Mandamus Relief.</u>

  The UMWA requests the Court to order MSHA in essence to take
three actions: (1) require immediate and random checks of SCSR's
and replacement of SCSR's found to be faulty; (2) require
immediate and recurring training in  SCSR use; and (3) require
operators to maintain and submit SCSR inventories.  Because the
UMWA's request "is essentially a request for a writ of mandamus,"
it should be evaluated under the requirements for mandamus.  <u>Swan
v. Clinton</u>, 100 F.3d 973, 977 n.1 (D.C. Cir. 1996) (discussing
authorities).[9]  The requirements for mandamus "go to [the]
court's jurisdiction under [the] mandamus statute, although [it
is] often discussed in merits terms as to whether a writ of
mandamus should be issued."  <u>Id</u>., citing <u>Willis</u> v. <u>Sullivan</u>, 931
F.2d 390, 395-96 (6th Cir. 1991).  The Court of Appeals for this
Circuit has emphasized that jurisdiction over actions in the

---

   [9] The UMWA states that its action is brought under Rule
65(a) of the Federal Rules of Civil Procedure and 28 U.S.C.
§ 1651(a) (the All Writs Act).  Complaint para. 1.  Neither of
those provisions is an independent grant of jurisdiction.  <u>See</u>
Fed. R. Civ. P. 1 ("These rules govern the procedure in the
United States District Court . . . ."); <u>In re Tennant</u>, 359 F.3d
523, 527-31 (D.C. Cir. 2004).  Because the UMWA identifies no
independent basis for jurisdiction, and because the UMWA's
request for relief is in the nature of a request for mandamus,
the question of jurisdiction should be analyzed under the
requirements for mandamus.

nature of mandamus "is strictly confined." In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005).

It is beyond dispute that the mandamus remedy under 28 U.S.C. § 1361 "is a drastic one, to be invoked only in extraordinary situations." Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980); In re Cheney, 406 F.3d at 729.  The remedy is "hardly ever granted." In re Cheney, 406 F.3d at 729. A party seeking the issuance of a writ of mandamus has "'the burden of showing that [his] right to issuance of the writ is "clear and indisputable."'" Kerr v. United States District Court, 426 U.S. 394, 403 (1976) (citations omitted); In re Cheney, 406 F.3d at 729.  Such a right is "'clear and indisputable" only when "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.'" Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005), quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002).  The duty of the officer to act must be specifically established by law and plainly defined. See, e.g., Haneke v. Secretary of Health, Ed. and Welfare, 535 F.2d 1291, 1296 n.15 (D.C. Cir. 1976).  Only if there is a clear obligation to perform a ministerial duty may the Court issue a writ of mandamus to compel the fulfillment of that obligation. Nat'l Wildlife Federation v. United States, 626 F.2d 917, 923 (D.C. Cir. 1980).  In addition, "[e]ven if the plaintiff

overcomes all these hurdles, whether mandamus relief should issue is discretionary" with the Court.  <u>In re Cheney</u>, 406 F.3d at 729. Moreover, the Mandamus Act "does not allow judicial intervention in matters which are within properly-exercised discretion of government officials.  <u>Welch</u> v. <u>Donovan</u>, 551 F. Supp. 809, 810 (D.D.C. 1982).  <u>See</u>, <u>e.g.</u>, <u>Haneke</u> v. <u>Secretary of Health and Welfare</u>, 535 F.2d at 1296 n.15.

Applying the principles set forth above, it is clear that UMWA's request for mandamus should be denied.  The UMWA has completely failed to demonstrate that MSHA has a clear duty to act with respect to the type of checks that should be made of SCSRs or the type of training that should be given those who may need to use SCSRs.  Strikingly, the UMWA identifies <u>no</u> statutory duty to act -- <u>i.e.</u>, it identifies <u>no</u> provision of the Mine Act that imposes on MSHA a duty to take the actions the UMWA demands it take.  The only duties that could possibly be implicated in this case are the duty to improve mine safety and health (Section 2), the duty to conduct periodic mine inspections (Section 103(a)), and the duty to promulgate mine safety and health standards (Section 101).  All of those duties are, in the context of this case, highly discretionary.  <u>See</u> <u>Secretary of Labor on behalf of Wamsley</u> v. <u>Mutual Mining, Inc.</u>, 60 F.3d 110, 113-14 (4th Cir. 1996) (explaining that MSHA's policy judgments are entitled to deference because MSHA is given the authority to

-22-

engage in rulemaking, inspection, and enforcement and, in so doing, evaluates information and accumulates experience).

To satisfy the requirements for mandamus, the plaintiff must identify a governmental duty to him that is "clear and compelling." In re Cheney, 406 F.3d at 729. The UMWA has "failed to establish any duty, let alone a clear and indisputable duty." Id. at 731. Under such circumstances, the UMWA plainly has established no clear right to relief.

In addition, the UMWA has failed to establish that there are no other adequate remedies available to it. As demonstrated below, the UMWA could have challenged the March 2006 ETS in the Court of Appeals if it believed the additional protections for miners using SCSRs established in the ETS were insufficient. The UMWA also may submit comments during the current rulemaking period, which does not close until June 29, 2006, and then if dissatisfied appeal any final rule to the Court of Appeals for this Circuit.

In addition, if the UMWA seeks measures that may be beyond the scope of the current rulemaking, it can petition for further rulemaking under Section 101(a) of the Mine Act. Although proceeding through the statutorily-specified rulemaking process will produce action less quickly than a writ of mandamus, "the fact that a remedial scheme chosen by Congress vindicates rights less efficiently than [the action plaintiff seeks] does not

render the [statutory] remedies inadequate for purposes of

mandamus." Fornaro, 416 F.3d at 69. See Shalala v. Illinois

Council on Long Term Care, 529 U.S. 1, 13 (2000) (requiring

parties to proceed through the agency "assures the agency greater

opportunity to apply, interpret, or revise policies, regulations,

or statutes without possibly premature interference by different

individual courts," and although "[t]his assurance comes at a

price, namely occasional individual, delayed-related hardship,"

Congress judged that the price is justified.).[10]  It is

especially important to note that the current ETS must, by

statute, be completed and result in a final rule by December 9,

2006.  "This is a matter that is committed to the agency's

expertise in the first instance, and [the] court is in no

position to pretermit the statutory process."  In re UMWA, 231

F.3d 51, 54 (D.C. Cir. 2000) ("it would be premature for [the

court] to consider [the UMWA's objections to the proposed

rules").

For similar reasons, it would be premature for the court to

act now in light of the fact that the recently-enacted MINER Act

requires mine operators to submit, and MSHA to review and

approve, mine-specific accident response plans addressing

---

[10] As to the adequacy of the ETS itself, the UMWA did not
exercise its statutory right to challenge the ETS in a court of
appeals.  See In re Braxton, 258 F.3d 250, 261 (4th Cir. 2001)
(cautioning against permitting a party to use a petition for
mandamus "as an end-run" around established appellate
requirements).

many aspects of SCSR's.  30 U.S.C. § 876(b)(2).  The Act requires mine operators to make such plans available to miners and their representatives and the plans must be approved by MSHA.  30 U.S.C. § 876(b)(2)(C).

With respect to SCSRs, the mine operator's plan must provide for 2 hours of emergency supplied breathable air per miner, caches of SCSRs in various escapeways that could be reached by a miner walking within thirty minutes, a maintenance schedule for checking the reliability of SCSRs, including a schedule for retiring old SCSRs and replacing them with technologically advanced SCSRs, and training for miners in the proper procedures for using SCSRs.  30 U.S.C. § 876(b)(2)(E)(iii)(I)-(IV). The UMWA will have an opportunity to participate in the plan approval process and to challenge action taken by MSHA under this new statute, should it so desire, at the appropriate time.

Thus, the UMWA has plenty of adequate avenues available to it to pursue any claims of inadequate protections for miners. This avenue, however, of seeking in essence mandamus relief under the guise of injunctive relief, is not available.  Consequently, the UMWA has failed to demonstrate a likelihood of success on the merits of its claims.

B.   The Court Lacks Jurisdiction Over the Claims.

Even if this case is not construed to be one seeking in essence mandamus relief, there can be no doubt that the UMWA's

claims seek to challenge the ETS promulgated by MSHA.  The UMWA
concedes that MSHA responded to the mine tragedies earlier this
year by enacting the ETS.  The UMWA goes on to state that the
ETS:

> fails to provide for any testing of SCSR units to determine
> if the units are operating properly.  The ETS also fails to
> provide for miners to experience emergency-like drills to
> ensure they will know how to use the SCSR units if they
> would have to don one in a real emergency.

UMWA Mem. at 5.  There can be no doubt, then, that this suit is
in fact a challenge to MSHA's March 9, 2006 ETS.

But the UMWA is in the wrong court and out of time for such
a challenge.  Under Section 101(b)(1) of the Mine Act, the
Secretary may enact an emergency temporary mandatory health or
safety standard that takes effect immediately upon publication in
the Federal Register.  30 U.S.C. § 811(b)(1).  Under Section
101(d) of the Mine Act, persons adversely affected or aggrieved
by a mandatory health or safety standard may challenge the
standard directly in an appropriate United States Court of
Appeals.  30 U.S.C. § 811(d).  Such challenges, however, must be
brought prior to the sixtieth day after the standard is
promulgated.  Id.

Thus, if the UMWA wanted to challenge the March 9, 2006 ETS
issued by MSHA, it was encumbent upon the UMWA to file a petition
for review in an appropriate United States Court of Appeals by no
later than May 8, 2006.  Yet suit in this case was filed on June

-26-

8, 2006 in this Court.  Thus, this case must be dismissed because it is untimely and in the wrong court.

Finally, even if this case is not construed to be a challenge to the March 9, 2006 ETS, the UMWA has failed to exhaust its administrative remedies in two respects. One of these two avenues would have to be pursued before the UMWA's claims would be ripe for judicial review.

First, if the UMWA believes that MSHA has not to date addressed its concerns about the kinds of checks that should be made of SCSRs or the type of training that should be given to miners who may need to use SCSRs, then the UMWA should request the Secretary to promulgate another emergency standard under 5 U.S.C. 553(e) of the Administrative Procedure Act or make a request under Section 101(a)(1) of the Mine Act.  Section 101(a)(1) provides that interested parties may submit information to the Secretary on which the Secretary may decide to propose a standard.  Id.  If the UMWA had pursued this avenue, then MSHA would have had an opportunity to apply its expertise to the issue, develop an administrative record, and render a decision as to whether to issue an emergency standard requested by the UMWA. The Mine Act plainly contemplates such administrative procedures inasmuch as absent a showing of good cause the Court of Appeals will not consider any objection to action taken by the Secretary that has not been presented to the Secretary. 30 U.S.C. § 811(d).

Thus, the Act contemplates that objections relating to the Secretary's rulemakings will be raised in the first instance to the Secretary.  This makes sense as the Secretary's rulemaking determinations are rooted in expert judgments drawn from complex scientific and factual data, which would need to be reflected in an administrative record prior to any judicial review. Inexplicably, the UMWA has failed to take this course available to it.

Second, although the ETS is currently enforceable, MSHA is engaged in ongoing rulemaking procedures.  As explained above, the ETS serves as a proposed rule for the rulemaking proceeding authorized by Section 101(a) of the Act, and the Secretary is required to promulgate a permanent health or safety standard no later than nine months after publication of the ETS.  30 U.S.C. § 811(b)(3).  The comment period on the March 9, 2006 ETS does not close until June 29, 2006.  71 Fed. Reg. 29785 (May 24, 2006).

It is well settled that only "final agency action" may be reviewed under Section 10(c) of the APA.  E.g., Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990).  "Final agency action" means a "definite statement of position."  FTC v. Standard Oil Co., 449 U.S. 232, 241 (1997); Time Warner Entertainment Co., L.P. v. FCC, 56 F.3d 151, 194-95 (D.C. Cir. 1995), cert. denied, 516 U.S. 1112 (1996).  Until the Secretary

makes a "definite" statement in a final rule, there is no final agency action that is subject to review.  Indeed, UMWA still has time to submit comments under the ongoing rulemaking procedure. Its time would be more appropriately spent pursuing that avenue than seeking to have this Court short-circuit the administrative process in the fashion this case seeks.

Accordingly, for all the foregoing reasons, this case should be dismissed for lack of jurisdiction.  As such, UMWA clearly cannot show any likelihood of success on the merits of its claims.

III. <u>Plaintiff Has Failed To Establish Irreparable Injury.</u>

The Court of Appeals for this Circuit has repeatedly held that the issuance of preliminary injunctive relief is dependent upon a showing of **concrete** irreparable injury.  <u>See</u>, <u>e.g.</u>, <u>Wisconsin Gas Co.</u>, 758 F.2d at 674.  Indeed, the Court of Appeals has noted that while such relief may be available when there is a particularly strong likelihood of success on the merits and only a relatively slight showing of irreparable injury, the moving party still is required to demonstrate at least "some injury," since the basis of injunctive relief in federal courts has always been irreparable injury.  <u>E.g.</u>, <u>Citifed Financial Corp</u> v. <u>Office of Thrift Supervision</u>, 58 F.3d at 747 (Court requires demonstration of "at least 'some injury'").  When the movant has made no showing of concrete irreparable injury, that alone is

sufficient for rejecting the request for preliminary injunctive relief.  Id.

Of course there is no dispute that miners in an emergency may face irreparable injury.  But UMWA has failed to show that miners in fact face a serious risk of having to use disfunctional SCSRs.  At most UMWA has pointed to the accounts from two survivors from the recent mine disasters.  But as the McKinney Declaration explains, MSHA's recent investigation of the SCSRs used at the Sago mine indicates that they in fact were used successfully and that some of them still contained oxygen.  Id. at 9-11.  MSHA has been unable to interview Mr. McCoy, the sole survivor of the miner crew that was unable to escape the Sago mine, but has found certain physical evidence that conflicts with the letter in the news paper upon which UMWA relies.  Id. at 10.  Moreover, the letter in the newspaper provides an insufficient basis upon which to enter an injunction against MSHA.  Accord Metropolitan Council of NAACP Branches v. FCC, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents" given the hearsay rules.); Carter v. District of Columbia, 795 F.2d 116, 127 (D.C. Cir. 1986) ("allegations contained in newspaper articles were themselves of no probative value").  This is especially true given the fact that the only competent evidence on the issue is the McKinney Declaration from

MSHA.[11]

Thus, UMWA has failed to make the requisite showing of irreparable injury. Therefore, the request for emergency injunctive relief should be denied on this basis as well.

IV.     The Remaining Factors Do Not Support An Injunction.

Under Virginia Petroleum Jobbers, supra, preliminary injunctive relief may not be granted unless the alleged irreparable harm outweighs the harm to be encountered by other parties and the public interest. In this case, granting relief to UMWA will cause clear harm by interrupting ongoing rulemaking procedures.

As demonstrated throughout this memorandum, MSHA is moving rapidly and appropriately, on multiple fronts, to ascertain what safety problems SCSRs may present and how best to address such problems. If the Court were to intervene at this point and dictate to MSHA how to proceed, the fashioning and implementation of a truly effective approach might be delayed rather than hastened. This is especially true because the UMWA not only has failed to identify a problem that requires an immediate hasty response, but it also has failed to address in any meaningful sense the details of what that response should be. Safety will

---

[11]     The Affidavit of Dennis Bryan O'Dell, filed by UMWA, is replete with inadmissible hearsay -- hearsay which, at most, represents the anecdotal reports of two unidentified mine operators and the worries of an unspecified number of unidentified miners.

be served best if a response is fashioned by the agency with the
expertise, and through the administrative process that Congress
established to fashion such a response.  The undeniable emotional
pull of this issue should not override the need to fashion an
appropriate and thorough answer to any problems uncovered in a
complete investigation and examination of the issues achieved
with input from interested parties.

CONCLUSION

For the foregoing reasons, defendant respectfully submits
that plaintiff's request for emergency injunctive relief should
be denied and this case should be dismissed.

Respectfully submitted,


_____

KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney


_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____

MARINA UTGOFF BRASWELL, DC BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 514-7226

OF COUNSEL:

HOWARD M. RADZELY
Solicitor of Labor

EDWARD P. CLAIR
Associate Solicitor

W. CHRISTIAN SCHUMANN
Counsel, Appellate Litigation

JACK POWASNIK
Attorney
Office of the Solicitor
U.S. Department of Labor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED MINE WORKERS OF AMERICA,     )
  INTERNATIONAL UNION               )
  8315 Lee Highway                  )
  Fairfax, VA 22031,                )
                                    )
          Plaintiff,                )
                                    )
          v.                        )    Civil No. 06-1053 JDB
                                    )
DAVID DYE,                          )
  Acting Assistant Secretary,       )
  Mine Safety and Health Admin.     )
  U.S. Department of Labor          )
                                    )
  Washington, D.C.                  )
                                    )
          Defendant.                )
_____)
```

ORDER

Upon consideration of plaintiff's emergency motion for preliminary injunction, defendant's opposition and motion to dismiss, and the entire record, and it appearing to the Court that the denial of plaintiff's motion and the grant of defendant's motion is just and proper, it is hereby

ORDERED that plaintiffs' emergency motion for preliminary injunction be, and it is, denied; and it is further

ORDERED that defendant's motion to dismiss for lack of jurisdiction is granted; and it is further

ORDERED that this case is dismissed.

_____
UNITED STATES DISTRICT JUDGE

MARINA UTGOFF BRASWELL
Assistant United States Attorney
U.S. Attorney's Office
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530


Judith Rivlin, Esq.
Grant Crandall, Esq.
United Mine Workers of America
8315 Lee Highway
Fairfax, VA 22031-2215