IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION, 8315 Lee Highway, Fairfax, VA 22031,       Plaintiff,   v.   David Dye, Acting Assistant Secretary, Mine Safety and Health Administration, U.S. Department of Labor,       Defendant. | Civil No. 1:06CV01053 JDB |

### UMWA's Opposition to MSHA's Motion to Dismiss

This action was initiated because there is a real and on-going threat of coal miners' death resulting from faulty self-contained self-rescuers ("SCSRs"), and the Secretary of Labor has failed and refused to take action necessary to protect miners. Already this year, in three different coal mine emergencies, 16 miners died of carbon monoxide poisoning after being trapped underground and trying to use SCSRs. The government seeks dismissal under Federal Rule 12(b)(1) and 12(b)(6), contending that MSHA's "considerable discretion" should deprive the court of jurisdiction to consider this matter. However, the government's discretion is not so broad as to allow it to remain complacent in the face of documented substantial problems with SCSRs (with 16 miners dying from carbon monoxide poisoning in just the first five months of 2006), and which SCSR problems will likely re-occur absent government action focused on correcting SCSR problems. Before seeking relief through this court, the UMWA raised with the Mine Safety and Health Administration ("MSHA") its concerns about SCSR malfunctions based on a report from the survivor of the January 2 disaster at the Sago Mine that four of the trapped

miners' SCSR units did not function. The UMWA asked that MSHA begin nationwide testing of SCSR units to determine their reliability and to enhance miners' training. However, MSHA rejected the UMWA's request for action, choosing instead to "monitor" the matter. Since MSHA refused the UMWA request and adopted its plan to "monitor," three more miners died of carbon monoxide poisoning at the Darby Mine on May 20. The Darby survivor also complained about SCSR problems, saying that he "felt like [he] was smothering...could hardly breathe at all...and passed out." Ledford affidavit, at Attachment 1. While the federal government fails to act, states like Kentucky have initiated their own efforts to test SCSRs, and remove the faulty ones it has been finding. It is coal miners who die. They cannot afford to wait. The UMWA has no other adequate remedy.

In responding to the UMWA's Motion for Preliminary Injunction, MSHA both moved for Dismissal and Opposed the Motion for Preliminary Injunction. It filed a single, combined brief to address both matters. This filing opposes the Motion to Dismiss. A separate pleading responds to the Agency's Opposition to the UMWA's Motion for Preliminary Injunction. While the government merged some arguments, the UMWA has made an effort to segregate them, as appropriate.

As the federal agency charged with protecting miners' health and safety, MSHA has an affirmative duty to protect miners.[1] Despite this mandate, MSHA has failed to take the required steps to protect underground coal miners from problems with SCSR use that came to light after miners died when their SCSRs failed them earlier this year.

---

1 In the first portion of the Federal Mine Safety and Health Act ("Mine Act"), Congress declared that "it is the purpose of this Act (1)...to direct the...Secretary of Labor to develop and promulgate improved health and safety standards to protect the health and safety of the Nation's coal or other miners...." 30 U.S.C. § 801(g).

2

Contrary to its claims that MSHA has taken "steps to address all of the UMWA's concerns in this proceeding with respect to SCSR functionality and training" (MSHA's Memorandum in Opposition to UMWA's Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss ("MSHA Memo"), at p. 2), it has *not* addressed the UMWA's concerns because MSHA has refused to engage in immediate and periodic testing of SCSR units to determine their reliability, and MSHA has failed to require immediate and recurring hands-on emergency-like training of underground coal miners in SCSR use so that miners can physically experience the labor of breathing while wearing an SCSR; further, MSHA has not required coal operators to maintain and submit to MSHA an inventory of their SCSR units. Without these necessary protective measures, more miners will likely die when they will have to rely on SCSRs in an underground mine emergency. Thus, the UMWA maintains substantial concern about SCSR reliability and about the training MSHA requires.

Though MSHA promulgated an emergency temporary mandatory safety standard ("ETS") in March, 2006 after two West Virginia mine disasters killed 14 coal miners in January, 2006, it developed the ETS *before* learning the extent of the SCSR failures in those emergencies.[2] Specifically, on or about April 26, 2006, Randal McCloy, the sole survivor of the Sago emergency, sharing information about his experience for the first time in the form of a letter he prepared for the families of the 12 miners killed at Sago, stated that "at least four" of the SCSR units failed to operate. Mr. McCloy's letter was widely circulated, and was published in the Charleston Gazette on April 28, 2006. See Exhibit 2 to UMWA Motion for Preliminary Injunction.

---

2 The instant action neither challenges nor implicates that emergency standard.

3

Less than one month after Mr. McCloy provided his information about SCSR failures at Sago, the very same kind of SCSR failures occurred at the Darby Mine where five miners died, three from carbon monoxide poisoning after trying to rely on SCSRs. See Exhibit 6 to UMWA Motion for Preliminary Injunction. Moreover, the sole survivor of the Darby disaster, Paul Ledford, recently explained that when he donned his SCSR he "felt like [he] was smothering...and could hardly breathe at all...and passed out." Ledford affidavit, at Attachment 1.

These SCSR failures came to light only *after* MSHA promulgated its ETS. Yet, MSHA has not taken any action to address these SCSR problems. UMWA President Roberts specifically advised the Acting Assistant Secretary of Labor for MSHA about the SCSR problems Mr. McCloy and other Sago miners reported. Exhibit 3 to UMWA Motion for Preliminary Injunction. "Whether it was because the trapped miners could not properly don their SCSRs or some other reason, miners working in 2006 have reason to be concerned about whether they will be able to successfully use an SCSR if an emergency confronts them." Id. The UMWA specifically asked MSHA to both test SCSRs and to enhance the miners' training on SCSR use; however, MSHA refused to take decisive action. Id. and Exhibit 4 to UMWA Motion for Preliminary Injunction.

In fact, the Agency opined that "all of the Sago SCSRs were working," citing evidence that 25-75% of the SCSRs' capacity remained in all of the SCSR units the Sago miners had used. Id at Exhibit 4, and Exhibit F to MSHA Memo. However, the government's preliminary tests on the *22* SCSR units that were deployed by miners at the Sago Mine revealed that for only *one* of these units was more than 50% of the oxygen-producing chemical exhausted by miners. Sago

4

Mine spreadsheet, at Attachment F to MSHA Memo. Because 11 miners at the Sago Mine died of carbon monoxide poisoning after trying to utilize their SCSR units, the evidence from Sago demonstrates that SCSRs are not providing trapped miners with the oxygen they are supposed to offer.

The government's SCSR-test results for the units retrieved from the other two disasters in 2006 were no more re-assuring: from the Aracoma Alma No. 1 Mine, eight units were found, of which only one had more than 50% of the oxygen-producing chemical exhausted; and at the Darby Mine, of the five units found, only one had more than 50% of the oxygen-producing chemical exhausted. Id. The government's SCSR test results prove that there is something terribly wrong.

Instead of recognizing that something was terribly wrong at Sago when 11 miners died and one more was severely disabled as a result of carbon monoxide poisoning *at the same time* that SCSRs within the miners' reach were allegedly viable, and when more miners died of carbon monoxide poisoning at two subsequent mine emergencies, when those miners also supposedly had viable SCSRs available to them, MSHA continues to accept the status quo. Absent the court's direction that MSHA respond to this problem, the government will fail to take action needed to protect miners from the SCSR problems miners suffered at Sago, Alma Aracoma, and Darby: miners can be expected to die after experiencing problems using an SCSR if the status quo is allowed to persist.

While MSHA fails to promulgate another ETS to address the SCSR problem, or otherwise respond to protect miners, various states are trying to fill the void. For example, Kentucky has initiated a systematic review of SCSRs in use within that state; it has already found

119 defective units, and required them to be replaced.[3] Courier Journal article "119 mine breathing devices defective," July 8, at Attachment 2. Kentucky's initial report was made after state inspectors checked SCSR units at 174 of that state's 250 underground mines; SCSRs at the remaining mines will also be checked, where additional defective units will likely be identified, removed and replaced. Id. West Virginia is also increasing its control over SCSRs after federal regulators have failed to adequately protect miners from SCSR problems, following the deaths of 13 West Virginia coal miners who succumbed to carbon monoxide poisoning after they were trapped and tried to rely on SCSRs to survive. Charleston Gazette article "Mines must give state air pack info," July 11, at Attachment 3. West Virginia is now requiring coal operators to provide the state with detailed information, but it is moving towards, *inter alia*, state inspection and testing of SCSR units. Id.

Today, miners across the country are vulnerable to piece-meal, inconsistent levels of protection concerning their SCSRs. However, as the federal agency charged with protecting miners' health and safety, MSHA should be taking the lead by taking decisive action to address the very substantial problem with SCSR failures that the three accidents have brought to light, and the survivors' reports about the SCSR failures they witnessed and experienced. At a minimum, there is a crisis in confidence among miners concerning SCSRs; at worst, they are vulnerable to carbon monoxide poisoning if the SCSR they carry proves to be faulty when they become trapped in a noxious underground mine. Miners' affidavits, at Attachment 4.

---

3 Some units failed a shaking test revealing that the chemicals used to generate oxygen and remove carbon dioxide was degrading, color indicators on other units showed they had insufficient air capacity, while other units showed moisture contamination. All of these defects were found without even opening the SCSR units, though only by opening an SCSR can one find other types of deficiencies such as dry rot, holes in the breathing tube, or a unit's failure to activate.

6

The message MSHA conveys in its Motion to Dismiss is that MSHA has done all that it must do. The government has essentially circled its wagons around the ETS it issued in March, claiming that because it took *some* action after two accidents in January, it has done enough. However, the world is not static: with newly-acquired information about very specific and significant SCSR failures, MSHA has a duty to act further. Indeed, MSHA's failure to address the SCSR failures will have dire – even fatal-- consequences for underground coal miners: the miners at Darby died three weeks after Mr. McCloy's letter and the UMWA request was sent to MSHA. This court should compel MSHA to take action responsive to the SCSR problems, and it should not sanction MSHA's lassitude.

## ARGUMENT

### Standard of Review

Defendants seek dismissal under both 12(b)(1) and 12(b)(6). The plaintiff bears the burden of showing that the court has proper subject matter jurisdiction. Forrester v. United States Parole Comm'n, 310 F.Supp.2d 162, 167 (D.D.C. 2004). When reviewing a 12(b)(1) motion to dismiss for lack of jurisdiction, the court must accept as true all the factual allegations contained in the complaint. Newborn v. Yahoo!, Inc., 391 F.Supp.2d 181, 185 (D.D.C. 2005); Blankett v. United States Bureau of Land Management, No. 04-2152, 2006 U.S.Dist. LEXIS 12872, at *10 (D.D.C. March 20, 2006). The plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. Blankett, 2006 U.S.Dist. LEXIS 12872 at *10. Additionally, the court may consider not only allegations in the complaint, but also material outside of the pleadings. Newborn, 391 F.Supp.2d at 185. The court should deny a motion for dismissal unless it appears beyond a doubt that the plaintiff can prove no set of supporting facts

that would entitle him to relief. Loughlin v. United States, 393 F.3d 155, 162 (D.C. Cir. 2004).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court determines not whether the plaintiff will prevail on the merits, but whether the plaintiff has properly stated a claim. Forrester, 310 F.Supp.2d at 167. The court must construe all allegations and facts in the light most favorable to the plaintiff and "draw all reasonable inferences in the plaintiff's favor" Uberoi v. Equal Employment Opportunity Comm'n, 180 F.Supp.2d 42, 45 (D.D.C. 2001). The plaintiff's factual allegations are subject to less exacting scrutiny in resolving a 12(b)(6) motion than in resolving a 12(b)(1) motion. See Forrester 310 F.Supp.2d at 167; Bannum, Inc. v. Sawyer, 251 F.Supp.2d 7, 10 (D.D.C. 2003). The court may dismiss a claim pursuant to 12(b)(6) only if the defendant can demonstrate beyond a doubt that the plaintiff cannot prove a set of facts supporting his claim that would entitle him to relief. Newborn, 391 F.Supp.2d at 185; Forrester, 310 F.Supp.2d at 167-68.

Based on these applicable standards, Defendant's Motion to Dismiss should be denied. Further, because Federal Rule 12(h)(3) provides the court with inherent authority to re-consider the jurisdictional issue at any time, given the compelling nature of the risk to miners' lives that is here at issue, it would be prudent for the court to allow plaintiff an opportunity to present its case in support of its claim for injunctive relief.

**The UMWA Has Made a Proper Claim and Set Forth Facts Establishing a Right to Relief**

As will be explained more fully in the UMWA's Response to MSHA's Opposition to Preliminary Injunction, the UMWA has a right to relief based on the extraordinary risk posed to underground coal miners who will have to rely on SCSRs in upcoming mine emergencies. The Verified Complaint, Motion for Preliminary Injunction and Points and Authorities in Support

demonstrate that there is a substantial problem with SCSRs currently in use. Miners are dying *while* their SCSR units still contain significant quantities of the chemicals needed to create oxygen. Even MSHA's evidence proves that either the units do not operate properly or miners have not been trained adequately to enable them to maximize the protections SCSRs are supposed to offer. Trapped miners are dying when their SCSR units fail to provide them oxygen. We deem this unacceptable.

The government's position is absurd. MSHA contends that, because the SCSR units recovered after the three disasters show that the units were "activated" and they did produce oxygen, they "worked as designed."[4] Ex. A, par. 7, to MSHA Memo.[5] Nevertheless, miners died while their SCSR still contained the requisite chemicals, according to MSHA's evidence. So long as the units work *some* of the time and to some degree seems to be sufficient for MSHA. With this mind-set, it is clear that without this court's direction, MSHA will not make the changes needed to protect miners. This court should not sanction MSHA's delay in addressing the life-threatening problems with SCSRs.

MSHA has the duty to protect the lives of the miners and to continually seek to improve their working conditions. In the Mine Act, Congress recognized the "urgent need" to improve the health and safety of miners. 30 U.S.C. §801(c). MSHA's "first priority and concern" is "the health and safety of its most precious resource—the miner." 30 U.S.C. §801(a). Indeed, MSHA

---

4 This is like saying if you push somebody out of an airplane, pull his parachute cord, and the parachute opens, that is "good enough." That the individual does not know how to use the parachute and gets injured or killed in his crash landing is not of concern because the parachute *did* open.

5 Even with fully functioning SCSRs, perhaps *some* of the same miners would have perished because they were trapped for so very long. MSHA uses that possibility as a basis for contesting the "harm" to miners. While the recently enacted MINER Act should give miners a better chance of evacuating in a mine emergency, and requires operators to store additional SCSR units underground, unless MSHA takes action to address the very real problems with SCSR functionality and use, just having more units available to trapped miners will do little to expand their chances for survival. If the units do not operate properly or if miners do not have effective training on SCSR use,

9

is charged with protecting miners' lives and safety *above all else*. This court has jurisdiction because MSHA's duty is "discretionary within limits." MSHA "cannot transgress those limits, and if [it] does so, [it] may be controlled by injunction or mandamus to keep within them." Ganem v. Heckler, 746 F. 2d 844, 853 (D.C. Cir. 1984). Thus, while MSHA may have some discretion in deciding how to craft certain regulations and in determining which regulations would best promote miners' safety, it is *not* free to completely ignore the testimony of surviving miners or the evidence demonstrating that there are serious problems with both SCSR training and the reliability of the SCSRs. MSHA is *not* free to take *no* action to address SCSR problems. MSHA is *not* free to spend more time debating the *need* for new regulations to address this issue in the face of the several serious accidents in quick succession, and the information revealing very specific problems with the SCSRs, and miners' inability to access the oxygen within them before succumbing to carbon monoxide poisoning. In short, MSHA has overstepped the limits of its discretion.

MSHA's legal duty, plainly defined, is to take action to address the specific SCSR failures to protect miners *before* the next mine emergency occurs. The ETS that MSHA issued in March, 2006 did not correct the SCSR problems; indeed the extent and nature of SCSR failures came to light only after MSHA issued that ETS. MSHA's (in)actions in this case demonstrate that its interpretation of its statutory duties is "clearly wrong." Haneke v. Secretary of HEW, 535 F.2d 1291, 1296 n.15 (D.C. Cir. 1976). Its failure to act to protect the lives of miners who are dependent on SCSRs is "arbitrary and capricious" in that MSHA chose to run the risk of yet more deaths rather than confront this issue. Id. The relief the UMWA seeks via the injunction constitutes steps necessary for reducing the grave danger confronting active miners across the

additional quantities will not save the lives of trapped miners.                                                                                                10

country. MSHA has a clear duty to act, and it has not complied with that duty.

MSHA claims the risk to miners is only "speculative," and thus not a subject for injunctive relief. It is wrong. There is no doubt that there will be more mining accidents, and that miners will confront poisonous mine atmospheres when they will need to rely on an SCSR in order to breathe. That we cannot predict where or when the next such emergencies will arise does not mean that the harm need not be addressed. The court has held that non-speculative irreparable harm exists even where the potential for recurrence of that harm is contingent on future events and the timing of its potential recurrence is indefinite. Al-Joudi v. Bush, 2005 U.S. Dist. LEXIS 6265 (D.D.C., April 4 2005) (Preliminary injunction requiring 30 days' notice of any transfer of foreign national detainees was proper because detainees faced imminent threat of possible torture or indefinite confinement.) This court has also found irreparable harm sufficiently imminent and non-speculative even where manifestation of that harm is contingent on the outcome of subsequent litigation. Hicks v. Bush, 397 F. Supp. 2d 36, 45 (D.D.C. 2005) (Injunction against further proceedings granted. "Petitioner has shown that irreparable injury will flow from his adjudication before a commission that could be held by the Supreme Court to lack jurisdiction over him entirely.")

The irreparable harm that underlies the UMWA's petition for injunctive relief is the continued risk of death or serious injury to coal miners. This Circuit has held that continued exposure to harm should be proved by reference to past occurrence of that harm. Wisconsin Gas Co., 758 F.2d at 674 (D.C. Cir. 1985) ("The movant must provide proof that the harm has occurred in the past and is likely to occur again....") Documented unreliability of SCSR devices and inadequate miner training in the use of these devices were identified by MSHA in June,

11

1999. 64 Fed. Reg. 36632. What MSHA warned was a *potential* for harm in 1999 has since been realized in multiple deaths and debilitating injuries. Absent a *substantive* change in the safety regulations and procedures related to SCSR devices and training, the demonstrated risk of irreparable harm faced by coal miners is imminent and non-speculative.

There is no other relief available. What the ETS accomplished is not at issue and it does not speak to the needed protections, so challenging it - whether when it first issued or when the rule becomes final later this year - would not fix the SCSR problem. Moreover, the UMWA has satisfied its obligation, under the APA, to first seek relief from the Agency before initiating this litigation; MSHA rejected the UMWA's request. There is no particular format for satisfying the requirement in 5 U.S.C. 553(e) that a complainant must approach the Agency before initiating legal action.[6] Here, the UMWA made a specific demand of MSHA and supported its request with evidence why the relief was warranted. MSHA rejected the UMWA's request. On this record, MSHA had ample opportunity to pass on the merits, but chose *not* to initiate another emergency standard, or otherwise protect coal miners from documented SCSR problems.

## CONCLUSION

In summary, MSHA has a duty to protect miners from substantial SCSR problems, problems that are so substantial that miners cannot afford to wait while MSHA monitors or studies the issue; the SCSR problems came to light after MSHA issued its ETS; the ETS itself does not provide the relief needed; the UMWA is not trying to challenge the ETS by this action; and the UMWA satisfied its APA obligations by first petitioning the Agency before filing this

---

6 See, generally Schmidt v. Reich, 835 F. Supp. 435, 441 (N IL. 1993).

suit. For all of these reasons, the UMWA urges the Court to deny the government's Motion to Dismiss.

The UMWA seeks oral argument on this matter, and such a Motion is submitted with this Opposition.

                                        Respectfully submitted,

                                        _____
                                        JUDITH RIVLIN, Bar # 305797
                                        United Mine Workers of America
                                        8315 Lee Highway
                                        Fairfax, VA 22031-2215
                                        (703) 208-7180

                                        COUNSEL FOR UNITED MINE WORKERS OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July 2006, I have electronically filed the foregoing UMWA's Opposition to MSHA's Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> W. Christian Schumann
> Office of the Solicitor
> U.S. Department of Labor
> 1100 Wilson Boulevard, 22nd Floor
> Arlington, VA 22209-2296
> 202-693-9361
>
> Marina Utgoff Braswell
> Assistant United States Attorney
> United States Attorney's Office
> 555 - 4th Street, N.W.
> Washington, DC 20530
>
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Ave, NW
> Washington, DC 20530-0001

_____
Judith E. Rivlin