IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA,<br>INTERNATIONAL UNION,<br>8315 Lee Highway, Fairfax, VA 22031,<br><br>        Plaintiff,<br>v.<br><br>David Dye, Acting Assistant Secretary,<br>Mine Safety and Health Administration,<br>U.S. Department of Labor,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action 1:06CV01053 JDB<br>)<br>)<br>)<br>)<br>)<br>) |

### Plaintiff UMWA's Reply to MSHA's Opposition to UMWA's Motion for Preliminary Injunction

After learning from the sole survivor of the Sago Mine disaster that one-third of the self-contained self-rescuers ("SCSRs") did not function when the trapped coal miners tried to activate them, and where the remaining 11 trapped miners died from carbon monoxide poisoning, the United Mine Workers of America ("UMWA") demanded that the Mine Safety and Health Administration ("MSHA") initiate nationwide testing of SCSRs and enhanced training on SCSR use to protect miners from future SCSR failures. MSHA failed and refused the UMWA's demand. Shortly thereafter, three more miners died from carbon monoxide poisoning at the Darby Mine; the sole survivor from Darby also reported problems with SCSR use. The UMWA seeks injunctive relief to compel the government to take decisive action to correct the problem before more miners are killed after being unable to successfully use their SCSRs.

In opposing this action, MSHA contends that the UMWA cannot meet its heavy burden of proving that such extraordinary relief is warranted. MSHA contends that it has no such duty to act, that the UMWA's harm is only speculative and not concrete, and that the UMWA has alternative remedies, primarily in connection with an on-going rulemaking procedure related to

an emergency temporary standard ("ETS") that took effect in March, 2006. This Reply will show that the relief the UMWA seeks *is* warranted. The UMWA can prevail as to each of the four factors the court must consider when determining whether injunctive relief should be granted. However, concrete, irreparable harm is so certain to occur if the injunction is not granted that that factor alone would be enough to prompt the court to grant the injunction even if the other factors were less compelling.

## A. UMWA has Substantial Likelihood of Prevailing on the Merits

The UMWA has a substantial likelihood of prevailing on the merits, because MSHA has not complied with the objectives stated in the Mine Act. In the Mine Act, Congress stated "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner." 30 U.S.C. §801(a). Congress also set as a priority the continual and "urgent need to provide more effective means and measures for improving the working conditions and practices in the nation's coal and other mines in order to prevent death and serious physical harm." 30 U.S.C. §801(c). Section 811(a)[1] requires the Secretary to "develop, promulgate, and revise as may be appropriate, improved health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. §811(a)(1). Further, the Act provides for the promulgation of emergency temporary mandatory standards whenever "such an emergency standard is necessary" to protect miners. 30 U.S.C. §811(b). While MSHA claims that it has no duty to act here, there is ample statutory support for the UMWA's claim that the Secretary must act. The need for the Secretary to promulgate and enforce regulations and take other actions to protect miners was urgent when Congress first passed the Mine Act, and it remains urgent today.

---

1 In the UMWA's Points and Authorities filed with its Motion for Preliminary Injunction, this Section of the Mine Act was improperly cited (as § *801*(a)).

2

Thirty-three coal miners died in the first five months of 2006. In three tragedies, 16 miners died of carbon monoxide poisoning after being trapped underground and trying to use SCSRs when those SCSRs were not functional, in whole or in part. Miners who survived two of the disasters have reported serious SCSR problems, and MSHA's own investigation reveals troubling information about miners not successfully using SCSRs. But, MSHA has failed to respond effectively to this troubling pattern.

In March 2006, MSHA implemented an Emergency Temporary Standard ("ETS"), 71 Fed. Reg. 12252, et seq. to address some of the emergency response problems that were prominent in the first two multi-fatal accidents that occurred in West Virginia within the first few weeks of 2006. However, that ETS was prepared before the SCSR problems came to light. And the ETS does <u>not</u> include provisions for miners' training in the use of SCSRs in emergency-like situations. Similarly, the ETS does not provide for the immediate and random testing of SCSRs already in use. Nevertheless, when some mine operators have voluntarily tested their SCSRs, many have been found to be inadequate. See Exhibit 5 to UMWA Motion for Preliminary Injunction ("UMWA Motion"). These failures on the part of MSHA are particularly troubling because MSHA has known about, and articulated concerns about, SCSR training and their reliability since at least 1999. 64 Fed. Reg. 36632 (July 7, 1999).

Without immediate testing of SCSRs, miners have no way of knowing whether they may safely trust their lives on the SCSRs provided to them. Miners are concerned about whether they will be able to depend on their SCSRs for use in an underground emergency. See Attachment 4 to UMWA Opposition to Motion to Dismiss. The miners cannot afford to wait any longer. With the large number of deaths attributable to carbon monoxide poisoning this year, each month of delay will likely mean that many more miners will experience the same sort of SCSR failures.

3

Because of MSHA's refusal to take immediate actions to protect the health, safety, and lives of the miners, the UMWA has a substantial likelihood of prevailing on the merits.

**B. A Preliminary Injunction is Necessary to Prevent Irreparable Injury**

If a preliminary injunction is not granted, miners will suffer irreparable injury. The threat of underground accidents is neither vague nor speculative: it is a concrete and certain threat. Preventable death from carbon monoxide poisoning has occurred in the past and is likely to occur again. See Wisconsin Gas Co. v. Federal Energy Regulatory Com., 758 F. 2d 669 (D.C. Cir. 1985) (explaining requirements for showing that irreparable injury is likely to occur). MSHA claims the risk to miners is only "speculative," and thus not a subject for injunctive relief. It is wrong. There is no doubt that there will be more mining accidents, and that miners will confront poisonous mine atmospheres when they will need to rely on an SCSR in order to breathe. That we cannot predict where or when the next such emergencies will arise does not mean that the harm need not be addressed.

The court has held that non-speculative irreparable harm exists even where the potential for recurrence of that harm is contingent on future events and the timing of its potential recurrence is indefinite. Al-Joudi v. Bush, 2005 U.S. Dist. LEXIS 6265 (D.D.C., April 4 2005) (Preliminary injunction requiring 30 days' notice of any transfer of foreign national detainees was proper because detainees faced imminent threat of possible torture or indefinite confinement). The irreparable harm that underlies the UMWA's petition for injunctive relief is the continued risk of death or serious injury to coal miners. The circuit instructs that continued exposure to harm should be proved by reference to past occurrence of that harm. Wisconsin Gas Co., 758 F.2d at 674 (D.C. Cir. 1985) ("The movant must provide proof that the harm has occurred in the past and is likely to occur again…").

4

Documented unreliability of SCSR devices and inadequate miner training in the use of these devices were identified by MSHA seven years ago. 64 Fed. Reg. 36632 (July 7, 1999). What MSHA warned was a *potential* for harm in 1999 has since been realized in multiple deaths and debilitating injuries. In the first five months of 2006 alone, 33 coal miners died in mining accidents. At least 16 of those deaths were caused by carbon monoxide poisoning. *None* of the 16 miners were able to utilize all of the oxygen that the SCSRs were designed to produce: tanks were left with 25-75% of the oxygen-producing capabilities remaining after the miners died, according to MSHA. Attachment F to MSHA's Memo. In fact, the government's evidence shows that of the *22* SCSR units activated by miners at the Sago Mine, only *one* of the units had more than 50% of its oxygen-producing chemical exhausted. Id. Yet 11 miners at the Sago Mine died of carbon monoxide poisoning after trying to utilize their SCSR units.

The government's documents demonstrate that the SCSRs did not provide the miners trapped at Sago with the oxygen they should have been able to access from their units. Moreover, the SCSR assigned to one of the miners who died, Jesse Jones, had an out-dated shelf life and should already have been removed from service and replaced. Post-Gazette article "Sago air pack past expiration date," July 13, at Attachment A.

The government's SCSR-test results for the units retrieved from the other two major disasters in 2006 provided similar results: from the Aracoma Alma No. 1 Mine, eight units were found, of which only one had more than 50% of the oxygen-producing chemical exhausted; and at the Darby Mine, of the five units found, only one had more than 50% of the oxygen-producing chemical exhausted. Attachment F to MSHA's Memo. The government's SCSR test results prove that there is something terribly wrong.

5

At this point it is not clear whether the SCSR failures were from inadequate training of the miners, in the SCSRs themselves, or in some combination of the two. Nevertheless, the result is clear: sending miners into the mines with no "hands on" training in emergency-like situations, with SCSRs that may or may not be capable of producing oxygen in whole or in part, sentences miners to death when they confront an underground mine emergency requiring them to rely on an SCSR to breathe in the noxious mine atmosphere. The threat of injury here is both certain, and great; this is an actual threat, not a theoretical one. Wisconsin Gas, 758 F.2d at 674. There *will* continue to be accidents in the mines; it is not speculative. They will occur soon, and frequently - they will not occur at some "indefinite time." Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931).

The government misses the mark in attempting to illustrate the standard for establishing irreparable harm by citing cases where the plaintiff alleged mere economic harm. In the instant case, miners' continual exposure to an unreasonable risk of severe physical injury or death is precisely the sort of harm that courts have routinely found to be both irreparable in nature and uniquely appropriate for injunctive relief. For example, the D.C. Circuit Court of Appeals has invariably found irreparable harm where the party seeking equitable relief faced a risk of death or bodily injury. See, e.g. In re International Chemical Workers Union, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (Court issues injunction to set a deadline for OSHA rule-making related to worker exposure to cadmium.); Wilson v. Group Hospitalization and Medical Service, Inc., 791 F.Supp. 309, 313-14 (D.D.C. 1992) appeal dismissed, 995 F.2d 306 (D.C. Cir. 1993) (Court grants injunction to prevent a denial of health benefits that posed a threat to a cancer patient's life.); National Assoc. of Rehabilitation Facilities, Inc. v. Schweiker, 550 F. Supp. 357, 366 (D.D.C. 1982) (Mandamus granted where, "[R]etroactive reimbursement will not... compensate

for foregone rehabilitative treatment..."). Harm to human life or health is necessarily irreparable. No legal remedy can resurrect the dead or rehabilitate injury - prevention is the cure.

The risk to human life or health, without more, is a harm prohibited by law. National Assoc. of Farmworkers Organizations v. Marshall, 628 F.2d 604 (D.C. Cir 1980) (Court of Appeals reverses district court by enjoining application of challenged regulations.) In Marshall, the court held, "[i]n the context of safety regulations, risk is itself the harm prohibited by law. Exposure to that harm [the risk] is thus irreparable injury." Id at 613, n.39. The instant case concerns formulation and application of safety regulations. Therefore, the UMWA's burden in establishing irreparable harm is to demonstrate exposure to risk of death or physical injury. Id. Once the UMWA demonstrates such exposure to risk, the court may exercise its equitable power to intervene on behalf of coal miners who must now depend on its protection for their physical well-being.

The only adequate remedy is an injunction. The UMWA has no other adequate remedy available, judicial or administrative. Haneke v. Secretary of HEW, 535 F.2d. at 1296 & n.15. Commenting on the ETS or challenging it in court once the rule becomes final will not address the particular SCSR problems that came to light after the ETS issued. Likewise, the recently-enacted MINER Act does not provide adequate relief.

The ETS does not remedy these problems, nor will the final rule.[2] The UMWA did not immediately challenge the ETS, in part because Mr. McCloy had not yet spoken about the failures of one-third of the trapped miners' SCSR units, and in part because the ETS includes

---

2 There is only one aspect of the relief the UMWA seeks that *may* be covered by the final rule that will supersede the ETS: having operators maintain and submit to MSHA an inventory of their SCSR units. Though not part of the ETS now in effect, MSHA raised the issue in its request for comments so it is now properly part of that rulemaking effort. MSHA might include such a requirement in its final rule. However, the other relief the UMWA seeks were neither included in the ETS nor subjects about which MSHA sought comment.

7

many other valuable protections. Nevertheless, MSHA cannot be satisfied with what it already accomplished in the ETS when other compelling challenges arise. When Mr. McCloy revealed that one-third of the SCSR units the Sago miners tried to use would not activate (Exhibit 2 to UMWA Memo), MSHA had a duty to respond. Upon learning the troubling and very-specific evidence about the Sago miners' experience with SCSR unreliability, it became apparent that MSHA's ETS was not sufficient.

The UMWA immediately wrote to the Acting Assistant Secretary of Labor for MSHA, asking MSHA to require additional training of the miners in proper use of the SCSRs, to perform nationwide testing to determine whether the current SCSRs were reliable, and to procure immediate replacements for any found to be unreliable. Exhibit 3 to UMWA Memo. The response was inadequate. MSHA promised no immediate, concrete results. Rather, MSHA wrote that the Agency would merely "evaluate the quality and adequacy" of the training the miners had had before the Sago disaster, and then "make recommendations." Exhibit 4 to UMWA Memo. MSHA also said it was creating and "implementing an action plan to address proper training on SCSRs and functionality of devices," but did not mention what that training might entail. Id. MSHA further indicated that there would be "special focus" placed on training in donning and exchanging SCSRs, but did not suggest that the new focus would include any change in the training requirements or require training in emergency-like conditions. Id.

In fact, neither the pre-existing training requirements, nor the ETS require the kind of training that the UMWA seeks through this action. The only change in the type of training that is included in the ETS goes to instructing miners in how to switch from one SCSR unit to another, as reflected in 30 CFR §48.5 (b)(ii); §48.6(b)(12)(ii), etc. See Ex. C to MSHA Memo.

8

Thus, while the regulatory language on miners' training on SCSRs requiring "hands-on training" (30 CFR §48.5 (b)(i); §48.6(b)(12)(i), etc.) might *suggest* that miners get experience using an SCSR in their required training, this is decidedly not so. Under existing standards, miners do not experience breathing through an SCSR when they are trained. See e.g. par. 6 of affidavits in Exhibit 4, and par. 5 of Exhibit 1 to UMWA Opposition to Motion to Dismiss. Nothing about the quality of this training will change through the ETS or the final rule that will take its place. Accordingly, simply commenting on MSHA's proposed rulemaking is not an adequate option.[3]

The MINER Act also does not provide an adequate alternative because it does not provide miners with these needed protections. The MINER Act nowhere requires any kind of government testing of SCSRs, much less the immediate, random testing of the SCSRs that this action seeks. The MINER Act simply imposes on operators some kind of maintenance schedule for their SCSRs. 30 U.S.C §876(b)(2)(E)(iii)(III). The MINER Act also requires mine operators to develop mine-specific accident response plans. 30 U.S.C. §876(b)(2). However, it does not change the quality of miners' training.[4] Nor would MSHA require such accident response plans to include the kind of SCSR training the UMWA seeks if MSHA does not otherwise mandate such training.

There are no adequate remedies available to the UMWA save injunctive relief. No other avenue, judicial or administrative, provides for immediate action to make sure that miners are

---

3 The case that MSHA relies on to justify its slow-paced scheme of action, Fornaro v. James, 416 F. 3d 63 (D.C. Cir. 2005), should be distinguished from the case at hand. That case suggests that "the fact that a remedial scheme chosen by Congress vindicates rights less efficiently than [plaintiff's desired action] does not render [those] remedies inadequate for purposes of mandamus." However, Fornaro is concerned, above all, with economic issues (annuities): no lives were directly at stake.

4 The MINER Act simply requires "training for each miner in proper procedures for donning self-rescuers, switching from one unit to another, and ensuring a proper fit." 30 U.S.C §876(b)(2)(E)(iii)(IV).

able to trust their lives in their SCSRs - and miners cannot afford to wait. There is either a problem with the reliability of the SCSRs, or there is a problem with the training the miners receive, or both. In order to prevent yet more deaths, the only adequate remedy is to randomly check the SCSRs currently in use, and to train the miners in use of the SCSRs under the adverse, uncomfortable conditions that occur in underground mine emergencies. Without this injunction, miners take their lives in their hands each time they enter a mine. If the injunction is not granted, miners will continue to die preventable deaths when accidents occur. Absent a *substantive* change in the safety regulations and procedures related to SCSR devices and training, the demonstrated risk of irreparable harm faced by coal miners is imminent and non-speculative.

### C. The Potential for Injury to the Miners Outweighs Any Possible Harm to Others

The injunction would not cause any injury to anyone, and would prevent the unnecessary deaths of miners involved in underground accidents. Since the purpose of the Mine Act is to "provide more effective means and measures for improving the working conditions and practices in the nation's coal and other mines in order to prevent death and serious physical harm," 30 U.S.C. §801(c), the costs associated with complying with a new regulation would not constitute "harm." The injunction would in fact aid MSHA in complying with the Mine Act; costs incurred would be the costs required to comply with it. MSHA has not suggested it would suffer any particular loss because of the injunction. See National Wildlife Federation v. Burford, 835 F. 2d 305, 326 (D.C. Cir. 1987) (listing types of harm that cause a particular loss--delay, cloud on title, investment costs, permanent loss of aesthetic values, loss of land--as harms that would prevent an injunction from being issued). Neither has MSHA identified any speculative harm. Even if it had, injunctions may not be denied "merely because someone might possibly be harmed at some

time in the indefinite future." FTC v. Weyerhaeuser Co., 665 F. 2d 1072 (D.C. Cir. 1981). Because the injunction would cause no concrete or speculative harm, its benefit to the miners outweighs any potential harm and it should be granted.

**D. Public Interest Favors Issuance of the Injunction**

The public interest is strongly in favor of granting this injunction in order to prevent future deaths of miners. In the first five months of 2006, there were three large, well-publicized, multi-fatal underground coal mine accidents. In these accidents, at least 16 miners died from carbon monoxide poisoning. Future deaths from carbon monoxide poisoning could be prevented by better training and by assuring that all of the SCSRs actually function the way they are designed to function. The public interest lies in preventing more such deaths. Major matters of national concern, like national safety, can outweigh other factors in determining the public interest, but in this case the lives of the miners are the first priority of the Mine Act: there are no national interests that outweigh preserving their lives. See Natural Resources Defense Council v. Pena, 972 F. Supp. 9, 19 (D.D.C. 1997) (national security outweighs other public interests). Additionally, the mining industry would benefit from fewer such deaths, not only because there would be fewer losses of workers, but also because there would not be the negative publicity that surrounds large accidents. This injunction would be consistent with the Mine Act in protecting the lives of the miners, the mine industry's most important resource; since there are no other superseding national interests, this injunction should be issued.

**II. Entitlement to Mandamus Relief**

11

This court should exercise its mandamus jurisdiction because the UMWA meets all of the requirements: the UMWA has a right to the relief, MSHA has a clear duty to act, and the UMWA has no other adequate remedy available. American Cetacean Soc'y v. Baldridge, 768 F. 2d 426 (D.C. Cir. 1985).

The UMWA has a clear right to relief in this case because MSHA has unreasonably delayed acting to protect the lives of the miners. Unreasonable delays give a clear right to relief under the Mandamus Act. Liberty Fund, Inc. v. Chao, 394 F. Supp. 2d 105, 114 (D.D.C. 2005). Telecommunications Res. and Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984) sets forth the six principles relevant in determining whether delay by an agency is so unreasonable as to warrant mandamus relief:

> "(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed."

Id. at 80 (citations omitted). MSHA's delays in this case might have been reasonable if only economics were at stake. But human lives, "human health and welfare," are at stake. The ETS set forth in March 2006 does not constitute a timely and appropriate action, because it does not provide the protection sought. It does not provide for random testing of the SCSRs currently in service to determine whether the SCSRs are functioning, nor does it allow for the "hands-on"

12

testing in emergency-like circumstances that would demonstrate to the miners how it really feels to operate the SCSRs in an emergency.[5] Without these key safety precautions, the ETS does not significantly improve the safety of workers. MSHA has been delaying rulemaking since it articulated serious concerns, in 1999, about whether existing regulations were adequate. 64 Fed. Reg. 36632. Then, in 2001, MSHA withdrew its proposed rulemaking on SCSR improvements from the semi-annual regulatory agenda, despite the fact that there had not been - and still have not been - any improvements in SCSR reliability or miners' training.

Moreover, one of this year's tragic mine accidents occurred *after* the ETS came into effect: the Darby No. 1 explosion in Kentucky on May 20, 2006. Autopsy reports from the Darby disaster show that three of the miners died of carbon monoxide poisoning. Their SCSRs were the same model as those used by the victims of the Sago Mine disaster. Exhibit 6 to UMWA Memo. Shortly after the Darby disaster, Davitt McAteer, the lead investigator at Sago, suggested "either the device has some problem or else the training has some problem." Exhibit 7 to UMWA Memo. The ETS did not prevent further deaths, so clearly it offers neither sufficient nor timely protection. MSHA has not passed regulations requiring testing of SCSRs, nor has it increased the training requirements to require training that adequately prepares miners for their use. The measures MSHA has implemented, such as the ETS, do not address the problems this action seeks to remedy.

---

[5] The ETS "recommends" that mine operators provide training in simulated emergency conditions, but mine operators are neither obliged to do so, nor does this contemplate requiring miners to breathe through an SCSR, which is critical to ensuring miners will use them properly when an emergency strikes. Even SCSRs that provide oxygen can be extremely difficult to use, causing miners to feel like they are not getting oxygen even if the SCSR is providing some protection. See Ledford affidavit, Attachment 1 to UMWA Opposition to Motion to Dismiss, and Exhibit 5 (at par. 7) to UMWA Memo.

13

Not only has MSHA refused to take the protective actions the UMWA requested, but the Agency suggests there is no problem because the SCSR units are working properly. MSHA's Administrator for Coal Safety and Health, Ray McKinney, stated that the SCSRs deployed at the Sago Mine, Aracoma Alma No. 1 Mine, and the Darby Mine all worked properly "because they all had been activated and they all produced oxygen." McKinney affidavit at par. 7, Attachment A to MSHA Memo. However, the government's tests reveal that all but one of the 22 SCSR units deployed by miners at the Sago Mine had *less than 50%* of the oxygen-producing chemical exhausted by miners (Sago Mine spreadsheet, at Attachment F to MSHA Memo), at the same time 11 of those miners died from carbon monoxide poisoning. Something is not right. The government's position remains steadfast even though MSHA's test results for the units retrieved from the other two multi-fatal disasters in 2006 were similar insofar as those SCSR units also had substantial reserves of the oxygen-producing chemical at the same time that miners died of carbon monoxide poisoning. Id.

The government exhibits an unrealistic Polyanna perspective as to the Darby survivor, too. Mr. McKinney claims that the Darby survivor testified that "no one had difficulty donning the SCSR or causing it to function." McKinney affidavit at par. 14, Attachment A to MSHA Memo. Yet, Mr. Ledford reports that once he donned the SCSR, he

> immediately had a problem breathing…and felt like I was smothering….The farther I walked, the harder it became to breathe….I became so tired and was having such a difficult time breathing that I started crawling. After a short while crawling, I could hardly breathe at all. I thought I would stop and rest for a few minutes, and when I stopped, I passed out. I must have passed out for a long time. When I came to, I still had my mouthpiece in and my nose clips on… When I came to I was very weak. I crawled into the intake air course and rested. Then I continued

> crawling and stopped to rest again....when rescue workers found me. I was totally exhausted and could not have traveled any further on my own....I believe the SCSR failed me and my co-workers. Had I been able to breathe properly, I believe I would have had no trouble walking out of the mine. I believe the SCSR also failed Bill Petra, Paris Thomas, and Roy Middleton, all of whom died of carbon monoxide poisoning.
> Attachment 1 to UMWA Opposition to Motion to Dismiss.

Even when miners utilize SCSR units, they are dying from carbon monoxide poisoning while SCSR units still retain life-saving chemicals. That the miners are not able to achieve the full protection for which these SCSR units are approved, establishes that either the units are not operating properly, or that miners do not know how to use them properly, or both.[6] Yet, MSHA rejects the idea that there is a problem with the status quo and remains unwilling to take needed action to protect miners.

MSHA has the duty to protect the lives of the miners and to continually seek to improve their working conditions. In the Mine Act, Congress recognized the "urgent need" to improve the health and safety of miners. 30 U.S.C. §801(c). MSHA's "first priority and concern" is "the health and safety of its most precious resource—the miner." 30 U.S.C. §801(a). Indeed, MSHA is charged with protecting miners' lives and safety *above all else*. This court has jurisdiction because MSHA's duty is "discretionary within limits." MSHA "cannot transgress those limits, and if [it] does so, [it] may be controlled by injunction or mandamus to keep within them."

---

6 The CSE-brand SCSR units that were in use at all three of the disasters discussed herein get extraordinarily hot when used, "medical experts say the sensation of suffocating would drive most miners to remove the packs, regardless of the threats they face." Associated Press story in Charleston Gazette, July 6 "Mining air pack quality debated", at Attachment B. Chairman of the physiology department at the University of Kentucky College of Medicine, Michael Reid, was also quoted as saying: "There is no kind of perception that is more primal. It's a protective response. It's Darwinian." Id. These professional opinions underscore the necessity for miners to experience the labored breathing in training, before they confront a real emergency.

Ganem v. Heckler, 746 F. 2d 844, 853 (D.C. Cir. 1984). Thus, while MSHA may have some discretion in deciding how to craft certain regulations and in determining which regulations would best promote miners' safety, it is *not* free to completely ignore the testimony of surviving miners or the evidence demonstrating that there are serious problems with both SCSR training and the reliability of the SCSRs. MSHA is *not* free to take *no* action to address SCSR problems. MSHA is *not* free to spend more time debating the *need* for new regulations to address this issue in the face of the several serious accidents in quick succession, and the information revealing very specific problems with the SCSRs, and miners' inability to access the oxygen within them before succumbing to carbon monoxide poisoning. In short, MSHA has overstepped the limits of its discretion.

**Conclusion**

For all of these reasons, and those included in the UMWA's other filings in this matter, the UMWA is entitled to a preliminary injunction. This court must compel MSHA to take action so underground coal miners will be able to rely upon and effectively use their SCSR when confronted with a mine emergency, and must breathe through an SCSR for life-saving oxygen.

Respectfully submitted,

_____
JUDITH RIVLIN, Bar # 305797
United Mine Workers of America
8315 Lee Highway
Fairfax, VA 22031-2215
(703) 208-7180

COUNSEL FOR UNITED MINE WORKERS
OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of July 2006, I have electronically filed the foregoing Plaintiff UMWA's Reply to MSHA's Opposition to UMWA's Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

W. Christian Schumann
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Boulevard, 22nd Floor
Arlington, VA 22209-2296
202-693-9361

Marina Utgoff Braswell
Assistant United States Attorney
United States Attorney=s Office
555 - 4th Street, N.W.
Washington, DC 20530

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001

_____
Judith E. Rivlin