UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED MINE WORKERS OF AMERICA,    )
   INTERNATIONAL UNION,             )
                                    )
         Plaintiff,                 )
                                    )
         v.                         )    Civil No. 06-1053 JDB
                                    )
DAVID DYE,                          )
   Acting Assistant Secretary,      )
   Mine Safety and Health Admin.,   )
   U.S. Department of Labor,        )
                                    )
         Defendant.                 )
                                    )
```

MEMORANDUM IN REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

Plaintiff United Mine Workers of America ("UMWA")'s
opposition to the motion to dismiss filed by the Mine Safety and
Health Administration ("MSHA") is long on emotion but short on
legal analysis.  Moreover, contrary to the tenor of the UMWA's
filings, the union does not have a monopoly when it comes to
concern over the lives and safety of miners.  Rather, as
demonstrated in MSHA's prior memorandum [Defendant's Mem.], and
further explained below, MSHA has taken prompt substantive action
to address the concerns raised by the UMWA with respect to self-
contained self-rescuers ("SCSRs") used in underground coal mines
and is continuing to take action designed to provide additional
protection to miners.

The UMWA argues that the steps taken and being taken by MSHA
are insufficient because MSHA (1) "has refused to engage in

immediate and periodic testing of SCSR units to determine their reliability," (2) "has failed to require immediate and recurring hands-on emergency-like training of underground coal miners in SCSR use, and (3) "has not required coal operators to maintain and submit to MSHA an inventory of their SCSR units." Plaintiff's Opposition to Defendant's Motion to Dismiss {Plaintiff's Opp.], Docket No. 7, at 2.  The UMWA's claims, however, are either unsupported by the facts or insufficient to provide a basis for the drastic mandamus relief the UMWA seeks.

For example, the UMWA has failed to dispute MSHA's showing that periodic testing of some SCSR units for reliability in fact is occurring.  Thus, the dispute really is over how many such units should be tested at a given time.  Given that SCSR testing for some SCSRs is being conducted by MSHA, the National Institute for Occupational Safety and Heath [NIOSH], and mine operators, it is hardly unreasonable for MSHA to decline to test every SCSR unit nation-wide.  The UMWA points to no authority that would require such action, and indeed none exists.

As to training, contrary to the UMWA's claim, hands-on emergency-like training of underground coal miners in SCSR use is now being required.  Thus, this claim is moot.

Finally, whether underground coal mine operators should maintain and submit to MSHA an inventory of their SCSR units is currently the subject of rulemaking, and a final rule will be

published by MSHA by no later than December 9, 2006.  The UMWA
has submitted its comments in connection with this rulemaking.
The UMWA has set forth no compelling argument that would justify
any preemption of these rulemaking proceedings.

Although the UMWA may not be satisfied by the steps taken by
MSHA, this does not create a basis for this Court to exercise
jurisdiction over the UMWA's request for mandamus relief, nor
does it justify the interruption of ongoing rulemaking
procedures.

Accordingly, MSHA's motion to dismiss should be granted.

RECENT FACTUAL DEVELOPMENTS

1.  <u>MSHA Program Policy Letter</u>

On July 21, 2006, MSHA issued a Program Policy Letter
("PPL") pertaining to Section 2 of the Mine Improvement and New
Emergency Response Act of 2006 ("MINER Act"), Pub. L. 109-236,
120 Stat. 493 (2006).  <u>See</u> Second Declaration of Ray McKinney [2d
McKinney Declaration], Administrator for Coal Mine Safety and
Health, attached, at ¶ 3.  Section 2 of the MINER Act requires
all underground coal mine operators to have, within 60 days of
enactment, an Emergency Response Plan ("ERP"), to be approved by
MSHA.  Under the PPL, the ERP should include SCSR training that,
at least once a year, replicates actual SCSR use.  <u>See</u> 2d
McKinney Declaration at ¶ 3 and Attachment A.  Mine operators
must submit ERPs by August 14, 2006; MSHA district managers must

-3-

then evaluate the ERPs and decide whether to approve them.  Id.

    2.    Verification Testing of SCSRs Recovered
          From the Sago, Aracoma, and Darby Mines

    On June 22 and 23, 2006, MSHA had the preliminary test
results for the SCSRs recovered at the Sago, Aracoma, and Darby
Mines verified by Alternative Testing Laboratories, Inc., an
independent laboratory.  Second Declaration of Jeffery Kravitz
[2d Kravitz Declaration], Chief Mine Emergency Operations and
Special Projects for MSHA Technical Support, attached, at ¶ 5.
The results of the verification testing show that the amount of
the oxygen-producing chemical used was, in most cases, higher
than the preliminary results indicated.  See id. and Attachment
A.

    The SCSR-related inquiries which are part of the accident
investigation is continuing, and MSHA and the NIOSH are reviewing
the SCSR test results.  When completed, the SCSR investigation
report will be included in the final accident investigation
report.  2d Declaration of Kravitz, ¶ 6.

    Regarding the Sago Mine accident, seven miners on the 1 Left
Section crew donned their SCSR's prior to safely evacuating the
mine, and five of those SCSRs were recovered and tested.  The
test results show that the SCSRs had been activated and produced
oxygen, and that the percentage of unused oxygen-producing
chemical that was found in these SCSRs was consistent with actual
usage of the SCSR.  2d Declaration of Kravitz, ¶ 7.  Regarding

-4-

the miners on the 2 Left Section crew who were unable to evacuate the mine, MSHA and NIOSH test results show that all twelve of the SCSRs belonging to the miners and which were recovered from that section worked from the standpoint that all twelve had been activated and produced oxygen, and all showed oxygen usage.  2d Declaration of Kravitz, ¶ 8.

Regarding the Aracoma Mine accident, ten miners donned SCSRs in smoke and used the SCSRs to safely evacuate the mine.  Two miners did not evacuate the mine.  The results of the testing of the SCSRs that were recovered from the Aracoma Mine indicate that the amount of the oxygen-producing chemical that was used was consistent with the amount of time that the SCSRs were reported to have been used.  2d Declaration of Kravitz, ¶ 10.

Regarding the accident at the Darby Mine, the test results of the SCSR that was used by the miner who safely evacuated the mine show that the SCSR produced oxygen and that the oxygen-producing chemical that was used was consistent with the miner's actual SCSR usage.  2d Declaration of Kravitz, ¶ 11.

3.    Extension of Comment Period on MSHA's
      Emergency Temporary Standard

On May 24, 2006, MSHA extended the public comment period on the Emergency Temporary Standard ("ETS") issued on March 9, 2006, for 30 days so that interested parties could provide additional comments on issues raised in MSHA's opening statement at the ETS rulemaking hearings.  71 Fed. Reg. 29785 (May 24, 2006).  MSHA

requested additional comments on two issues pertaining to SCSR training: (1) whether a new provision should be added that would allow the use of new SCSR technology, such as SCSRs that have the ability to provide up to two or more hours of oxygen per unit; and (2) whether other realistic emergency evacuation practices should be required, such as conducting a drill in smoke or using a realistic mouthpiece that provides the user with the sensation of actually breathing through an SCSR, commonly referred to as "expectations" training.  See 2d McKinney Declaration, ¶ 4 and Attachment B.  MSHA also requested additional comments on two issues pertaining to SCSR inventory: (1) whether specific information should have to be reported for each SCSR at each mine; and (2) whether operators should have to provide MSHA with a written report of all SCSRs that are used for an accident or emergency and all instances where such SCSRs did not function properly.  See 2d McKinney Declaration, ¶ 4 and Attachment B.

4.  UMWA Comments on the ETS

On June 28, 2006, the UMWA filed comments on the ETS.  With respect to SCSR training, the UMWA stated that it supports a provision which would require "realistic, in-mine training, under conditions that mimic emergency conditions."  2d McKinney Declaration, Attachment C at pp. 10-11.  With respect to SCSR inventories, the UMWA stated that it supports a provision which would require mine operators to provide SCSR inventory

information to MSHA and to report the activation of any SCSR to MSHA. Id. at pp. 5-6. The comment period closed on June 29, 2006. MSHA will consider all comments received and must, under Section 101(b)(3) of the Mine Act, publish the final rule no later than December 9, 2006, that is, nine months after the publication of the ETS. 30 U.S.C. § 811(b)(3).

    5. <u>Update to MSHA's Action Plan</u>

MSHA began implementing an SCSR Action Plan on April 27, 2006. As part of the Plan, MSHA inspectors from all eleven MSHA district offices have had an opportunity to observe some SCSR training and some SCSR functionality tests conducted by mine operators. 2d McKinney Declaration at ¶ 6. Functionality tests were conducted to determine storage distance locations under the ETS. During the functionality tests, the miners donned an actual SCSR and physically walked through portions of the mine. Id. MSHA inspectors have also utilized mine visits to inspect SCSRs and to observe mine operators' hands-on training for donning the SCSRs during the quarterly Mine Emergency Evacuation drills held at the mine. Id. Few problems were identified by MSHA inspectors with respect to SCSR functionality or training, and those that were identified were immediately corrected. Id. MSHA is continuing to monitor SCSR functionality and training under its Action Plan. Id.

6.  <u>Recent SCSR Usage at an Underground Coal Mine Accident</u>

On June 30, 2006, a roof fall occurred in the San Juan Mine, an underground coal mine in Waterflow, New Mexico.  <u>See</u> 2d Kravitz Declaration at 6.  A mine foreman, who detected high methane and low oxygen levels in the mine, donned a short duration (10 minute) SCSR and safely traveled approximately 1,100 feet to an SCSR storage cache containing 2 CSE SR-100 SCSRs (the same type of SCSRs used at the Sago, Aracoma, and Darby mines).  <u>Id</u>.  The miner successfully transferred from the 10-minute SCSR to the 60-minute SCSR and safely evacuated the mine.  <u>Id</u>.  The miner traveled approximately 7,800 feet from the time he donned the first SCSR to the time he exited the mine.  <u>Id</u>.

ARGUMENT

I.  Plaintiff Has Failed to Demonstrate any
     Entitlement to Mandamus Relief.

The UMWA does not deny that it is seeking to have this Court order MSHA to: (1) require immediate and random checks of SCSR's and replacement of SCSR's found to be faulty, (2) require immediate and recurring training in SCSR use, and (3) require operators to maintain and submit SCSR inventories, and that such a request is essentially a request for a writ of mandamus.  <u>Compare</u> Def. Mem. at 20 <u>with</u> Plaintiff's Opp. at 8-12.  The UMWA also does not dispute that, given the nature of its request, it bears the burden of showing that its "right to issuance of the writ is "clear and indisputable."'"  <u>Kerr</u> v.

-8-

United States District Court, 426 U.S. 394, 403 (1976) (citations omitted); In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005). Finally, the UMWA does not contest that such a right is "'clear and indisputable" only when the government has a clear duty to perform a ministerial act that is specifically established by law and plainly defined. See, e.g., Nat'l Wildlife Federation v. United States, 626 F.2d 917, 923 (D.C. Cir. 1980); Haneke v. Secretary of Health, Ed. and Welfare, 535 F.2d 1291, 1296 n.15 (D.C. Cir. 1976).

Rather than dispute these well established requirements for mandamus relief, the UMWA argues that it "has a right to relief based on the extraordinary risk posed to underground coal miners who will have to rely on SCSRs in upcoming mine emergencies." Plaintiff's Opp. at 8. No support is offered for the novel proposition that mandamus relief is available solely on the basis that one party believes that it is critically needed. Were this to be the case, the courts would quickly find themselves in the business of governing, as opposed to making judicial determinations with respect to decisions made by the executive branch of government.

The UMWA next argues that MSHA "has the duty to protect the lives of the miners and to continually seek to improve their working conditions." Plaintiff's Opp. at 9. This assertion gets the UMWA nowhere in this case. The salient question for mandamus

relief is whether MSHA has failed to act in a specific, plainly
defined manner that is clearly required by law.  <u>See</u>, <u>e.g.</u>,
<u>Haneke</u> v. <u>Secretary of Health, Ed. And Welfare</u>, 535 F.2d at 1296
n.15.

 The UMWA concedes that MSHA has "some discretion" in
determining how best to promote miner safety.  Plaintiff's Opp.
at 10.  This concession is fatal to the UMWA's request for
mandamus relief, as it constitutes an acknowledgment that MSHA
has no clear duty to act in a specifically defined manner to
protect miners.  If the specific actions the UMWA seeks to have
imposed on MSHA are not clearly required by law, as the UMWA
implicitly concedes, then no mandamus relief is available.

 The UMWA's only legal response to MSHA's argument concerning
mandamus is set forth in its reply to MSHA's opposition to the
UMWA's motion for injunctive relief [Plaintiff's PI Rep.], Docket
No. 10, in which the UMWA argues for the first time that it is
entitled to such relief under the principles set forth in
<u>Telecommunications Research & Action Center</u> v. <u>FCC</u>, 750 F.2d 70
(D.C. Cir. 1984) ("<u>TRAC</u>").  Plaintiff's PI Reply at 11-16.  The
UMWA's argument represents a fundamental misunderstanding of the
principles in <u>TRAC</u>, which were addressed by this Court in <u>Liberty
Fund, Inc.</u> V. <u>Chao</u>, 394 F. Supp.2d 105 (D.D.C. 2005), also cited
by the UMWA.  Plaintiff's PI Reply at 12.

 As the Court of Appeals for this Circuit explained at length

in In re Tennant, the All Writs Act "is not itself a grant of jurisdiction": it authorizes a court to issue a writ of mandamus only "in aid of" jurisdiction which the court has from some other source.  In re Tennant, 359 F.3d 523, 527-31 (D.C. Cir. 2004).  Although TRAC holds that courts may issue writs of mandamus in cases in which agencies have engaged in "unreasonable delay," the TRAC holding applies only to cases in which the court would have jurisdiction from an independent source to review any final action the agency might take in the future, and the exercise of the court's mandamus authority to review the claim of "unreasonable delay" is necessary "'to protect [the court's] future jurisdiction.'"  Tennant, 359 F.3d at 527 (quoting TRAC, 750 F.2d at 76).  See also In re American Rivers and Idaho Rivers United, 372 F.3d 413, 418 (D.C. Cir. 2004) ("In considering a charge of unreasonable delay, [the court] must satisfy [itself] that the agency has a duty to act and that it has 'unreasonably delayed' in discharging that duty.") (citations omitted).  Simply stated, if the agency has no duty to take any final action which the court would have jurisdiction to review, the court has no authority to review a claim that the agency has "unreasonably delayed" in taking action.

In this case, nothing except the ETS has triggered a duty to take any final action which would be judicially reviewable in the future and would justify TRAC review now.  Although MSHA

published an Advance Notice of Proposed Rulemaking ("ANPR") requesting comments pertaining to SCSRs in July 1999, it withdrew the ANPR from its regulatory agenda in December 2001 and, except for the ETS it promulgated in March 2006, did not subsequently reinitiate rulemaking regarding SCSRs in any way.  Defendant's Mem. at 8-13.  Compare with OCAW v. Zegeer, 768 F.2d 1480, 1483-85 (D.C. Cir. 1985) (MSHA had an ongoing duty to take rulemaking action because it promulgated an ANPR and "agreed ...to undertake a thorough a notice and comment process").  Although the UMWA sent MSHA a letter demanding that MSHA conduct immediate SCSR testing and training on May 1, 2006, that letter did not trigger a duty to take any judicially reviewable final action.  Because the UMWA "never initiated a proceeding [with MSHA]," there is no basis for TRAC review in this case.  Tennant, 359 F.3d at 529 (noting that there were several established procedures by which the plaintiff could have initiated, but did not initiate, a proceeding before the agency).[1]

_____

[1]    The Mine Act specifically imposes three duties on MSHA with respect to taking regulatory action.  The first two concern MSHA action in response to a recommendation from the NIOSH or from an advisory Committee. 30 U.S.C. § 811(a)(1).  Neither is applicable here.  The third requirement for MSHA with respect to regulatory action, found in Section 101(a)(4) of the Act, states that, after going through notice-and-comment rulemaking, MSHA must within 90 days after the hearing record is certified publish a rule or an explanation for its decision not to publish a rule. 30 U.S.C. § 811(a)(4).  These three provisions are the **only** events the Mine Act specifically identifies as triggering a duty to take regulatory action which, when final, would be judicially reviewable.  If there are other events that could trigger such a

(continued...)

Nonetheless, even if the TRAC holding is applicable in this case, the UMWA has fallen far short of satisfying the TRAC criteria for mandamus relief.  In TRAC, the D.C. Circuit identified six principles for evaluating claims of unreasonable agency delay: (1) the time the agency takes to make a decision must be governed by a "rule of reason"; (2) whether there are any statutory timetables or other Congressional indications of how quickly the agency should proceed; (3) whether human health and welfare are at stake; (4) the effect of expediting delayed agency action on agency activities of a "competing or higher priority"; (5) what interests are prejudiced by the delay; and (6) agency impropriety is not a prerequisite to finding unreasonable delay.  Id., 750 F.2d at 80.  In this case, the first and the fourth principle in particular preclude a finding of unreasonable delay.

As to the first principle, the UMWA sent its letter demanding that MSHA take action with respect to SCSRs on May 1, 2006 -- approximately five weeks before the UMWA initiated this case.  The UMWA itself states that "the SCSR problems came to

---

[1](...continued)
duty, the UMWA has not identified any in this case.  It should also be emphasized that, if anything triggered a duty in this case to take regulatory action under Section 101 of the Act, jurisdiction under TRAC would exist exclusively in the court which had jurisdiction to review the final action.  TRAC, 750 F.2d at 77-79.  That court would be the D.C Circuit or another appropriate Court 0f Appeals – not this Court.  30 U.S.C. § 811(d).

light" after MSHA published its ETS on March 9, 2006.
Plaintiff's PI Reply at 3.  In essence, the UMWA asserts that the
SCSR problems came to light when Sago Mine survivor Randal McCloy
wrote a letter regarding the Sago disaster on April 26, 2006.[2]
Id. at 7-8.  MSHA can hardly be said to have engaged in
unreasonable delay in responding to a problem the UMWA itself did
not recognize until only a few months ago.

As to the fourth principle, MSHA, at the same time it is
diligently addressing the asserted SCSR problems on a nation-wide
basis, is working to address a number of other competing
priorities pertaining to miner safety.  Those priorities include
implementing the March 9th ETS at all mines throughout the Nation
and completing the ETS rulemaking -- a rulemaking which is
statutorily required to be completed by December 9, 2006.  See 2d
McKinney Declaration at ¶ 4.  They also include complying with
the recently enacted MINER Act, which requires MSHA, inter alia,
to receive and start evaluating Emergency Response Plans ("ERPs")
from underground coal mine operators throughout the Nation by
August 14, 2006.  Id. at 1-2.  It would be particularly
inappropriate for this Court to order MSHA in effect to put the
action the UMWA demands "'at the head of the queue'" when
Congress itself has directed MSHA to devote its limited resources

---

[2] In fact, the ETS was promulgated in response to the Sago
and Aracoma Alma mine disasters, see 71 Fed. Reg. 12252 (Mar. 9,
2006), and addressed the issue of SCSRs in several respects.  Id.

to immediately addressing competing priorities.  Mashpee
Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100-01
(D.C. Cir. 2003) (the problem of ordering priorities in the face
of limited resources is "'a problem for the political branches to
work out'") (quoting In re Barr Laboratories, Inc., 930 F.2d 72,
75-76 (D.C. Cir. 1991)).

This Court recognized this very principle in Liberty Fund,
Inc. V. Chao, by holding that under TRAC's "'rule of reason', the
agency's provision of a projected timeline for balancing
competing priorities -- one that provides relief in the
foreseeable future -- weighs against the issuance of mandamus."
Id., 394 F. Supp.2d at 116.  In the instant case, regulatory
changes pertaining to SCSRs have either already occurred or are
under active consideration.

For example, the March 2006 ETS requires hand-on training in
the use of SCSR units in the context of mine emergency evacuation
drills which must be conducted at a mine.  See Defendant's Mem.
at 11-12.  Additionally, in the July 21, 2006 Program Policy
Letter, MSHA ordered underground coal mine operators to submit by
September 21, 2006, an Emergency Response Plan which includes
SCSR training that must, at least once a year, replicate actual
SCSR use.  2d McKinney Declaration at ¶ 3 and Attachment A.
These requirements directly address the UMWA's complaint that
SCSR training is defective because it does not consist of hands-

on, emergency-like training.  Indeed, these requirements by MSHA

moot the UMWA's request for mandamus and/or injunctive relief

with respect to SCSR use training.  See, e.g., Columbian Rope

Company v. West, 142 F.3d 1313, 1316 (D.C. Cir. 1998) (even where

live controversy exists when case filed, the mootness doctrine

requires a federal court to refrain from deciding it if

subsequent events will cause the decision to have no present

effect on the rights of the parties).

As to the testing of SCSR units, the UMWA provides no

evidence to dispute that MSHA and NIOSH have a testing program in

which a certain number of SCSR units are evaluated each year.[3]

Compare Defendant's Mem. at 9 and Attachments A & B to that

memorandum with Plaintiff's Opp. at 3.  Rather, the UMWA simply

argues that MSHA should undertake "nationwide testing of SCSR

units" and that "MSHA has refused to engage in immediate and

periodic testing of SCSR units. . . ."  Plaintiff's Opp. at 2-3.

Given the UMWA's complete lack of evidence that no SCSR unit

testing is being undertaken, this in fact is not a question of

---

[3] In addition, under 30 C.F.R. § 75.1714-3, mine operators
are required to ensure that SCSRs that are worn or carried into
the mine are inspected for damage and integrity of the seal, and
that all SCSRs are tested in accordance with instructions
approved by MSHA and NIOSH.  Such instructions would include
testing that would estimate the ability of the SCSR to remove
carbon dioxide when the SCSR is used.  2d Kravitz Declaration at
¶ 15.  Moreover, NIOSH performs quality assurance audits at the
facilities of all SCSR manufacturers to assure that the
manufacturers are following their approved quality assurance
plans and procedures.  2d Kravitz Declaration at ¶ 14.

MSHA not taking action; rather, it is a question of the extent of the action being taken.  Yet the UMWA cites no authority that would require MSHA to test all SCSR units nation-wide.

Indeed, there is no such authority and no such duty should be imposed.  Congress enacted the Mine Act to improve the "working conditions and practices in the Nation's ... mines in order to prevent death and serious physical harm ... in such mines." 30 U.S.C. § 801(c).  MSHA was created to carry out the provisions of the Act.  29 U.S.C. § 557a.  MSHA's statutory duties include "provid[ing] technical assistance to operators ... [to] improv[e] the ... safety conditions ... in ... mines."  30 U.S.C. § 952(b). Mine operators, however, with the assistance of miners, retain "the primary responsibility" under the Act for ensuring safety in their mines.  Id. § 801(e).  Imposing a duty to test SCSRs on MSHA when it provides technical assistance would, in effect, shift the primary responsibility for safety away from operators and onto MSHA.  Despite the UMWA's argument to the contrary, MSHA does not substitute itself for the mine operator when it provides technical assistance to operators. See Myers v. United States, 17 F.3d 890, 903 (6th Cir. 1994) (stating that holding the government liable for undertaking to fulfill a duty owed by an operator to its miners would require the court "to ignore [the] plain language" of 30 U.S.C. § 801).

In addition, there is no factual support for such nation-

wide testing because there is no clear evidence that the recent
tragic mine deaths were caused by a failure of SCSR units, as
opposed to improper use of the SCSR units.  See Docket No. 12,
Plaintiff's Supplemental Authority, at 49-55 (concluding that in
the Sago mine disaster the evidence is unclear at to whether
certain SCSRs were not functioning or whether they were not being
used properly).  Thus, there not only is no failure to act in
this regard, but there is no clear duty for MSHA to test all SCSR
units.  As a result, mandamus relief on this issue plainly is
unavailable.[4]

Finally, with respect to the UMWA's claim that underground
coal mine operators are not required to maintain and submit to
MSHA an inventory of their SCSR units, this issue is currently
the subject of the ETS rulemaking and will be decided by MSHA by
December 9, 2006.  See Defendant's Mem. at 10-11; supra at 4-5.
As the UMWA has failed to point to any duty imposed on MSHA to
require the reporting of such an inventory, the request for
mandamus relief on this issue also must fail.  To the extent that
the UMWA is seeking judicial relief other than mandamus, MSHA has
demonstrated, and the UMWA has failed to successfully rebut, that

---

[4] The UMWA's reliance on the state-sponsored preliminary
report to West Virginia Governor Manchin on the Sago Mine
Disaster, filed at Docket No. 12, appearing to recommend a
nation-wide audit of SCSRs, provides no grounds for mandamus
relief against MSHA with respect to this issue.  Not only is
there no explanation of what such an audit would entail, but the
UMWA has failed in its burden of proof to demonstrate that MSHA
has a clear duty to take such action.

this issue is the subject of ongoing rulemaking proceedings and thus there is no final agency action to review.  <u>See</u> Defendant's Mem. at 28-29.  The UMWA offers no basis for interrupting the rulemaking proceedings.

The evidence in this case simply does not support the UMWA's plainly unfounded claim that MSHA is taking "*no* action to address SCSR problems", and merely spending its time "debating the *need* for new regulations to address this issue," and "has overstepped the limits of its discretion."  Plaintiffs' Opp. at 16.  Rather, the unrefuted evidence shows that MSHA has been actively involved in trying to address any SCSR problems that have been shown to exist by reliable evidence.  MSHA also has acted to address concerns raised the UMWA even where there is no concrete evidence that the problem raised is widespread and/or recurring.  Under such circumstances, UMWA's claims of a failure to act by MSHA fall far wide of the mark.

The novel notion that this Court should grant mandamus relief because MSHA is not doing exactly what the UMWA thinks it should be doing, and is not taking action on a timetable that the UMWA believes is appropriate, should be rejected.

<u>CONCLUSION</u>

For the foregoing reasons, and those set forth in defendant's prior memorandum, defendant respectfully submits that

this case should be dismissed.

                                Respectfully submitted,


                                _____
                                KENNETH L. WAINSTEIN, D.C. BAR #451058
                                United States Attorney


                                _____
                                RUDOLPH CONTRERAS, D.C. BAR # 434122
                                Assistant United States Attorney


_____
                                MARINA UTGOFF BRASWELL, DC BAR #416587
                                Assistant United States Attorney
                                U.S. Attorney's Office
                                555 4th Street, N.W. – Civil Division
                                Washington, D.C. 20530
                                (202) 514-7226



OF COUNSEL:

HOWARD M. RADZELY
Solicitor of Labor

EDWARD P. CLAIR
Associate Solicitor

W. CHRISTIAN SCHUMANN
Counsel, Appellate Litigation

JACK POWASNIK
Attorney
Office of the Solicitor
U.S. Department of Labor