**Opening Statement**
**Charleston, West Virginia**
**May 9, 2006**
**Public Hearing – Emergency Mine Evacuation**

Good morning, my name is Patricia W. Silvey. I am Acting Director of the Office of Standards, Regulations, and Variances for the Mine Safety and Health Administration. I will be the moderator of this public hearing on MSHA's emergency temporary standard, or ETS, for emergency mine evacuations.

Pause – "moment of silence"

On behalf of David G. Dye, Acting Assistant Secretary of Labor for MSHA, I want to welcome all of you here today. Also attending this public hearing are several individuals from MSHA who are on the committee drafting the rule: Eric Sherer, of the Coal Mine Safety Division and Chair of the committee; Jeffery Kravitz, Chief of Mine Emergency Operations and Special Projects, Pittsburgh Safety and Health Technology Center; Thomas MacLeod, Policy and Program Coordination Division, Educational Policy and Development; Ken Sproul, Quality Assurance Division, Approval and Certification Center; Robert Snashall from our Solicitor's Office; and Debra Janes, Regulatory Specialist and Ron Ford, Economist, from my office.

1

This is the last of four hearings on the emergency standard. The first hearing was held in Denver, Colorado on April 24, the second was held in Lexington, Kentucky on April 26, and the third was held in Arlington, Virginia on April 28. Copies of the Emergency Temporary Standard (ETS), the Federal Register Notice that rescheduled this hearing from April 11 to May 9, and Volumes 1 and 2 of the compliance guide are available on the table where you signed in your attendance.

The purpose of these hearings is to receive information from the public that will help us evaluate the requirements contained in the emergency standard and produce a final rule that promotes safe and effective evacuation of miners during mine emergencies. We also will use data and information gained from these hearings to help us craft a rule that responds to the needs and concerns of the mining public, so that the provisions of the emergency standard can be implemented in the most effective and appropriate manner. We published the ETS in response to the grave danger to which miners are exposed during underground coal mine accidents. The ETS includes requirements in four areas. The first area, immediate accident notification, is applicable to all underground and

surface mines. The three other areas covered by the rule, self-contained self-rescuer storage and use, evacuation training; and installation and maintenance of lifelines, apply only to underground coal mines. During these four hearings, we will solicit public input on these issues. The hearings will give manufacturers, mine operators, miners and their representatives, and other interested parties an opportunity to present their views on these issues.

MSHA issued this emergency standard on March 9, 2006 in response to the tragic accidents at the Sago Mine on January 2, 2006 and the Aracoma Alma No. 1 Mine on January 19, 2006. MSHA determined that better notification, safety, and training standards are necessary to further protect miners when a mine accident takes place.

The ETS was issued in accordance with section 101(b) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. 811. Under 101(b), the emergency standard is effective until superseded by a mandatory standard, which is to be published no later than nine months after publication of the emergency standard. The emergency standard also serves as a proposed rule for this purpose.

As stated earlier, we will use the information provided by you to help us decide how best to craft the final rule. In addition to the provisions of the emergency standard, we are also considering the following issues and seek further information from you. Many of these issues were raised either in the preamble to the ETS or in questions we received from the public in response to the ETS. As you address these issues (either in your comments to us today or those sent to us in Arlington) please be as specific as possible with respect to impact on safety and health, mining conditions, and the feasibility of implementation.

Additional Issues

1. Should miners have the ability to tether themselves together during escape through smoke-filled environments? If so, what length of tether between miners should be required? Should a miner's tether be capable of clipping easily to another's so that any number of miners could be attached together to work their way out of the mine? How should the tether be attached to the miners' belts, or should there be a place other than the miners' belts to attach the tether to the miners? Should the tether be constructed of durable and/or reflective material? Where should the tether

be stored on the section or could it be part of the miner's belt? Should it be stored with the additional SCSRs in a readily accessible and identifiable location, or in a separate location?

2. Should a training record under new paragraph 75.1502 (c)(3) not only include a requirement that mine operators certify, by name, all miners who participated in each emergency evacuation drill, but also include additional information, such as a checklist? The checklist could be used to itemize the successful completion of each step of the training, as outlined in the approved program of instruction.

3. When should a miner don an SCSR during an evacuation? Currently, miners are told to don an SCSR when they believe they are in danger or when smoke is encountered. This may leave miners vulnerable to irrespirable air, such as air that contains lethal carbon monoxide levels or low-oxygen. MSHA is considering requiring that at least one miner in a group of miners, and an individual miner when working alone, have at least one multi-gas or air quality detector with them.

4. In the preamble to the ETS, we discussed a method to locate additional SCSRs, based on a joint MSHA – NIOSH heart rate study.

MSHA solicits comments on the heart rate method. What other reliable alternatives exist for determining where to position additional SCSRs in the mine?

5. MSHA is considering a requirement that additional SCSRs under new paragraph 75.1714-4 (c) be stored in all escapeways at intervals of 5,000 feet for mines where the escapeway height is above 48 inches and 2,500 feet for all other mines. Would a specification standard be more appropriate than the performance-oriented heart-rate method provided in this ETS? Regarding such a specification-oriented standard, what would be more appropriate: a 5,000 foot interval for coal seams greater than 48" in height and a 2,500 foot interval for coal seams 48" or less in height? Would some other specific intervals be more appropriate?

6. Should all underground coal miners be required to use SCSRs exclusively? If so, is it appropriate to prohibit the use of filter self-rescuers ("FSRs") in all underground coal mines? In addition, MSHA is considering adding a new provision to § 75.1714-4 that would allow the use of new SCSR technology to comply with the standard, such as SCSRs that have the

6

ability to provide up to two or more hours of oxygen per unit. Is such a provision appropriate?

7. Manufacturers sometime lose track of which mines purchased their SCSRs. When a mine shuts down, the SCSRs are often sold to another mine. In the past, problems have been discovered with all brands of SCSRs. MSHA is considering requiring that the following information be reported for each SCSR at each mine: 1) the total number of SCSRs, 2) the manufacturer, 3) the model, 4) the date of manufacture, and 5) the serial number. Is it appropriate to require mine operators to report to the relevant MSHA District Manager the total number of SCSRs in use at each underground coal mine? If so, should any additional information be reported?

8. Because in the past MSHA did not always learn of problems associated with SCSRs, MSHA is considering a requirement that mine operators promptly, report to the MSHA District Manager, in writing, all incidents where any SCSR required by § 75.1714, is used for an accident or emergency, and all instances where such SCSR devices do not function properly. In addition, when any SCSR device does not function properly,

the mine operator would be required to retain the device, for at least 90 days, for investigation by MSHA. These requirements would help assure that MSHA is notified of problems in a timely manner so that MSHA can provide timely notice to both manufacturers and users to assure that the affected SCSRs are available for testing and evaluation. Should MSHA include such requirements in the final rule?

9. SCSR storage locations in escapeways may not be readily accessible to all persons underground, such as pumpers, outby crews, and examiners. Are there other ways to provide readily accessible SCSR coverage for these miners? Are there other storage locations that would be readily accessible to such persons?

10. MSHA sought comments on the appropriateness of requiring that signs to help locate SCSR storage areas be made of a reflective material. MSHA also asked whether there are alternative methods available for making SCSR storage locations easy to locate when conditions in the mine might obscure the storage location. What methods exist that would make SCSR storage locations readily visible?

11. Under new paragraph 75.1714-4 (c), operators are required to have separate SCSR storage in each escapeway. Where a mine has parallel and adjacent escapeways, under what circumstances would it be appropriate to allow a hardened room or "safe haven," which serves both escapeways with one set of SCSRs? A hardened room is a room constructed with permanent seal techniques, submarine-type doors opening to both escapeways, and positive ventilation from the surface through a borehole. Is a safe haven an acceptable alternative? If so, what should be the minimum criteria for MSHA to accept a hardened room or safe haven?

12. Currently, cone systems on lifelines vary, some with the cones pointing toward the face, and others pointing away from the face. Miners may become confused in an emergency as to the direction of escape. Should cones or other directional indicators on lifelines be standardized? Following a NIOSH recommendation and for ease of movement, should the point end of the cone be toward the face?

13. Miners should be able to safely evacuate a mine without the use of mechanized transportation. There may be unique escapeway conditions

including ladders, mandoors, airlocks, and overcasts where hands-on experience of these conditions is required in order to escape the mine. It is reasonable to require that miners walk the escapeways at least under these unique escapeway conditions. Should all miners be required to walk the escapeway in its entirety rather than use mechanized transportation during the drills required by new paragraph 75.1502 (c)? We are considering including a requirement in the part 48 training program for new miners that new miners travel, at least in part, both escapeways. Would this training be appropriate and should the training include walking part or all of the escapeways?

14. A more instructive emergency evacuation practice may be provided by using realistic drills. For example, conducting a drill in smoke, or using a realistic mouthpiece that provides the user with the sensation of actually breathing through an SCSR, commonly referred to as "expectations" training, are more realistic than simulation training. What other realistic emergency evacuation practices and scenarios would ensure that miners are better prepared to act in an emergency?

We intend that scenarios required by the Approved Program of Instruction under paragraph 75.1502 (a) be used to start and to conduct the mine emergency evacuation drills required by paragraph 75.1502 (c). For example, to start a drill, the section foreman may choose one of the mine's approved explosion scenarios. The foreman would gather the miners on the section and state where the explosion occurred, any special circumstances of the event, and conditions requiring immediate donning of SCSRs. The foreman and miners would then physically follow the best options for evacuation as they evacuate the mine. When the miners travel to the place or into the conditions that require immediate SCSR donning, the need to don the SCSR must be made clear so that it is understood by all.

15. We expect that the scenarios developed as part of the mine emergency and firefighting program of instruction under new paragraph 75.1502 (a) would be included as part of the emergency evacuation drills under new paragraph 75.1502 (c), making the drills more realistic. Should we further clarify this issue in the final rule? Are there additional requirements that should be included in this training to make it more realistic, such as conducting SCSR donning in a smoke-filled environment?

16. We are considering putting all emergency evacuation drill requirements in § 75.1502. Thus, for example, the escapeway drill requirements under existing § 75.383 pertaining to the frequency of drills, how far miners travel in the drills, and the number of miners involved in each drill would be incorporated into requirements under new § 75.1502. Under paragraph 75.383(b)(1) each miner must participate in a "practice escapeway drill" at least once every 90 days, but is only required to travel to the area where the split of air ventilating the working section intersects a main air course, or 2,000 feet outby the section loading point, whichever distance is greater. Under new § 75.1502, during the emergency evacuation drills, the miners must travel to the surface or to the exits at the bottom of the shaft or slope. Existing paragraphs 75.383(b) (2) and (b) (3) require that "practice escape drills" occur at least once every 6 weeks, but only involve 2 miners and a supervisor. Miners systematically rotate in taking these drills, so that eventually all miners participate. Under new § 75.1502, emergency evacuation drills are required for all miners and at periods of time not to exceed 90 days. We will have to reconcile these time differences.

MSHA is requesting comments on this approach. We also are considering requiring section bosses to travel both escapeways in their entirety prior to acting as a boss on any working section or at any location where mechanized mining equipment is being installed or removed.

17. We also are considering requiring that all mine fires be reported to MSHA, including fires shorter than 30 minutes duration. This would address all mine fire hazards, including situations where a number of short duration fires occur. Should the definition for "accident" in existing paragraph 50.2 (h) (6) be revised to include all unplanned underground mine fires, or fires of a particular type or duration, or occurrences at particular locations in the mine?

To date we have received 2 comments on this emergency standard. You can view these comments on our website at the following address: www.msha.gov under the section entitled "rules and regulations." We have also answered several questions on compliance with the ETS covering a range of issues. These questions and answers are posted on our web page.

13

Finally, we have received questions as to whether the emergency evacuation training provisions for metal and nonmetal mines are affected by the ETS. While the ETS amends part 48 by adding references to the requirements for emergency evacuation plans in existing § 57.11053 for underground metal and nonmetal mines, these reference do not affect the existing training requirements for metal and nonmetal miners and it is our intent not to change the existing part 48 emergency evacuation training provisions for metal and nonmetal mines. We will clarify this in the final rule.

The format of this public hearing will be as follows:

- Formal rules of evidence will not apply, and this hearing will be conducted in an informal manner.

- Those of you who have notified MSHA in advance of your intent to speak or have signed up today to speak will make your presentations first. After all scheduled speakers have finished, others can request to speak.

- If you wish to present written statements or information today, please clearly identify your material. When you give it to me, I will identify the material by the title as submitted. You may also submit

comments following this public hearing. To be considered, they must be submitted to MSHA by May 30, 2006, which is the close of the comment period. Comments may be submitted by any of methods identified in the ETS. Again, we have copies of the ETS in the back of the room, and posted on our web page at www.msha.gov .

MSHA will post the transcripts of all of the public hearings on our website. Each transcript should be posted there approximately one week after the completion of the hearing.

We will begin with persons who have requested to speak. Please begin by clearly stating your name and organization for the record to make certain we obtain an accurate record when you speak. Our first speaker today is:

second
McKinney Declaration - Attachment B