Received 6/28/06
MSHA/OSRV

United Mine Workers of America
Comments
on the
United States Department of Labor
Mine Safety and Health Administration's
Emergency Temporary Standard
for
Emergency Mine Evacuation
Published March 9, 2006

The United Mine Workers of America (UMWA or Union) is pleased to offer these comments on this extremely important matter facing the coal miners of the Nation. The UMWA is acutely aware of the significance of the Emergency Temporary Standard for Mine Emergency Evacuation (ETS) proposed by the Mine Safety and Health Administration (MSHA or Agency). In its limited history as an agent for miners' health and safety, this marks only the third time it has seen fit to use the powers afforded them by the United States Congress to press an action that would immediately benefit the Nation's miners. Unfortunately, those previous acts were, as is the present case, in the aftermath of a horrific accident in a coalfield community. The UMWA will attempt to offer comments that address the issues raised by the Agency and also address those matters that have not been mentioned or have only been given a limited attention.

The Agency requests specific comments on seventeen questions raised in the ETS. The Union's response to each of these are as follows.

1) Should miners have the ability to tether themselves together during escape through smoke-filled environments? If so, what length of tether between miners should be required? Should a miner's tether be capable of clipping easily to another's so that any number of miners could be attached together to work their way out of the mine? How should the tether be attached to the miners' belts, or, should there be a place other than the miners' belts to attach the tether to the miners? Should the tether be constructed of durable and/or reflective material? Where should the tether be stored on the section, or could it be part of the miner's belt? Should it be stored with additional SCSRs in a readily accessible and identifiable location, or in a separate location?

**UMWA Response:**

Yes, miners should have the ability to tether themselves together in order to have the best chance of escaping the hazardous conditions that are encountered during a mine emergency. The length of the tether should be sufficient to permit each miner ease of movement in the event they are either walking or crawling. A length of six to eight feet should be sufficient for conditions that may be encountered.

The tether should be capable of attaching easily to each miner that would be evacuating the affected area of the mine. This would include outby miners who would be encountered as miners from the working sections or other inby areas of the mine proceed to the surface. It may

AB46-COMM-34

*Second*
McKinney Declaration – Attachment C

be obvious, but important to note that tethering must occur in a systematic manner. (Miners would need training to attach themselves to the inby person to avoid confusion and tripping conditions that could otherwise occur.) This practice would allow "unlimited tethering", however, it would not permit a condition where an unmanageable number of miners were tethered to a single location.

The tether should be attached to the miners' belt with a spring loaded quick clip that allows for a single motion non-mechanical application. The miners' belt should be equipped with a ring or appropriate device to accept this clip, that would be attached to the tethering line. Under no circumstance should the tether be attached to the miners' belt prior to necessary use.

Tethers must be constructed of both durable and reflective material. They must be available at the inby end of the directional lifeline and at readily accessible locations along both the primary and secondary escapeways, but at least at every SCSR storage location. (As noted previously, the tether should not be a permanent part of any miners' belt. However, a ring for quickly coupling the tether must be part of the belt.)

2)   Should a training record under new paragraph 75.1502(c)(3) not only include a requirement that miners -- mine operators certify, by name, all miners who participated in each emergency evacuation drill, but also include additional information, such as a checklist? The checklist could be used to itemize the successful completion of each step in the training, as outlined in the approved program of instruction.

**UMWA Response:**

We are convinced that documentation of who participated in any emergency evacuation training is necessary and a checklist of activities completed may be beneficial, however, we are just as convinced that requiring this limited documentation is ineffective for assuring that the training was successfully performed, in whole or in part.

The Mine Safety and Health Administration has a responsibility beyond what has become paperwork compliance. There must be a verifiable method of insuring that training is conducted as required by the Federal Mine Health and Safety Act of 1977 (Mine Act) and regulations. The Union understands the capabilities and duties of the Inspectorate employed by the Secretary of the Department of Labor. Because of the understanding, we feel comfortable that necessary training has been completed in an appropriate manner if such a Representative of the Secretary is present to witness this activity. However, the Agency can not rely on the trustworthiness of the operator community and must place this compliance requirement with the Inspectors in each MSHA District. For example, training inadequacies were identified in the aftermath of the JWR #5 explosion, despite seemingly good record keeping. There have been numerous other instances where training was not provided even when the paper records showed the training obligations had been satisfied.

3)  When should a miner don an SCSR during an evacuation? Currently, miners are told to don an SCSR when they believe they are in danger or when smoke is encountered. This may leave miners vulnerable to irrespirable air, such as air that contains lethal carbon monoxide levels or low oxygen. MSHA is considering requiring that at least one miner in a group of miners, and an individual miner when working alone, have at least one multi-gas or air quality detector with them.

**UMWA Response:**

Miners should be instructed to don their SCSR at the first sign of danger. There does not need to be the recognition of smoke, concussion from a blast or other immediate indications to the miner. Verbal notification that a situation has occurred that is a potentially threatening condition is sufficient for any miner to don their SCSR and move towards the surface. There must be recognition by MSHA that in too many instances mine operators place a higher priority on the cost of replacing a rescue device than having a miner err on the side of caution. This fact must be changed and reinforced through training, if miners are to be given the best chance of survival in the event of an emergency.

The Union cannot be more forceful in stating that MSHA must stop simply "considering a requirment that at least one miner in a group of miners, and an individual miner when working alone have at least one multi-gas or air quality detector with them;" instead the Agency should immediately mandate this. At least one qualified individual within any group, and each person working alone must have equipment available to inform miners of their immediate conditions. The Union believes this capability should be required as a condition for any operator to remain in business.

4)  In the preamble to the ETS, we discuss a method to locate additional SCSRs based on a joint MSHA-NIOSH heart rate study. MSHA solicits comments on whether the heart rate method is the most appropriate method to determine location, whether it is realistic, and any other comments you may have. What other reliable alternatives exist for determining where to position additional SCSRs in the mine?

**UMWA Response:**

The UMWA is very concerned that this matter has been an issue of greater debate than is necessary by mine operators. The issue should be at what distances, based on coal seam height and mine conditions, should additional cachets of SCSRs be stored. Unlike the operators, who continue to focus on "cost per unit" when addressing this issue, the Union believes the appropriate measure must be thirty minutes travel time. The UMWA is certain that this determination is not as complicated as either the Agency or mine operators would like to suggest. In fact the Union is convinced these complications are raised to confuse, rather than clarify the issues.

3

*Second*
McKinney Declaration - Attachment C

The Union proposes that a reasonable distance to store additional SCSRs can be realized by simply understanding the seam height, conditions, and the nature of underground mining. The Agency with the assistance of labor, industry and the National Institute for Occupational Safety and Health (NIOSH) can arrive at specific distances almost immediately. In this matter, we wish to stop the cost-induced confusion and implement a common sense approach. It should be clear to everyone with a mining background that this is the correct solution for determining where additional SCSRs should be stored.

5)  MSHA is considering a requirement that additional SCSRs under new paragraph 75.1714-4(c) be stored in all escapeways in intervals of 5,000 for mines where the escapeway height is above 48 inches, and 2,500 feet for all other mines. Would such a specification standard be more appropriate than the performance-oriented heart-rate method provided in this ETS? Regarding such a specification standard, what would be appropriate: a 5,000 and 2,500 foot intervals for heights greater than 48 inches and heights of 48 inches or less, respectively? Or, some other specific interval?

**UMWA Response:**

The Union has responded to this issue in the previous question. However, based on the specific nature of this question the Union notes that, there should be a requirement for SCSRs to be located at specific time frames rather than distances. The Union has offered its expertise to the Agency in cooperation with mine operators and NIOSH in quickly determining how these decisions are to be made.

This question also suggests a desire to offer mine operators a performance based solution to the problem. The Union strenuously objects to this regulatory approach. Allowing deference to any entity must rely on a history of compliance and due diligence. These traits must be earned and this industry has not done that. They generally comply only when forced, and are diligent only when closely monitored. Therefore, performance-based rules should never be an option and trust should be weighted by inspection. The Union demands prescriptive regulations be placed on the mining industry in all instances. This industry has proven itself to be unable to self regulate and willing to sacrifice its workers for the sake of increased production. They have demonstrated their callous disregard for miners. The Agency must not afford them anything less than absolute compliance with clearly defined and enforceable regulation.

6)  Should all underground coal miners be required to use SCSRs exclusively? If so, is it appropriate to prohibit the use of filter self-rescuers in all underground coal mines? In addition, MSHA is considering adding a new provision to 75.1714-4 that would allow the use of new SCSR technology to comply with the standard, such as SCSRs that have the ability to provide up to two or more hours of oxygen per unit. Is such a provision appropriate?

4

*Second*
McKinney Declaration – Attachment C

**UMWA Response:**

The UMWA believes that filter self rescuers have outlived their usefulness and must be removed from the industry. Miners must be equipped with state-of-the-art SCSRs. However, given the malfunctions that have been reported over the course of the past several years and the immediate problems that have been reported by miners in the last emergency situations, it is not sufficient to leave this question in the context it was asked.

Miners must be absolutely confident that the escape apparatus they carry with them and those stored at strategic locations along their escape route will function properly. At this point in time miners cannot say that is true. Therefore, while the Union agrees Self-Contained Self-Rescuers are the proper device for this industry, we cannot say with certainty the current units are the proper ones. These units have proven to be inconsistent at best and steps must be taken to insure operational certainty. The Union supports a rule that would incorporate new technology that would provide better protection, such as 2 (or more) hours of oxygen.

The Union would require the Agency to immediately initiate a random test of at least 3% of all units currently used in the industry. This testing must pull SCSRs that are currently being employed in the industry for activation and testing. These units must be sacrificed, at the expense of management to NIOSH, to determine the fitness of all other units in the field. In addition annual sampling of at least 1% of all SCSR currently deployed in the industry must be subject to the same testing.

This is the only type of testing that will insure operational integrity and enhance miners confidence that these units are fully functional.

7) Manufacturers sometimes lose track of which mines purchased their SCSRs. When a mine shuts down, the SCSRs are often sold to another mine. In the past, problems have been discovered with all brands of SCSRs. MSHA is considering requiring that the following information be reported for each SCSR at each mine: 1) the total number of SCSRs, 2) the manufacturer, 3) the model, 4) the date of manufacture, and 5) the serial number. Is it appropriate to require mine operators to report to the relevant MSHA District Manager the total number of SCSRs in use at each underground coal mine? If so, should any additional information be reported?

**UMWA Response:**

This is a chronic problem in the industry, however, it should not be just a manufacturers' problem. Once SCSRs are purchased by the mine operator (outside of warranty defects) they become the absolute property of the mine operator and must be treated as such.

Having noted the obvious, the Union endorses the efforts of MSHA to track all these devices. We are convinced that, in order to have an effective evacuation plan, all SCSRs must be

*second*
McKinney Declaration - Attachment C

closely tracked. Therefore, we would propose that operators must be required to report, on at least a semi-annual basis all relevant information regarding the rescuers at each operation or in the possession of the operator at any operation or facility. This requirement would include stored units not placed into service and should require at least the following information.

- Number of SCSRs at each location,
- Number of SCSRs within each company,
- Number of SCSRs stored, but not in use,
- Manufacturer,
- Date of Manufacture,
- Serial number,
- Purchase date,
- Origin of purchase,
- Sale of any Self-Contained Self-Rescuer,
- Purchaser of any Self-Contained Self-Rescuer,
- Reason for the purchase, and
- Reason for the sale.

8) Because, in the past, MSHA did not always learn of problems associated with SCSRs, MSHA is considering a requirement that mine operators promptly report to the MSHA District Manager in writing all incidents where any SCSRs required by 75.1714, is used for an accident or emergency, and all instances where such SCSR devices do not function properly. In addition, where any SCSR device does not function properly, the mine operator would be required to retain the device for at least 90 days for investigation by MSHA. These requirements would help assure that MSHA is notified of problems in a timely manner so that MSHA can provide timely notice to both manufacturers and users to assure that the affected SCSRs are available for testing and evaluation. Should MSHA include such requirements in the final rule?

**UMWA Response:**

Yes. The Union contends that reporting to MSHA the activation of any unit for any reason is not a hardship on the operator and would lead to the development of essential information about SCSR reliability and the effectiveness of miners' training on SCSR use. The Union would request that <u>all</u> devices activated, for any reason regardless of whether they function properly or not, be promptly reported to the Agency. The Union further contends that even when a unit may "produce oxygen," its functionality may not be fully adequate. The Union agrees that all such devices should be held on mine property for MSHA inspection for a period of at least 90 days, and that the government routinely analyze how well the deployed SCSR units functioned. The data obtained from these tests must be made available to the public. When units do not fully function, the government should determine the nature of the problem, and whether it was due to an equipment malfunction.

Second
McKinney Declaration – Attachment C

9) SCSR storage locations in escapeways may not be readily accessible to all persons underground, such as pumpers, outby crews, and examiners. Are there other ways to provide readily accessible SCSR coverage for these miners? Are there other storage locations that would be readily accessible to such persons?

**UMWA Response:**

The Union does not believe that pumpers, mine examiners, outby crews and other individuals whose job routinely tracks a designated area or travelway are appropriately placed within the context of this question. These individuals must be afforded the same level of protection on a continuous basis as other miners, including those working in each section. Therefore, management must be required to store adequate SCSRs along each of these miners' travel routes. This does not pose a significant hardship to any employer and should not be deviated from under any circumstance. Several mining companies already store additional SCSRs along fire boss routes and have plans for mobile storage cachets.

In those rare instances where miners are required to enter into and work in areas otherwise considered to be outside the normal mining process, management must be required to take such action(s) that is necessary to insure they are afforded the same level of protection as all other miners, including those working in the section. These circumstances do not offer any difficulty that would eliminate this requirement for any employer and should not be deviated from under any circumstance.

10) MSHA sought comments on the appropriateness of requiring that signs to help locate SCSR storage areas be made of a reflective material. MSHA also asked whether there are alternative methods available for making SCSR storage locations easy to locate when conditions in the mine might obscure the storage location. What methods exist that would make SCSR storage locations readily visible?

**UMWA Response:**

The locations of all SCSR storage cachets should be appropriately marked with reflective material for miners to have the best possible chance of locating these devices. The Union does, however, recognize the fact that such markings would have little benefit to miners should they encounter thick smoke or toxic gases. Therefore, additional steps must be taken to insure miners can locate and utilize these lifesaving devices.

The Union believes that lifelines located throughout the mine, beginning at the face of the working section and traveling the entire underground area of the mine to the closest surface opening should intersect each SCSR storage location along that escapeway. These lifelines must enter each SCSR cachet and then guide the miner to the next storage location or to the surface, whichever is closer. This type of underground network will be essential in offering each

7

*Second*
McKinney Declaration - Attachment C

miner the best opportunity for a safe exit from the mine. We also recommend that the Agency require a lighting system, such as a strobe light, at each SCSR cachet to assist miners in locating them.

11) Under new paragraph 75.1714-4(c), operators are required to have separate SCSR storage in each escapeway. Where a mine has parallel and adjacent escapeways, under what circumstances would it be appropriate to allow a hardened room or "safe haven" to serve both escapeways with one set of SCSRs? A hardened room is a room constructed with permanent seal techniques, submarine-type doors opening to both escapeways, and positive ventilation from the surface through a borehole. Is a safe haven an acceptable alternative? If so, what should be the minimum criteria for MSHA to accept a hardened room or safe haven?

**UMWA Response:**

The question as structured and based on the nature of mining is confusing. If the basis for the question is, is a "safe haven or a hardened room" a suitable alternative for a mobile mine rescue chamber, the Union must respond emphatically no.

The Union does not object to the construction and maintenance of a "safe haven or a hardened room" as defined in the ETS. However, anything with less than what is outlined in the ETS cannot be considered. There are few places within the mine to be considered "safe" and none that are havens, so the Union will settle for nothing less than the Agency has subscribed to in the emergency standard. The Union does reserve the right to assess these requirements further and increase the requirements noted by the Agency as necessary.

We have also heard what the industry has suggested on this issue and those suggestions must be immediately rejected. These deviations from the emergency standard are deceiving to miners and an insult to the health and safety of those within the industry.

The Union believes there may be instances where a hardened room, that is a room constructed with permanent seal techniques, submarine-type doors opening to both escapeways, and positive ventilation from the surface through a borehole, would be functional and should be placed in use. However, MSHA and the industry cannot be permitted to lose sight of the need for mobile rescue chambers that are located near the area where miners work and provide safety in the event they are unable to escape a mine disaster. These devices must be standardized through regulation and their implementation required in all mining operations.

12) Currently, cone systems on lifelines vary, some with the cones pointing toward the face, and others pointing away from the face. Miners may become confused in an emergency as to the direction of escape. Should cones or other directional indicators on lifelines be standardized? Following a NIOSH recommendation and for ease of movement, should the point end of the cone be toward the face?

*second*
McKinney Declaration - Attachment C

**UMWA Response:**

Yes, there must be standard requirements for the installation of lifelines throughout the industry. The Union concurs with the recommendations of NIOSH and would seek to have it part of the Rule. The Union also believes that all lifelines should be made of flame resistant material.

13) Miners should be able to safely evacuate a mine without the use of mechanized transportation. There may be unique escapeway conditions, including ladders, mandoors, airlocks and overcasts, where hands-on experience of these conditions is required to quickly and safely escape the mine. Is it reasonable to require that miners walk the escapeways at least under these unique escapeway conditions? Should all miners be required to walk the escapeway in its entirety rather than use mechanized transportation during the drills required by new paragraph 75.1502(c)? We are considering including a requirement in the part 48 training program for new miners that new miners travel, at least in part, both escapeways. Would this training be appropriate, and should the training include walking out part or all of the escapeways?

**UMWA Response:**

The Union is convinced that a miners' knowledge of the escapeway, including any unique conditions that exist are extremely important in aiding their ability to safely and effectively exit the mine in the event of an emergency. This knowledge can only be acquired by having the individual experience these conditions. However, it would be ineffective to have a "forced march" of the escapeway simply to comply with a regulation that's intent is extremely useful. Therefore, the Union would seek to have miners know and walk their escapeways in a methodical manner that affords them the ability to understand the conditions and deal with potential hazards. Miners could walk specific segments of the escapeway every 90 days to familiarize themselves with conditions, SCSR storage cachets, unique hazards and other elements vital for their escape.

The UMWA has given considerable thought to this section of the ETS and determined that without rigid and specific requirements it will, by the nature of the industry and writing of the rule, quickly become ineffective. The Union would seek and the Agency must demand that walking the escapeway, as the Union proposed here, would be done only in the presence of a

Representative of the Secretary. This requirement would not add any undue burden to the Agency, since a Representative is required to perform this task every 90 days. Further, it would insure compliance and offer miners a better chance of escape in the event of an emergency.

*second*

McKinney Declaration - Attachment C

14)     A more instructive emergency evacuation practice may be provided by using realistic drills. For example, conducting a drill in smoke or using a realistic mouthpiece that provides the user with a sensation of actually breathing through an SCSR, commonly referred to as "expectations" training, are more realistic than simulation training. What other realistic emergency evacuation practices and scenarios would ensure that miners are better prepared to act quickly and safely in an emergency? We intend that scenarios required by the Approved Program of Instruction under paragraph 75.1502(a) be used to initiate the drills and to conduct the mine emergency evacuation drills required by paragraph 75.1502(c). For example, to start a drill, the section foreman may choose one of the mines' approved explosion scenarios. The foreman would gather the miners on the section and state where the explosion occurred, any special circumstances of the event, and conditions requiring immediate donning of SCSRs. The foreman and miners would then physically follow the best options for evacuation as they evacuate the mine. When the miners travel to the place or into the conditions that require immediate SCSR donning, the need to don the SCSR must be made clear so that it is understood by all.

**UMWA Response:**

The Union is convinced that the current method of training miners in the donning and use of SCSR's is flawed. Classroom instruction does not sufficiently test the individuals' ability to use the units in an emergency situation. This situation has existed for far too long and is part of the basis for legal proceeding filed by the UMWA against the Secretary.

The recent disasters have demonstrated many inadequacies in mining regulations and enforcement, not the least of which is training. The Union endorses the practice of realistic, in-mine training, under conditions that mimic emergency conditions. This "expectation training" would better prepare miners in the event a real emergency strikes.

The use of mouthpieces that simulate actual wearing an apparatus is very important for this training. The use of theatrical smoke would also be beneficial for realistic training scenarios. Clearly training should, to the extent possible, mimic conditions that will be encountered in the event emergency evacuation is necessary. This is the only type of training that will offer miners the best chance of surviving an actual event.

15)     We expect that the scenarios developed as part of the mine emergency and firefighting program of instruction under 75.1502(a) would be included as part of the emergency evacuation drills under 75.1502(c), making the drills more realistic. Should we further

clarify this issue in the final rule? Or are there additional requirements that should be included in this training to make it more realistic, such as conducting SCSR donning in a smoke-filled environment?

10

**UMWA Response:**

The Union would argue that it is extremely important that the Agency be as clear and concise as possible regarding this issue. The requirement should be as prescriptive as possible to insure realistic training is achieved. The scenarios should be outlined in detail in each mines Emergency Evacuation Plan. The act of donning an SCSR in a coal mine setting must be part of each drill. We would further argue that in order to achieve the best result from training the drills be made as realistic as possible, including the use of theatrical smoke.

The Union believes that compliance with a performance based requirement in this instance will not protect miners, nor will it enhance their ability to escape an emergency situation. Mine operators will either claim confusion by a loosely worded regulation or perform the bare minimum to meet the requirements. MSHA need only to look at the recent problems that have been reported with donning and using SCSR's to conclude a strict regulatory approach, backed with strong enforcement is necessary.

There should also be a requirement that mine operators routinely update and change the scenarios to insure they are an adequate learning tool. Drilling the same two or three scenarios time and time again will not prove to be adequate.

16) We are considering putting all emergency evacuation drill requirements in 75.1502. Thus, for example, the escapeway drill requirements under 75.383 pertaining to frequency of drills, how far miners travel in the drills, and the number of miners involved in each drill would be incorporated in two requirements under 75.1502. Under 75.383(b)(1), each mine must participate in a practice escapeway drill at least once every 90 days, but is only required to travel to the area where the split of air ventilating the working section intersects a main air course or 2,000 outby the section loading point, whichever distance is greater. Under new 75.1502, during the emergency evacuation drills, the miners must travel to the surface or to the exits at the bottom of the shaft or slope.

Section 75.383(b)(2) and (b)(3) require that practice escapeway drills occur at least once every six weeks, but only involve two miners and a supervisor. Miners systematically rotate taking these drills so that eventually all miners participate. Under new 75.1502, emergency evacuation drills are required for all miners, and at periods of time not to exceed 90 days. We will have to reconcile these differences. MSHA is requesting comments on incorporating all evacuation drill requirements in 75.1502. We are also considering requiring section bosses to travel both escapeways in their entirety prior to acting as a boss on any working section or at any location where mechanized mining equipment is being installed or removed.

11

*second*
McKinney Declaration - Attachment C

**UMWA Response:**

The Union has repeatedly stressed its support of requiring more frequent and inclusive escape drills. We do support the practice of miners training in the actual escapeway from their workplace. We do believe that requiring this training every 90 days for all miners will be helpful to them.

However, the Union has also identified potential problems with the Agency's current draft of the Rule. Without a Representative of the Secretary present during this training the UMWA is not confident that all mine operators will comply with this requirement. Therefore, the Union believes that MSHA should require such training when a federal mine inspector is present to participate with the miners. This Representative must complete this activity every 90 days as part of their inspection requirements, therefore, it places no additional burden on the Agency. Failure on the part of the Agency to require this provision will lead to mine operators failing to comply and miners will be no better off with regard to training than what is the current status of emergency evacuation.

The Union does not believe that this training will be effective if the Agency demands miners walk the entire escapeway every 90 days. Requiring miners walk from the deepest penetration of the mine to the surface, a distance of several miles in almost every instance, is not really training. The UMWA would support a more methodical approach to this matter. For example, miners could walk a portion of the escapeway every 90 days until it has been completed in its entirety. This incremental approach will allow for a more comprehensive training exercise. It would, if done properly, afford miners the ability to move slower and become more familiar with the features of the escapeway. Further it would permit miners to address questions that will arise in the event escape is required.

The Union is convinced that the Agency's proposal turns the training exercise into a forced march and will not result in effective training. While we applaud the attempt at a new approach, we do not believe it is correct.

17) We are also considering requiring that all mine fires be reported to MSHA including fires shorter than 30 minutes duration. This would address all mine fire hazards, including situations where a number of short duration fires occur. Should the definition for "accident" in 50.2(h)(6) be revised to include all unplanned underground mine fires, or fires of a particular type or duration, or occurrences at particular locations in the mine?

**UMWA Response:**

The Union is on record supporting a requirement that all fires of any duration be immediately reported to MSHA. The fact that there is a fire in a coal mine should be considered a situation that raises concerns for everyone involved with that operation, including the regulatory agencies. The fact of the matter is that under current requirements many fires, even those lasting longer than 30 minutes, do not get reported by the operator. There is no justifiable

12

*second*

McKinney Declaration – Attachment C

reason for such flagrant non-compliance and the Agency must take steps to correct this situation. The Union is convinced the only practical way to solve the problem is requiring that all fires be immediately reported.

Further, the Union does not believe that all mine operators generally posses the expertise necessary to adequately address a fire situation. The Agency must be contacted so the experts within its employ can make the proper assessment of the situation and determine the appropriate steps to take in controlling it.

Finally, far too often the conditions that lead to the fire in the first place are not corrected without enforcement action by the Agency. Mine operators routinely address the immediate concern, by putting out the fire, but do not take appropriate action to rid the area of the hazards that caused the event.

**Additional Comments, beyond the questions posed;**

In addition to the specific questions the Agency requested comments on, the Union also must offer comment on other aspects of the ETS. The Union is convinced this attempt by the Agency to improve emergency evacuation is a good first step, however, it does not adequately address the situation in its current form. Therefore, the Union offers the following recommendations to enhance the Temporary Standard. Any comments made in reply to the prior questions are to be incorporated into the following sections as well, and are not repeated simply to avoid unnecessary duplication.

**Accident Reporting;**

The Union believes that every mine operator should be required to report all mine accidents within a 15 minute time period from when they occur. It has become abundantly clear in the first months of this year that mine operators are failing to comply with such reporting requirements. Based on the facts that have come from the Sago and Alma disasters not all mine operators take these events seriously enough, nor do they report events fast enough to maximize safe rescue.

The Union believes that mine operators, given the information available cannot properly manage these types of events. Therefore, MSHA must be immediately notified and based on their expertise be presented with the opportunity to determine the proper course of action.

**Mine Rescue;**

On page 12254 of the *Federal Register* Volume 71, Number 46, MSHA notes that, [it] "can help in procuring extra mine rescue teams who can provide assistance at the accident site." This may be an accurate statement, however, it does not address the underlying problems that exists within the industry with regard to mine rescue teams.

Second
McKinney Declaration - Attachment C

The Agency has been aware for some time that the number of highly trained and motivated mine rescue teams has been on the decline. Conferences have been held around the Country since 1995 to address this problem, but the Agency has taken no action to positively address it. Instead, the Agency has acquiesced to the bottom line of coal operators and created mine rescue teams using risky and unmanageable schemes. This practice has left many mines, including medium and large operations, at great risk.

The Union is in support of the efforts by Pennsylvania Senator Arlen Spector to enhance mine rescue capabilities through a user fee type system. This financial incentive would be an important first step in rebuilding the Nation's mine rescue capacity. Likewise we are very encouraged by the recent legislation passed by Congress that strengthens many areas of miners' health and safety, including mine rescue teams. However, MSHA must now move to bolster this key element of mine health and safety. The Agency must abandon its current rescue team concept and draft regulations that require additional rescue teams, of uniform high quality. These teams must be well trained, well equipped and have experience with mine conditions, and any special mine rescue needs, at the operation they are to provide service to. There must be a testing and certification process to insure these teams are able to perform the duties that will be required in the event of a disaster.

The tools for accomplishing these goals were made available through the 1977 Mine Act and recent legislation, the time is now for MSHA to apply them.

**Mine Evacuation Plans:**

The Union agrees with the Agency's proposal to require a more comprehensive mine evacuation plan be submitted by the operator. In many instances the key to surviving an emergency situation is having a well thought out procedure that addresses potential problems before they occur.

The Agency has also implemented a new training regiment to assist miners in properly following these procedures and therefore, increase the chances of survival. The Union has previously commented on these training requirements to a major extent. There are, however, areas of concern with some sections of the ETS that could adversely impact its overall effectiveness.

The Union has long argued that donning a SCSR in an emergency situation can be extremely challenging. Both the Agency and NIOSH have also recognized this fact. The ETS, while outlining new training requirements regarding this matter, raises some additional and significant problems. The necessity for donning an additional unit during an escape is a reality based on the limited duration of the current devices. This places miners at significant risk when such activity must be done in an irrespirable atmosphere. Training will be extremely important in reducing this risk to the lowest possible level. However, the Agency cannot permit that to

*second*

McKinney Declaration – Attachment C

become the standard practice over the next 20 or 30 years. MSHA must include in the Final Rule language that forces technological advances and creates better, longer lasting units. This is the only way to insure miners lives are protected to the greatest degree possible.

The Union believes that the Agency should not permit the use of different type self-rescuers at any single location. As noted previously, donning multiple SCSR's of the same type is a difficult enough challenge under stressful conditions. The necessity to don a different unit under these conditions is ill-advised and dangerous. The Union recommends the Agency require operators to have a single model of SCSR at each individual operation. This would lessen confusion and panic, while offering miners the best chance for escape

**Training:**

The Union has argued previously, on a number of issues, that the current training required under Part 48 can no longer be expanded to include anything else. Therefore, any requirements for instruction or training with regard to this Final Rule must be in addition to and separate from that Part of the regulations.

**Immediate Notification:**

The Union supports the Agency's decision to require immediate notification by the mine operator in the event of an accident. There is no doubt that the sooner individuals with the necessary expertise arrive on the scene of an accident or disaster the better the chances for a successful outcome.

However, requiring the operator to run through a list of possible Agency contacts does not adequately address the issue. The Agency holds a unique responsibility regarding notification and must take a proactive approach to facilitating communications. The Agency must establish a call center at its Arlington headquarters to handle these matters. The center must be manned 24 hours a day seven days a week by employees of the Mine Safety and Health Administration who are familiar with mining and mining terminology. These individuals would be responsible for gathering the necessary information from the mine operator and disseminating to the appropriate MSHA officials. This single point of contact will improve emergency response and enhance rescue efforts.

The argument put forward by the operators during the hearings that, requiring immediate notification would overburden the system and inhibit their efforts to deal with the problem, must be disregarded in its entirety. Any operator who cannot initiate onsite emergency efforts and call the regulatory agency should not be in the mining business.

Second
McKinney Declaration - Attachment C

**Self-Contained Self-Rescuers**

The Union agrees with the need to have additional SCSRs in each working section and also having cachets stored at 30 minute intervals along the escapeways. However, there must be a comprehensive review of the effectiveness of the current units. The recent disasters have demonstrated a systemic problem in the devices. Reports by miners that the units are not operating must initiate an immediate response by MSHA. There must be a random sampling of these devices Nationwide to determine the nature of the problem and its extent.

The Union is also aware that mine operators are reporting results of tests that indicate the units are being "overbreathed". If these units are not providing adequate oxygen in controlled tests it should be obvious they will not function properly in an emergency situation. It is the opinion of the Union that SCSRs that do not supply all the necessary oxygen are not functional and should therefore not be approved for use. "Overbreathing" a unit simply means the device is not providing the intended protection. Such units cannot be relied on to protect miner in an emergency.

**Rescue Chambers**

The Agency failed to address the need to provide miners with a structure that will support life in the event an emergency occurs and they cannot escape. The UMWA believes these chambers are vital to miners when events warrant their use. The miners at Sago would have had a much greater chance of survival had a chamber been available on the section. Because of this fact the Agency must include a requirement for such facilities at strategic locations in all mines.

The chamber itself should be fire proof and explosion resistant. It must contain necessary survival items such as first aid equipment, water, food and oxygen. It must also have sanitary facilities and a means of communication with the surface separate from the general mine phone lines. In order to be most effective the chamber should be track mounted or placed on a skid. This will allow it to be stored within 1,000 feet of the face of each section. Additional units must be placed strategically throughout the mine to afford protection for miners working in outby and remote areas.

The introduction of these units will require the mine operator to submit training plans to the Agency. These plans should be written by mine management and the representative of the miners' at the operation. Every plan must stress the use and operation of the chambers, their locations and the fact that escape is the first thing each miner should attempt. Obviously, these plans will need to be detailed and the UMWA will be available to assist in plan writing and submission.

**Sealing Areas of the Mine:**

The Agency must repeal the language in 30 CFR Part 75.335 pertaining to sealing of mined out or abandoned areas. The Agency must instead revert back to the appropriate language

Second
McKinney Declaration - Attachment C

of Section 303(z)(2) and 303(z)(3) of the 1977 Mine Act that requires, "When sealing is required, such seals shall be made in an approved manner so as to isolate with explosion-proof bulkheads such areas from the active workings of the mine, and (3) In the case of mines opened on or after the operative date of this title, or in the case of working sections opened on or after such date in mines opened prior to such date, the mining system shall be designed in accordance with a plan and revisions thereof approved by the

Secretary and adopted by such operator so that, as each working section of the mine is abandoned, it can be isolated from the active workings of the mine with explosion-proof seals or bulkheads."

The Union is on record in numerous instances opposing the use of a lesser standard to construct seals. The recent mining disasters are absolute proof that the current sealing materials approved by the Agency over the years are not adequate to protect miners.

With regard specifically to the use of Omega Blocks or other similar products the Union demands the Agency immediately ban any further use of such products in any area of an underground mine. The process of placing production and profitability above the health and safety of miners must end.

The Agency must also reexamine its position on sealing areas of the mine. Operations that liberate limited amounts of methane over time may not be practical to seal. The time it takes for methane to accumulate beyond the explosive range, therefore rendering it harmless may take so long as to place the lives of miners at greater risk than if the area was ventilated.

The Agency must also consider what safety precautions must be followed for areas of the mines that are to be sealed. The Union believes the area should be monitored through a remote means to insure the atmosphere does not pose a threat to miners. Further, it may be necessary to evacuate the mine while the atmosphere behind the seals travels through the explosive range. Finally the Agency must consider requiring an inerting agent be pumped into the sealed area to eliminate the chance of an explosion.

**Increasing of Penalties:**

The Agency has been aware for some time that the penalty amounts and assessment scheme do not provide the necessary incentive to force compliance. The passage of the MINERS legislation addressed some of these problems. However, the system is still not adequate. The Agency must immediately raise the amount of every citation issued for violations of the law. The amount should reflect the nature of the infraction. Further, the Agency must limit conferencing of citations to only those that are clear abuses of inspector authority. The current practice of permitting mine operator to conference every citation only frustrates the system. The assumption must be that the inspector has written a valid citation. Any adjustment should only be done in extreme situations, not routinely. The current practice of adjusting citations basis only serves to frustrate the system. Finally, the fines should be the same for similar offenses without regard to the operator's size, profitability or other factors.

17

**Diligent Compliance**

The Agency notes on page 12254 of the *Federal Register* / Volume 71, Number 46 that, "Diligent compliance with safety and health standards and safety conscious work habits provide a substantial measure of protection against the occurrence of mine accidents and emergencies." While the Union does not dispute any part of the statement the Agency has failed to recognize the whole truth of the situation.

History has shown that the mining industry is not capable of self regulating. Given their own devices they will inevitably migrate away from health and safety requirements for the sake of enhanced production and greater profits. Therefore, having MSHA state the obvious does not address the need for diligent enforcement. The Union has stated time-and-time again that compliance within the industry is contingent upon regulatory enforcement. The Agency was designed intentionally by Congress to fill this requirement above all other charges. It is time the Agency return to that basic premise and protect miners through an aggressive enforcement regiment.

**Loss of Communications**

The Agency notes on page 12260 of the *Federal Register* / Volume 71, Number 46 that, "The 15 minutes begins when the mine operator determines an accident has occurred. MSHA is aware, however, that there are occasions, especially immediately after a fire or explosion when mine communications may be lost and it may take some time to re-establish contact and communicate that an accident has occurred."

The Union understands that such events may cause a loss in communications from the surface to underground sections of the mine or to the entire underground area of the mine. There is no way to determine how long this communication interruption could last. Therefore, the loss of communications should note preclude the operator from the immediate notification requirement. Given the current technology and monitoring systems available and in use at mining operations a loss in communications should only be one of many indicators that a potential problem has occurred. Because of these factors the operator must be required to contact MSHA with the information available to him within the mandatory time frame. MSHA can then determine what action should be taken to protect the health and safety of miners working at that operation.

**Flexibility**

The Union is aware of the numerous comments by mine operators suggesting that the final rule should be written to permit them flexibility when interpreting and applying the regulation. The Union strenuously objects to such a request and would demand the Agency write as prescriptive a final rule as possible.

18

*second*
McKinney Declaration - Attachment C

The Union believes to do anything other than this would allow the operator to create multiple standards for emergency evacuations throughout the industry and lessen the overall protections of the Nation's miners. The UMWA considers this a serious threat to the implementation of any meaningful regulation and would oppose such an attempt. The Union is convinced that the industry has not earned the right to any flexibility regarding regulation. Our experience has been, that in those instances where flexibility was granted, such as seals and other important protections, the industry seeks the cheapest solution, not the safest. This is not the appropriate means to protect miners.

The Union offers the following examples of increased flexibility MSHA has granted mine operators at the expense of miners' health and safety.

- Elimination of discussions on belt flamability.
- Eliminated discussions on increasing the number of qualified mine rescue teams.
- Eliminated discussions on surge/stockpile protections.
- Eliminated discussions on accident investigation procedures.
- Permitted the use of belt air to ventilate active working sections.
- Permitted the use of diesel generators in underground coal mines.
- Permitted a lesser standard for sealing areas of the mine.

Each of the actions noted above either eliminated costs mine operators may have incurred had work been completed on the issue or caused a measurable increase in productivity and profit. At the same time each permitted serious health and safety issues to go unaddressed or reduced the level of health and safety miners enjoyed prior to their enactment. The decisions made on some of these issues had a direct and detrimental impact on the miners at Sago, Aracoma and Darby. The Agency must adhere to a policy of strict enforcement of prescriptive regulations.

**Hearing Locations**

The Union reiterates its objection to the decision by the Agency to hold hearings that affect the lives of miners only at locations that generally exclude miners' participation. While hearings on other issues sometimes included locations outside the coalfields, this marks the first time that all the hearings were held at locations that made it extremely difficult for miners to participate. It is unacceptable for the Agency to do this under any circumstance, but is an even greater act of disregard for the needs of miners when the issue is so significant to their health and safety. Coal miners do not live in or sufficiently close to Denver, Colorado; Lexington, Kentucky; Arlington, Virginia or Charleston, West Virginia to participate in a meaningful way. Indeed, only three rank-and-file miners appeared at any of these hearings.

*second*

McKinney Declaration - Attachment C

Therefore, the Union is once again asking that at least two additional hearings be conducted on the ETS. We would suggest the following locations: Washington, Pennsylvania; Morgantown, West Virginia; Beckley, West Virginia and Tuscaloosa, Alabama. The Union is convinced that should the Agency fail to hold these hearings it would be doing a disservice to miners and further erode its already sagging credibility among those stakeholders.

20

*second*

McKinney Declaration - Attachment C