**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION,**<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>**DAVID DYE, Acting Assistant Secretary, Mine Safety and Health Administration, U.S. Department of Labor,**<br><br>    **Defendant.** | **Civil Action No.  06-1053 (JDB)** |

**MEMORANDUM OPINION**

In the wake of the mining tragedies in the spring of 2006 in West Virginia and Kentucky, the United Mine Workers of America, International Union ("UMWA"), several state and federal agencies, and Congress have all considered how to increase protections for underground coal miners.  Plaintiff UMWA has, in particular, raised concerns about the adequacy of regulations governing breathing devices known as "self-contained self-rescuers" ("SCSRs"), which are provided to coal miners for their protection in the event that the atmosphere is compromised, such as after a mine explosion or fire.  In this present action, plaintiff seeks an injunction from the Court ordering the Mine Safety and Health Administration, and all others acting in concert with them, to require (1) immediate and periodic random checks of SCSR units in coal mines, and replacements if faulty units are discovered; (2) immediate and recurring "hands-on, in-mine emergency-like training" for all underground coal miners that includes breathing through simulated SCSRs; and (3) inventory maintenance and reporting by operators that will enable the government to respond quickly to future problems with SCSR units.  Compl. at 6-7.  Plaintiff has

filed a motion for a preliminary injunction requesting the provision of such relief during the

pendency of this action, on the ground that miners continue to be exposed to a substantial risk of

injury and death absent immediate relief.  Defendant has moved to dismiss pursuant to Fed. R.

Civ. P. 12(b)(1) and 12(b)(6) on the ground that plaintiff has failed to meet the threshold

requirements for relief in the nature of mandamus and has circumvented statutory provisions that

would limit any relief potentially available to a circuit court of appeals.  The Court concludes that

plaintiff has failed to state a claim upon which relief can be granted, and that any latent claims

based on unreasonable delay by MSHA are beyond this Court's jurisdiction.   Accordingly, the

Court will dismiss this action and also deny plaintiff's motion for a preliminary injunction.

## BACKGROUND

**I.      Statutory and Regulatory Background**

The Federal Mine Safety and Health Act of 1977[1] ("Mine Act" or "Act") places regulation

of the entire mining industry under a single statute, and assigns to the Secretary of Labor, acting

through the Mine Safety and Health Administration ("MSHA"), the task of developing,

promulgating and revising mandatory health and safety standards, as well as inspecting mines and

enforcing such standards.  See generally Oil, Chem. and Atomic Workers Int'l Union v. Zegeer,

768 F.2d 1480, 1482 (D.C. Cir. 1985) ("OCAW"). Section 101(a) of the Act directs the Secretary

to promulgate "improved mandatory health or safety standards for the protection of life and

prevention of injuries in coal or other mines." 30 U.S.C. § 811(a).  Section 101(b) further directs

the Secretary to promulgate emergency temporary mandatory standards where she has made a

---

[1]  The Act was originally referred to as the Federal Coal Mine Health and Safety Act of
1969.  See Pub. L. 91-173, 83 Stat. 742 (1969).  In the 1977 amendments to that statute, Congress
redesignated it the Federal Mine Safety and Health Act of 1977.  See Pub. L. 95-164, § 101, 91
Stat. 1290 (1977).  The Act is codified in scattered sections of title 30 of the United States Code.

determination that miners are exposed to "grave danger" under certain circumstances.  Id. § 811(b).  An emergency standard takes immediate effect upon publication in the Federal Register, and also serves as a proposed rule for the rulemaking proceeding authorized under section 101(a).  Id.  The Secretary must complete the permanent health or safety standards no later than nine months after publication of the emergency standard.  Id.

Section 103(a) of the Act provides that authorized representatives of the Secretary of Labor (or the Secretary of Health and Human Services) shall make "frequent inspections and investigations" in mines each year for the purpose of, inter alia, obtaining, utilizing, and disseminating information relating to health and safety conditions and regulatory standards, determining whether an imminent danger exists, and determining compliance with the Act.  Id. § 813(a).  Underground coal mines must be inspected at least four times per year with respect to imminent danger and compliance determinations.  Id.  Moreover, "[t]he Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws."  Id.

MSHA first promulgated standards governing self-rescue units generating oxygen, commonly referred to as SCSRs, in 1978.  See 43 Fed. Reg. 54241 (Nov. 21, 1978).  These regulations are set forth at 30 C.F.R. §§ 75.1714 to .1714-3.  Each mine operator is required to make available to each miner who goes underground an approved SCSR that is adequate to protect the person for at least one hour, and must instruct and train such person in the use and

location of the device. 30 C.F.R. § 75.1714(a) and (b).[2]  Mine operators also must provide for

inspection, testing, maintenance, repair, and recordkeeping for SCSRs pursuant to 30 C.F.R.

§ 75.1714-3.[3]

On March 9, 2006, MSHA promulgated an emergency standard "in response to the grave

danger which miners are exposed to during underground coal mine accidents and subsequent

---

[2]  Section 75.1714 provides:

      (a)  Each operator shall make available to each miner who goes underground, and to visitors authorized to enter the mine by the operator, an approved self-rescue device or devices which is adequate to protect such person for 1 hour or longer.

      (b) Before any miner employed by the operator or visitor authorized by the operator goes underground the operator shall instruct and train such person in the use and location of the self-rescue device or devices made available at the mine.  Instruction and training of miners and visitors shall be in accordance with provisions set forth in 30 CFR Part 48.

[3]  Section 75.1714-3 provides:

      (a) Each operator shall provide for proper inspection, testing, maintenance, and repair of self-rescue devices by a person trained to perform such functions.

      (b)  After each time a self-rescue device is worn or carried by a person, the device shall be inspected for damage and for the integrity of its seal by a person trained to perform this function.  Self-rescue devices with broken seals or which are damaged so that the device will not function properly shall be removed from service.

      (c)  All FSRs [filter self-rescuers] approved by MSHA and NIOSH under 42 CFR part 84, except devices using vacuum containers as the only method of sealing, shall be tested at intervals not exceeding 90 days by weighing each device on a scale or balance accurate to within +1 gram.  A device that weighs more than 10 grams over its original weight shall be removed from service.

      (d)  All SCSRs approved by MSHA and NIOSH under 42 CFR part 84 shall be tested in accordance with instructions approved by MSHA and NIOSH.  Any device which does not meet the specified test requirements shall be removed from service.

      (e)  At the completion of each test required by paragraphs (c) and (d) of this section the person making the tests shall certify by signature and date that the tests were done.  This person shall make a record of all corrective action taken.  Certifications and records shall be kept at the mine and made available on request to an authorized representative of the Secretary.

      (f) Self-rescue devices removed from service shall be repaired for return to service only by a person trained to perform such work and only in accordance with the manufacturer's instructions.

evacuations," responding in particular to the fatalities at the Sago Mine and the Aracoma Alma No.1 Mine in West Virginia during January 2006.  71 Fed. Reg. 12252, 12253-54 (Mar. 9, 2006). The emergency standard includes requirements for immediate accident notification to MSHA by mine operators, the provision of additional SCSRs for all underground coal mines, SCSR storage and use, evacuation training, and the installation and maintenance of lifelines.  Id. at 12252.

With respect to SCSRs, at least one additional SCSR that will provide protection for at least one hour must be stored for each individual underground.  Id. at 12263, 12270 (codifying requirement at 30 C.F.R. § 75.1714-4(a)).  "Thus, each miner or person underground will have the self-rescuer device that is traditionally carried with him or her and an additional SCSR readily accessible."  Id. at 12263.  In mines where two SCSRs will not provide enough oxygen for all persons to safely evacuate under emergency conditions, the operator must provide additional SCSR devices in the primary and alternate escapeways.  Id. at 12264, 12270 (codifying requirement at 30 C.F.R. § 75.1714-4(c)).  The emergency standard also increases the required SCSR training from once each year to at least every 90 days, and adds a requirement to provide new miners with "hands-on training" in the transfer of SCSRs.  Id. at 12254-55, 12268-69 (codifying these requirements at 30 C.F.R. §§ 48.5, 48.6, 48.8, 48.11, and 75.1502).  With these changes, SCSR training now must include "[h]ands-on training" in the donning, use, and transfer of SCSRs as part of quarterly mine evacuation drills, to provide a more realistic training environment.  Id. at 12254-55, 12262.  MSHA solicited comments on several issues related to SCSRs, including the imposition of a semi-annual SCSR inventory reporting requirement on operators, reporting requirements related to SCSR use and malfunctions, and any "alternative realistic emergency evacuation practices."  Id. at 12262, 12265.  Pursuant to section 101(b), by December 9, 2006, MSHA must promulgate a permanent health or safety standard on the matters

covered by the ETS.

On June 15, 2006, Congress enacted the Mine Improvement and New Emergency Response Act of 2006, Pub. L. 109-236, 120 Stat. 493 (2006) ("MINER Act"), which took effect the same day.  Under section 2 of the MINER Act, each underground coal mine must, within 60 days of enactment, "develop and adopt a written accident response plan that complies with this subsection with respect to each mine of the operator," which must then be submitted to MSHA for review and approval.  120 Stat. at 493-94 (to be codified at 30 U.S.C. § 876(b)(2)).  In determining whether to approve a particular plan, the agency must consider all comments submitted by miners or their representatives.  Id.  The accident response plan must "provide for the evacuation of all individuals endangered by an emergency" and "provide for the maintenance of individuals trapped underground in the event that miners are not able to evacuate the mine." Id. at 493.  The plan also must provide for "post-accident breathable air" with respect to supplies, maintenance, and training, as follows:

> (I) emergency supplies of breathable air for individuals trapped underground sufficient to maintain such individuals for a sustained period of time;
> (II) . . . caches of self-rescuers providing in the aggregate no less than 2 hours per miner to be kept in escapeways from the deepest work area to the surface . . .;
> (III) a maintenance schedule for checking the reliability of self rescuers, retiring older self-rescuers first, and introducing new self-rescuer technology, such as units with interchangeable air or oxygen cylinders not requiring doffing to replenish airflow and units with supplies of greater than 60 minutes . . . ; and
> (IV) training for each miner in proper procedures for donning self-rescuers, switching from one unit to another, and ensuring a proper fit.

Id. at 494-95.

## II.    Factual Background

The complaint alleges the following facts, which are taken as true for the purpose of resolving defendant's motion to dismiss.  Proper use of SCSRs has been a long and recurring

problem in the mining industry.  Compl. ¶ 4.  Several SCSR units have not functioned properly, and the classroom-style training provided to miners to date does not afford them an opportunity to experience an SCSR as it will operate in a realistic emergency. Id. ¶¶ 4, 5.  In June 1999, MSHA and the National Institute for Occupational Safety and Health ("NIOSH") convened a joint conference to study SCSR devices, which resulted in an Advance Notice of Proposed Rulemaking ("ANPR") soliciting comment on SCSR issues developed at the conference, including problems with the proper donning of SCSRs, reliability, adequacy of training, and frequency of SCSR examinations by mine operators and manufacturers.  Id. ¶ 6 and 64 Fed. Reg. 36632 (July 7, 1999).  In 2001, MSHA withdrew the ANPR from its regulatory agenda, citing resource constraints and changing safety and health regulatory priorities. Compl. ¶ 7 and 66 Fed. Reg. 61866 (Dec. 3, 2001).  Since 2001, there have been no meaningful advances in SCSR reliability. Compl. ¶ 8.

Three coal mine tragedies this year have underscored the dangers posed by faulty SCSRs and inadequate training.  In January, an explosion at the Sago Mine in West Virginia resulted in 12 fatalities, and a fire at the Alma Aracoma Mine in West Virginia resulted in two more deaths; an explosion at the Darby No. 1 Mine in Kentucky in May resulted in three more deaths from asphyxiation.  Id. ¶¶ 9, 13-14; see also 71 Fed. Reg. at 12256.  In each of the accidents, it has been reported, underground coal miners attempted to utilize SCSRs, but were not able to use them in the intended manner or to their intended potential.[4]  Id. ¶ 9.  MSHA then issued an emergency

_____

[4]  The parties have submitted several news articles, declarations, and a state-sponsored preliminary report prepared for the Governor of West Virginia in support of their respective positions as to whether SCSRs were functional during the West Virginia and Kentucky mining accidents.  See, e.g., Letter from Randal McCloy, Jr., to Families of Victims of the Sago Mine Disaster, Apr. 26, 2006 (Pl.'s Mot., Ex. 2); Affidavit of Dennis Bryan O'Dell ¶¶ 4-6, 8 (June 7, 2006) (Pl.'s Mot., Ex. 5); *Breathing Units at Darby Mine Same as Those at Sago*, Courier Journal,
(continued...)

standard in March 2006 to assist miners in successfully escaping and surviving an emergency

event; however, plaintiff alleges that the emergency standard is inadequate because it does not

provide for any testing of existing SCSR units to determine if the units are operating properly, nor

does it include "emergency-like" drills.  Id. ¶ 10.

By letter dated May 1, 2006, plaintiff asked MSHA to implement a comprehensive review

of the reliability of SCSR units and to enhance the training of all active miners in the use of SCSR

breathing devices.[5]  Id. ¶ 11.  MSHA's response indicated that it had developed "an action plan to

address proper training on SCSRs and functionality of devices," and that it would place special

focus on donning and exchanging SCSRs as the new emergency standard training requirements

were implemented.  Id. ¶ 12.  But it did not commit to require any random testing of SCSRs or

training of miners in "in-mine, emergency-like conditions" that would enable miners to

experience the labored breathing that is typical when the devices are actually deployed.  Id. ¶ 14.

---

[4](...continued)
May 22, 2006 (Pl.'s Mot., Ex. 6); *119 Mine Breathing Devices Defective*, July 8, 2006 (Pl.'s Opp. Mem., Ex. 2); J. DavittMcAteer & Associates, *The Sago Mine Disaster: A Preliminary Report to Governor Joe Manchin III*, July 19, 2006, at 13, 49-54 (Pl.'s Notice of Filing, July 21, 2006); Decl. of Ray McKinney, MSHA, Administrator for Coal Safety and Health (undated) (Def.'s Mem., Attachment A); Decl. of Jeffrey Kravitz, MSHA, Chief Mine Emergency Operations and Special Projects (June 16, 2006) (Def.'s Mem. Att. E); Second McKinney Decl. (July 25, 2006) (Def.'s Reply Mem. Attachment); Second Kravitz Decl. (July 28, 2006) (Def.'s Rely Mem. Attachment).  Defendant's exhibits also discuss the adequacy of its current "action plan" and "policy letter" for addressing the concerns raised by plaintiff -- a matter that plaintiff disputes. For the purpose of resolving defendant's motion to dismiss, the Court assumes, as plaintiff alleges, that the SCSRs were not fully functional, that inadequate training contributed to the lack of use to their full potential, and that the action plan and policy letter do not require the specific measures plaintiff seeks. These extra-pleading documents were presumably submitted to support or oppose the issuance of a preliminary injunction, but having determined that the defendant's motion to dismiss must first be resolved, the Court has limited its consideration to the factual allegations of the complaint and the documents referenced therein.

[5] Plaintiff's letter is attached to its motion for preliminary injunction as Exhibit 3. MSHA's response is attached as Exhibit 4.

The Darby explosion occurred less than a week after MSHA's response.  Id. ¶ 13.
Problems with SCSRs were widely reported, and miners throughout the country are concerned
about whether SCSRs will protect them in an emergency.  Id.  MSHA still took no action in
response to plaintiff's letter.  Id. ¶ 14.

Davitt McAteer, a former MSHA Administrator and currently the lead investigator of the
Sago disaster for the State of West Virginia, has suggested that random testing of 1 percent of
SCSRs throughout the country be performed because "either the device has some problem or else
the training has some problem."  Id. ¶ 15.  Some coal mine operators have performed voluntary
spot checks of government-approved SCSRs in use at their mines and determined that some units
suffer from substantial shortcomings in their reliability and the duration of available oxygen.  Id.
¶ 16.  Miners are exposed to potential injury and death from faulty SCSRs in the absence of
methodical checks on SCSR units and "hands-on, in-mine emergency-like" training in their use.
Id. ¶¶ 17, 19.

On the basis of this background and the concerns raised, plaintiff requests issuance of a
preliminary and permanent injunction ordering MSHA, and all others working in active concert
with them, to require (1) immediate and periodic random checks of SCSR units in coal mines, and
replacements if faulty units are discovered; (2) immediate and recurring "hands-on, in-mine
emergency-like training" for all underground coal miners that includes breathing through
simulated SCSRs; and (3) inventory maintenance and reporting by operators that will enable the
government to respond quickly to future problems with SCSR units.  Compl. at 6-7.  Defendant
has opposed plaintiff's motion for a preliminary injunction and has moved to dismiss the action.

## STANDARD OF REVIEW

Defendant contends that the relief sought by plaintiff is in the nature of mandamus, and

plaintiff does not dispute this.[6]  The Mandamus Act states that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  Pursuant to the Act, a court has jurisdiction to grant mandamus relief only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  Fornaro v. James, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)); accord In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005); Ganem v. Heckler, 746 F.2d 844, 852 (D.C. Cir. 1984).  "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action."  In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).  Even if a plaintiff satisfies all three elements, whether the extraordinary remedy of mandamus should issue is discretionary.  Id.

In resolving a motion to dismiss an action for relief in the nature of mandamus, courts have characterized the issue as involving both a jurisdictional and a merits inquiry because, in determining whether the court has jurisdiction to compel an agency or official to act, it must consider the merits question of whether a legal duty is owed to the plaintiff under the relevant

---

[6]  Plaintiff's complaint does not refer to any statutory bases for this action except for the All Writs Act, 28 U.S.C. § 1651(a).  It is well-settled, however, that "the Act itself is not a grant of jurisdiction."  In re Tennant, 359 F.3d 523, 527 (D.C. Cir. 2004).  The All Writs Act provides that the federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (emphasis added).  This statutory language thus makes clear that the authority to issue writs is confined to the issuance of process "in aid of" jurisdiction which is created by some other source and not otherwise enlarged by the Act.  In re Tennant, 359 F.3d at 527.

Furthermore, review of plaintiff's complaint pursuant to standards governing mandamus is appropriate where an injunction is sought to compel a federal official to perform a statutorily required duty and only a general federal question is alleged.  See Swan v. Clinton, 100 F.3d 973, 976-77 n.1 (D.C. Cir. 1996).

statute.  See In re Cheney, 406 F.3d at 729 (noting that to the extent a court considers whether a statute creates a duty, "mandamus jurisdiction under [28 U.S.C.] § 1361 merges with the merits").  Whether a motion to dismiss a mandamus action should be considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) is a matter on which there are "conflicting signals," and little detailed analysis.  See Ahmed v. Dep't of Homeland Security, 328 F.3d 383, 386-87 (7th Cir. 2003) (discussing the lack of clarity in the case law over whether a plaintiff's alleged failure to satisfy mandamus requirements is jurisdictional).  The Court of Appeals for this Circuit had at one point signaled that the matter should be considered one of jurisdiction.  See Swan, 100 F.3d at 976-77 n.1 (citing with approval Willis v. Sullivan, 931 F.2d 390, 395-96 (6th Cir. 1991), for the principle that mandamus requirements "go to [a] court's jurisdiction under [the] mandamus statute, although often discussed in merits terms as to whether a writ of mandamus should be issued").  But its more recent decision in In re Cheney signals that the matter is properly considered as a merits issue (and thus, pursuant to Rule 12(b)(6)), both in its characterization of the jurisdictional and merits inquiries as "merged" and in the purposeful manner in which it limited its review of the record to the sufficiency of the complaint and the documents attached thereto.  In re Cheney, 406 F.3d at 729-30.[7]  Therefore, defendant's request for dismissal on the ground that plaintiff has failed to allege facts entitling it to relief in the nature of mandamus will be considered pursuant to Rule 12(b)(6).  To the extent defendant contends that the judicial review provisions of the Mine Act provide for exclusive jurisdiction in another court, defendant's motion will be considered pursuant to Rule 12(b)(1).

---

[7]  In limiting review to the complaint and attachments, the Court of Appeals relied on EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997), which emphasized that failure to meet a statutory requirement (in that case, under the Americans with Disabilities Act) should be considered on the merits pursuant to Rule 12(b)(6), instead of as a jurisdictional defect pursuant to Rule 12(b)(1).

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979). Therefore, the plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. Trudeau v. Federal Trade Comm'n, --- F.3d ---, 2006 WL 2087122, *11 (D.C. Cir. July 28, 2006) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

A motion to dismiss pursuant to Rule 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987). All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005) (quoting Conley, 355 U.S. at 47). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has

jurisdiction, and a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001); see also Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998). "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

Thus, a motion to dismiss tests the sufficiency of the complaint and typically excludes consideration of documents outside of the complaint. However, the Court may consider documents specifically referenced in the complaint where the authenticity of the document is not questioned. See Newborn v. Yahoo!, Inc., 391 F. Supp. 2d 181, 188 n. 6 (D.D.C. 2005); see also New York State Bar Ass'n v. F.T.C., 276 F. Supp. 2d 110, 114 n. 6 (D.D.C. 2003) ("[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned.") (quoting Cooper v. Pickett, 137 F.3d 616, 622-23 (9th Cir. 1997)). In the present case, the complaint cites plaintiff's May 2006 letter to MSHA requesting SCSR inspections and enhanced training, as well as MSHA's response, and plaintiff attaches those letters to its motion for preliminary injunction, filed simultaneously with the complaint. Because the complaint relies upon the letters and the authenticity of those documents is not questioned, the Court may properly consider them in resolving the motion to dismiss.

To prevail on an application for a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) that he will suffer irreparable harm absent the relief requested; (3) that other interested parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004); <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir.

2001); <u>Taylor v. Resolution Trust Corp.</u>, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995); <u>Washington

Area Metro. Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977).  If a

plaintiff has no likelihood of success on the merits, inquiry into the remaining factors is

unnecessary, for the injunctive relief must be denied on that ground alone.  <u>See</u> <u>Trudeau</u>,  --- F.3d

---, 2006 WL 2087122, *3 n.2 (noting that a court may not issue a preliminary injunction where

the plaintiff has no likelihood of success on the merits).

## DISCUSSION

### I.   Absence of Clear Duty to Act

Defendant moves to dismiss for failure to state a claim on the ground that plaintiff has

failed to establish the second element for mandamus relief -- a clear duty to take the actions

sought by plaintiff.  Def.'s Mem. at 20-25.[8]  Plaintiff argues in response that it has a right to relief

"based on the extraordinary risk posed to underground coal miners who will have to rely on

SCSRs in upcoming mine emergencies."  Pl.'s Opp. Mem. 8-12.  Plaintiff also contends that

several provisions of the Mine Act obligate defendant to implement the SCSR inspections,

training, and inventory it seeks and, furthermore, that an unreasonable delay action independently

creates a right to relief under the Mandamus Act.  Pl.'s Reply Mem. at 2-4, 11-16.

Plaintiff's briefs, like its complaint, contain few references to the law.  Instead, plaintiff

focuses primarily on the threat to miner safety that is posed by reportedly faulty and outdated

SCSRs and a lack of realistic training, a threat plaintiff illustrates with a detailed recounting of the

---

[8]  For ease of reference, the Court will refer to the briefs in support of defendant's motion
to dismiss as Def.'s Mem. and Def.'s Reply Mem., and the briefs in support of plaintiff's motion
for preliminary injunction and in opposition to defendant's motion as Pl.'s Opening Mem., Pl.'s
Opp. Mem., and Pl.'s Reply Mem.

mining disasters in West Virginia and Kentucky.  The loss of lives, and the risks miners presently

face, weigh heavily in public discourse and are taken seriously by this Court.  But the tragedy of

those events, and the need for greater protection described by plaintiff, cannot substitute for the

requirements of the law.

The few Mine Act provisions cited by plaintiff relate to the protection of the health and

safety of miners generally, and reveal no indicia of a clear and compelling duty to require the

specific SCSR inspections, training, and inventory requirements sought by plaintiff.  The

provisions relied upon by plaintiff consist of the Congressional findings and declaration of

purpose in section 2 of the Mine Act, and the requirement to promulgate regulations in section

101.  Section 2 states:

> Congress declares that --
>
> (a) the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource -- the miner;
>         . . .
> (c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines; [and]
>         . . .
> (g) it is the purpose of this chapter (1) . . . to direct . . . the Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners.

30 U.S.C. § 801(a) and (c).  With regard to the agency's standard-setting duty, section 101(a) of

the Act provides that the Secretary must "develop, promulgate, and revise as may be appropriate,

improved mandatory health or safety standards for the protection of life and prevention of injuries

in coal or other mines." Id. § 811(a).  The Secretary also must promulgate emergency standards

"if he determines (A) that miners are exposed to grave danger from exposure to substances or

agents determined to be toxic or physically harmful, or to other hazards, and (B) such emergency

standard is necessary to protect miners from such danger." Id. § 811(b).

It is evident from the plain language of these provisions that defendant does not have a "clear and compelling" duty to require the periodic random checks of SCSRs and the specific training and inventory maintenance sought by plaintiff.  The manner in which the agency's regulatory authority is implemented requires the exercise of discretion.  See Secretary of Labor ex. rel. Wamsley v. Mutual Mining, Inc., 80 F.3d 110, 113-14 (4th Cir. 1996) (noting that MSHA's rulemaking function requires it to "evaluate a wide variety of information regarding the operation of the mining industry" and exercise its "historical familiarity and policymaking expertise" that are the basis for judicial deference).  Neither section 2 nor section 101 sets forth specific inspection, training or inventory requirements for SCSRs to achieve the broad goals of improved miner health and safety -- indeed, SCSRs are not referenced in these sections at all.[9] Moreover, plaintiff concedes that "MSHA may have some discretion in deciding how to craft certain regulations and in determining which regulations would best promote miners' safety." Pl.'s Opp. Mem. at 10.  This concession is fatal, as there can be no clear and compelling duty to act where an agency has been granted discretion.  See Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) ("SUWA") (noting that relief in the nature of mandamus is "normally limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatever'") (citations omitted); see

---

[9]  Requirements governing SCSRs are, as noted previously, set forth at 30 C.F.R. § 75.1714-.1714.4, and requirements governing mine inspections are set forth at 30 U.S.C. § 813. However, plaintiff does not allege that any of these provisions require MSHA to take the specific actions plaintiff seeks, and, in fact, appears to allege just the opposite.  See Pl.'s Reply Mem. at 8 ("neither the pre-existing training requirements, nor the ETS require the kind of training that the UMWA seeks in this action"); id. at 13 ("MSHA has not passed regulations requiring testing of SCSRs").  The Court has nonetheless reviewed those other regulatory provisions and finds no provision requiring MSHA to take the specific actions sought by plaintiff.

also In re Cheney, 406 F.3d at 729, 731 (requiring demonstration of a "clear and indisputable" duty); Haneke v. Secretary of Health, Ed. & Welfare, 535 F.2d 1291, 1296 & n.15 (D.C. Cir. 1976) (noting that the mandamus remedy is to be utilized only if "the duty of the officer to act is clearly established and plainly defined and the obligation to act is peremptory").

In an attempt to save its case, plaintiff seeks to recast its request for mandamus relief as based on an unreasonable delay of agency action in protecting human life under the principles set forth in Telecommunications Research and Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC"). See Pl.'s Reply Mem. at 12-13. However, the threshold requirement of a clear duty to act cannot be so easily circumvented. As the Supreme Court has noted in the context of unreasonable delay claims brought pursuant to the APA, "a delay cannot be unreasonable with respect to action that is not required." SUWA, 542 U.S. at 64 n.1. In other words, even in the context of an unreasonable delay claim, a plaintiff still must establish a clear duty to act under the relevant statute. See In re American Rivers and Idaho Rivers United, 372 F.3d 413, 418 (D.C. Cir. 2004) (explaining that unreasonable delay may present a circumstance warranting mandamus where there is a "transparent violation[] of a clear duty to act," and thus, "[i]n considering a charge of unreasonable delay . . . [the court] must satisfy [itself] that the agency has a duty to act and that it has 'unreasonably delayed' in discharging that duty") (citations omitted, emphasis added).

The only duty alluded to by plaintiff not already discussed above is, at best, a duty to take final action on the 1999 Advance Notice of Proposed Rulemaking ("ANPR") pertaining to SCSRs or plaintiff's May 2006 letter to MSHA requesting SCSR inspections and enhanced training. See Compl. ¶ 6-7, 14; Pl.'s Opp. Mem. at 12; Pl.'s Reply Mem. at 13. Assuming without deciding that

MSHA is under a duty to take rulemaking action pursuant to the ANPR or plaintiff's letter,[10] relief for such a claim is not available in a district court.  Jurisdiction over the unreasonable delay claim would lie exclusively in the court which has jurisdiction to review the final action sought, which the Mine Act limits to the United States Court of Appeals for the District of Columbia Circuit or another appropriate circuit. See TRAC, 750 F.2d at 77-79 ("where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals"); 30 U.S.C. § 811(d) (providing that judicial review of a "mandatory health or safety standard promulgated under this section" is available in the United States Court of Appeals for the District of Columbia Circuit or the circuit in which the adversely affected person resides or has his principal place of business). Accordingly, any claim of unreasonable delay in promulgating such a standard lies within the exclusive jurisdiction of the appropriate circuit, rather than a district court.  See OCAW, 768 F.2d at 1483 (noting that TRAC eliminated district court jurisdiction over petitioner's claim that agency had unreasonable delayed promulgation of emergency standards under 30 U.S.C. § 811).

The ANPR and plaintiff's letter are, in any event, minimally relevant diversions.  It is self-evident from plaintiff's papers that the relief it seeks from this Court is not final action from

_____

[10]  Where a person submits a petition for rulemaking to MSHA, and the agency delays acting upon it, MSHA clearly would be subject to an action for unreasonable delay.  See In re Int'l Union, United Mine Workers of America, 231 F.3d 51, 54-55 (D.C. Cir. 2000) (recognizing potential availability of mandamus relief in the Court of Appeals for unreasonable delay where UMWA petitioned for emergency standard, but dismissing claim because MSHA had initiated a proposed rule to regulate the matter); OCAW, 768 F.2d at 1485-87 (holding that where adversely affected persons petitioned MSHA for promulgation of a standard under 30 U.S.C. § 811, and the agency responded by issuing an ANPR, the alleged delay by the agency in taking final action was subject to judicial review by the Court of Appeals).  Whether a claim for unreasonable delay may stand based solely on an ANPR, or where no petition for rulemaking is submitted, is unclear. Plaintiff's May 2006 letter is not styled as a petition for an emergency or permanent standard, but the Court will assume it is for the purpose of evaluating plaintiff's claim of unreasonable delay.

MSHA on the ANPR or its May 2006 letter, but instead an order that would <u>sua</u> <u>sponte</u> judicially define the scope and substance of such a final action -- the implementation of immediate and periodic random checks of SCSRs, in-mine emergency-like training with simulated SCSRs, and specific inventory requirements.  But the substance of a final action on the ANPR or an administrative petition is a matter within the agency's discretion, subject to judicial review by the appropriate court of appeals, and may not be predetermined by a court.  <u>See</u> <u>In re Int'l Union, United Mine Workers of America</u>, 231 F.3d at 54 (emphasizing that, where UMWA sought emergency standard to address the problem of respirable coal dust, "[t]his is a matter that is committed to the agency's expertise in the first instance, and this court is in no position to pretermit the prescribed statutory process").  Plaintiff, in effect, seeks to accomplish an end-run around both the statutory limits on judicial review and basic principles of administrative law by seeking relief, in the first instance, in the nature of mandamus instead of proceeding before the agency.  But plaintiff's failure to identify a clear and compelling duty that the agency has failed to perform precludes relief in the nature of mandamus.

## II.    Availability of Adequate Remedy

Assuming <u>arguendo</u> that plaintiff could establish a clear duty to take the actions sought, the Court would nonetheless conclude that relief in the nature of mandamus would not be warranted because plaintiff has failed to meet the third mandamus requirement -- that there is no other adequate remedy available.  <u>See</u> <u>Fornaro</u>, 416 F.3d at 69.  Plaintiff could have sought judicial review of the March 2006 emergency standard pursuant to 30 U.S.C. § 811(d), had it filed within the 60-day statutory time limit.[11]  Plaintiff also may participate in the ongoing rulemaking

---

[11]  Plaintiff suggests that such a challenge would not have served any purpose because the action it seeks is beyond the scope of the emergency standard.  Pl.'s Opp. Mem. at 12.  But at least
(continued...)

proceedings on the emergency standard, as the agency prepares to proceed to final action on a permanent health and safety standard covering the same issues.  MSHA extended that comment period by 30 days, to June 29, 2006 (see 71 Fed. Reg. 29785 (May 24, 2006)), and the Court is informed that plaintiff submitted comments.  If plaintiff is dissatisfied with the final rule, it will have another chance to obtain judicial review in the appropriate circuit.  To the extent plaintiff believes the regulatory action it seeks is beyond the scope of the proposed rule (see Pl.'s Opp. Mem. at 12), plaintiff may pursue an administrative petition pursuant to 30 U.S.C. § 811(a) and 5 U.S.C. § 553(e) for promulgation of an additional emergency standard.  Plaintiff's suggestion that such a petition is unnecessary or futile in light of the absence of SCSR inspections in response to its May 2006 letter is disingenuous.  Plaintiff's letter did not request issuance of an emergency standard, and defendant's response does not indicate that it understood plaintiff's letter to be such a petition.  See Letter from Cecil Roberts, International President, UMWA, to David Dye, MSHA, May 1, 2006, at 1 ("I urge MSHA to initiate a comprehensive review of the reliability of [SCSR] breathing devices and to enhance training for their use," without reference to promulgation of additional standards) (Pl.'s Mot. for Prelim. Injunction Ex. 3); Letter from Dye to Roberts, May 16, 2006 (summarizing MSHA's regulatory actions with respect to plaintiff's SCSR concerns, including an "action plan to address proper training on SCSRs and functionality of

---

[11](...continued)
two of the measures it requests -- more realistic hands-on training with SCSR units and a comprehensive inventory of SCSR units at mine sites -- are explicitly addressed by that rulemaking.  See 71 Fed. Reg. at 12262 ("A reason for including [SCSR] training within the mine evacuation drill is to provide a more realistic training environment . . . . MSHA is asking for comments and suggestions on alternative realistic emergency evacuation practices to ensure that miners are prepared to act in an emergency"); id. at 12265 ("MSHA also solicits comments on the appropriateness of requiring mine operators to report the total number of SCSRs in use at each underground coal mine, semi-annually, to the MSHA District Manager" and also to report SCSR manufacturer, model, and serial numbers).

devices") (Pl.'s Mot. for Prelim. Injunction Ex. 4).

Moreover, the recently passed MINER Act, discussed above, requires each underground coal mine operator to submit an emergency response plan by August 14, 2006, and further requires that such plans contain certain provisions for "post-accident breathable air," including "a maintenance schedule for checking the reliability of self rescuers" and training in the donning of self-rescuers. Pub. L. 109-236, § 2, 120 Stat. at 494-95 (to be codified at 30 U.S.C. § 876(b)(2)(E)(iii)).  Plaintiff will have the opportunity to submit comments on such plans, and MSHA is under a duty to consider them.  120 Stat. at 493-94 ("the Secretary shall take into consideration all comments submitted by miners or their representatives").  Plaintiff thus has an opportunity to pursue checks on the reliability of SCSRs and enhanced training through the emergency response plans required under the MINER Act.  Considering these other available avenues of relief, the Court concludes that plaintiff has failed to demonstrate that the extraordinary remedy of mandamus is warranted.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to dismiss for failure to state a claim upon which relief can be granted.  Insofar as plaintiff's complaint is premised on unreasonable delay by MSHA in taking action on the ANPR or its May 2006 letter, those claims will be dismissed for lack of jurisdiction.  Having concluded that plaintiff has failed to allege facts that would entitle it to relief under the mandamus statute, it is also clear that there is no likelihood of success on the merits, and plaintiff's motion for preliminary injunction thus will be denied.  A separate order will be issued herewith.

/s/
JOHN D. BATES
United States District Judge

Dated:   August 23, 2006